No. 13-1876

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CLIFFORD CHARLES TYLER

       Plaintiff – Appellant

v.

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, named as Hillsdale County Sheriff's Office; STAN W. BURCHARDT, individually and as Sheriff of Hillsdale County, Michigan; ERIC H. HOLDER, JR, individually and as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; B. TODD JONES, individually and as Acting Director of The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives; THOMAS E. BRANDON, individually and as Deputy Director of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives; FEDERAL BUREAU OF INVESTIGATION; ROBERT S. MUELLER, III, individually and as Director of the Federal Bureau of Investigation; UNITED STATES OF AMERICA,

       Defendants – Appellees

and

KRISTE KIBBEY ETUE, individually and as Director of the Michigan State Police; RICK SNYDER, individually and as Governor of the State of Michigan,

       Defendants.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

## APPELLANT'S BRIEF ON APPEAL

Lucas J. McCarthy
233 Fulton St. E., Ste. 104
Grand Rapid, MI 49503
(616) 965-1088
Counsel for Appellant

## CORPORATE DISCLOSURES

Pursuant to 6th Cir. R. 26.1, Clifford Tyler makes the following disclosures:

1.    Said party is not a subsidiary or affiliate of a publicly owned corporation.

2.    There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURES……………………………………………………i

TABLE OF CONTENTS………….…………………………………………..ii

TABLE OF AUTHORITIES……………………………………………………vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT …………………………1

JURISDICTIONAL STATEMENT……………………………………………..2

STATEMENT OF ISSUES……………………………………………………...3

STATEMENT OF THE CASE…………………………………………………4

STATEMENT OF FACTS………………………………………………………7

SUMMARY OF ARGUMENT…………………………………………………...13

STANDARD OF REVIEW………………………………………………………18

ARGUMENT…………………………………………………………………...18

I.     18 U.S.C. § 922(g)(4) Burdens Conduct Protected Under the Second
       Amendment, Because the Government Cannot Conclusively Prove the
       Conduct was Outside the Second Amendment's Historical Scope……..21

       A. The Historical Evidence Does Not Conclusively Prove That 18 U.S.C. §
          922(g)(4) Regulates Activity Beyond the Scope of the Second
          Amendment…………………………………………………………..22

       B. *Heller's* Presumption of Legality for Longstanding Prohibitions on
          Firearm Possession Did Not Conclusively Determine That 18 U.S.C. §

922(g)(4) Regulates Activity Beyond the Scope of the Second

Amendment…………………………………………………………..28

    1.  The *Heller* Court Explicitly Stated It Was Not Determining the Scope

       of the Second Amendment………………………………………..29

    2.  Longstanding Firearm Prohibitions Are Still Subject to an As-Applied

       Challenge, Because a Presumption of Legality May Be Rebutted….30

    3.  Longstanding Prohibitions on Firearm Possession by the Mentally Ill

       Are Not Synonymous With a Prohibition Based on an Involuntary

       Commitment…………………………………………………………33

C.  18 U.S.C. § 922(g)(4) Does Not Define "Mentally Ill" for Purposes of

Determining Whether It Regulates Activity Beyond the Scope of the

Second Amendment……………………………………………………34

    1.  Nothing About the Plain Language of 18 U.S.C. § 922(g)(4) Indicates

       That Congress Intended It To Be a Definition of "Mentally Ill."…...34

    2.  Congress Did Not Clearly State That It Intended 18 U.S.C. §

       922(g)(4) to Define "Mentally Ill" for Second Amendment

       Purposes………………………………………………………………..35

    3.  The Historical Evidence Suggests That 18 U.S.C. § 922(g)(4) Fails to

       Convey the Public Understanding of "Mentally Ill" in 1791………..36

4.  Definitions in Modern Statutes Cannot Determine the Public Understanding of the Scope of the Second Amendment in 1791…...39

II.    18 U.S.C. § 922(g)(4) as Applied Is Not Substantially Related to an Important Government Interest Because It Fails to Advance any Important Government Interest…………………………………………42

A. This Court Must Find that § 922(g)(4) As Applied Fails to Advance any Important Government Interest, Because This Court Must Accept as Fact that Appellant is a Safe, Sane, Stable Individual Who Poses No Risk of Harm……………………………………………………………………44

B. A Review of 18 U.S.C. § 922(g)(4) As Applied Does not Impede Any Important Government Interest…………………………………………47

1.  The Fact of a Prior Commitment Cannot Alone Predict a Long-Term Risk of Future Violence……………………………………………..47

2.  The Government Has No Important Interest in Disarming Individuals Who Pose No Risk of Harm…………………………………………50

C. Finding 11 U.S.C. § 922(g)(4) Unconstitutional as Applied Does Not Require a Perfect Fit Between the Statute and an Important Government Interest……………………………………………………………..54

D. 18 U.S.C. § 922(g)(4) Must Be Substantially Related, Not Reasonably Related, to an Important Government Interest…………………………57

CONCLUSION…………………………………………………………...61

CERTIFICATE OF COMPLIANCE……………………………………...…63

CERTIFICATE OF SERVICE……………………………………………64

ADDENDUM: DESIGNATION OF RELEVANT DISTRICT COURT

DOCUMENTS……………………………………………………………65

# TABLE OF AUTHORITIES

<u>Constitutional Provisions</u>

Second Amendment……………………………………………………………*passim*

Fifth Amendment………………………………………………………………10-12, 19

Fourteenth Amendment……………………………………………………..10-12, 18-19


<u>Statutes and Regulations</u>

5 U.S.C. § 702 (2006)………………………………………………………………2, 4

18 U.S.C. § 922(g)(4)……………………………………………………..*passim*

18 U.S.C. § 925(c) (2006)………………………………………………………9

28 U.S.C. § 1291 (2006)………………………………………………………2

28 U.S.C. § 1331 (2006)………………………………………………………2

28 U.S.C. § 2201 (2006)…………………………………………………....2, 4

28 U.S.C. § 2202 (2006)………………………………………………………2, 4

28 U.S.C. § 2412 (2006)………………………………………………………2, 4

The Consolidated Appropriations Act, 2010, Pub. L. No. 111–117, 123 Stat.

3034………………………………………………………………………...9

Firearms Owners' Protection Act (FOPA), Pub. L. No. 99, 100 Stat. 449

(1986)……………………………………………………………………….50-51

NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 121 Stat. 2559…9

27 C.F.R. § 478.144 (2011)……………………………………………………...9

## Court Rules

Fed. R. App. P. 4(a)(1)(B)………………………………………………………….2

Fed. R. Civ. P. 12(b)(6)………………………………………………...5, 10, 12-13, 18

Fed. R. Evid. 301………………………………………………………………….30

## Cases

*Association of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545

(6th Cir. 2007)…………………………………………………………………….18

*Barrett v. United States*, 423 U.S. 212 (1976)…………………………………….51

*Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469 (1989)…………...57-58

*Britt v. State*, 681 S.E.2d 320 (N.C. 2009)……………………………………31-32

*Clark v. Jeter*, 486 U.S. 456 (1988)……………………………………….41-43, 57

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002)…………………………...43

*Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983)………………..50-51

*District of Columbia v. Heller*, 554 U.S. 570 (2008)………………………………..

…………....…………………………………10, 20-23, 26, 28-29, 40, 43, 51-52

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)………………………..21, 42

*Hill v. Blue Cross and Blue Shield of Michigan,* 409 F.3d 710 (6th Cir. 2005)……………………………………………………………………..18, 45

*Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585 (6th Cir. 2003)……………………………………………………………………...57-58

*Romer v. Evans*, 517 U.S. 620 (1996)……..………………………………………43

*States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012)………………………...52-53

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011)……………………………31

*United States v. Chamberlain*, 159 F.3d 656 (1st Cir. 1998)……………………..55

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012)………………...20-21, 31, 42

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)……………………………42

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)……………………………27

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2012)…………………………...42

*U.S. v. Fisher*, 6 U.S. 358 (1805)……………………………………………35

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)……………………………...58

## Other

114 Cong. Rec. 14,733 (1968) (statement of Sen. Long)…………………………51

1 W. & M., c. 2, in 3 Eng. Stat. at Large 441 (1689)……………………………..23

*The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents* (1787), *reprinted in* 2 Bernard Schwartz, *The Bill of Rights, A Documentary History* 665 (1971)…………………………..26

1662 Militia Act. 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.)………………………...25

1 William Blackstone, *Commentaries*………………………………………24-25

4 William Blackstone, *Commentaries*………………………………………24-25

Albert Deutsch, *The Mentally Ill in America: a History of Their Care and Treatment From Colonial Times* (1946)…………………………………………..37

Benjamin Rush, *Sixteen Introductory Lectures to Courses of Lectures Upon the Institutes and Practice of Medicine* (1811)……………………………………….37

Benjamin Rush, *Medical Inquiries and Observations, Upon the Diseases of the Mind* (1812)………………………………………………………………37-38

W. Blizard, *Desultory Reflections on Police* (1785)…………………………..23-24

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009)………………….27

Gerald N. Grob, *The Mad Among Us: a History of the Care of America's Mentally Ill* (1994)………………………………………………………………..36

Henry J. Steadman et al., *Violence by People Discharged From Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*, 55 Archives. Gen. Psychiatry 393 (1998)………………………………………………47-48

Joyce Lee Malcolm, *The Role of the Militia in the Development of the Englishman's Right to be Armed—Clarifying the Legacy*, 5 J. on Firearms & Pub. Pol'y 139 (1993)…………………………………………………………..23

L.E. Saltzman et al., *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Med. Ass'n 22 (1992)……………………………..48

Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. Rev. 657 (2002)…………………...…25-26

Seena Fazel et al., *The Population Impact of Severe Mental Illness on Violent Crime*, 163 Am. J. Psychiatry 1397 (Aug. 2006)…………………………………48

S.P. Segal et al., *Factors Associated with Involuntary Return to a Psychiatric Emergency Service within 12 Months*, 49 Psychiatric Services 1212 (1998)…….48

Thomas Cooley, *The General Principles of Constitutional Law in the United States of America* (1891)……………………………………………………………23

Thomas Grisso and Paul S. Appelbaum, *Is It Unethical to Offer Predictions of Future Violence?*, 17 L. & Hum. Behav. 621 (1992)……………………………..48

2 Dictionary of the English Language 71 (6th ed.)……………………………36-37

Merriam-Webster, Merriam-Webster.com, http://www.merriam-webster.com (last visited Aug. 4, 2013) (hereinafter Merriam-Webster)…………..………………...59

N. Webster, American Dictionary of the English Language (1828)……………...36

No. 13-1876

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CLIFFORD CHARLES TYLER

       Plaintiff – Appellant

v.

HILLSDALE COUNTY SHERIFF'S DE et al,

       Defendants – Appellees

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN

## APPELLANT'S BRIEF ON APPEAL

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), Defendant-Appellant requests that oral argument be heard in this case. This case presents significant issues concerning basic constitutional rights affecting countless individuals. The issues presented require further explication beyond the realm of the written brief, and oral argument will facilitate the decision making process. Wherefore, Appellant prays that this Court grant oral argument.

# JURISDICTIONAL STATEMENT

The basis of the district court's jurisdiction was founded on 28 U.S.C. § 1331 (2006) in that this action arises under the Constitution and laws of the United States because the action sought relief pursuant to 28 U.S.C. §§ 2201, 2202, 2412 (2006) and 5 U.S.C. § 702 (2006). Complaint, RE 1, Page ID # 6, 13-14. The basis of appellate court jurisdiction is 28 U.S.C. § 1291 (2006), which grants this Court jurisdiction over appeals from final district court decisions. The appeal was timely as an appeal of right pursuant to Fed. R. App. P. 4(a)(1)(B), because the final order was entered June 21, 2013, the notice of appeal was filed June 26, 2013, and the United States, United States agencies, and United States officers are parties to the case. Complaint, RE 1, Page ID # 1; Order, RE 31, Page ID # 251; Notice of Appeal, RE 32, Page ID # 252. This appeal is from a final order or judgment that disposes all parties' claims.

## STATEMENT OF ISSUES

I.    Under the historical scope of the Second Amendment as publicly understood when enacted, was prohibiting firearm possession by someone with a prior commitment conclusively beyond the scope when the individual poses no risk of harm?

II.    Under the intermediate scrutiny standard, is a firearm prohibition as applied to Appellant substantially related to any important government interest when he poses no risk of harm?

## STATEMENT OF THE CASE

This appeal seeks review following a final order of the District Court for the Western District of Michigan. The action sought relief pursuant to 28 U.S.C. §§ 2201, 2202, 2412 (2006) and 5 U.S.C. § 702 (2006) based on infringement of Second Amendment, Fifth Amendment, and Fourteenth Amendment rights. Complaint, RE 1, Page ID # 6, 13-14. Specifically, Appellant-Plaintiff requested a declaration that the firearm prohibition of 18 U.S.C. § 922(g)(4) is unconstitutional as applied to him and a permanent injunction preventing the Defendants from enforcing § 922(g)(4) against Appellant. Complaint, RE 1, Page ID # 13-14.

The Complaint was filed May 21, 2012 and was timely answered by Defendant-Appellees Stan W. Burchardt and Hillsdale County Sheriff's Department on August 28, 2012. Complaint, RE 1, Page ID # 1; Answer, RE 18, Page ID # 93-113. Prior to answering the Complaint, Defendants Kriste Kibbey Etue and Rick Snyder filed a motion to dismiss as to them for failure to make allegations demonstrating they infringed any constitutional rights or supporting a permanent injunction against them. Motion to Dismiss, RE 16, Page ID # 82-84. After reviewing the motion, Appellant-Plaintiff agreed and stipulated to an order dismissing as to Defendants Kriste Kibbey Etue and Rick Snyder. Stipulation, RE 19, Page ID # 114-116. The district court entered an order pursuant to the

stipulation dismissing as to Defendants Kriste Kibbey Etue and Rick Snyder on September 25, 2012. Order, RE 21, Page ID # 122.

Prior to answering the Complaint, the federal Defendants filed on October 1, 2012 a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief could be granted. Motion to Dismiss, RE 23, Page ID # 124-125. Appellant-Plaintiff filed his response on October 30, 2012 contesting a dismissal as to the federal Defendants in their official capacities, but not contesting dismissal as to the federal Defendants in their individual capacities. Response, RE 24, Page ID # 188. The district court entered a stipulated order extending the time for filing a reply, and the federal Defendants timely replied pursuant to that order on December 7, 2012. Order, RE 26, Page ID # 214; Reply, RE 27, Page ID # 215-233. The district court granted the federal Defendant's motion to dismiss without a hearing in an order entered on January 29, 2013 with an accompanying opinion. Order, RE 29, Page ID # 246; Opinion, RE 28, 334-245.

Following entry of the order on January 29, 2013, the Appellant-Plaintiff and the only remaining defendants—Stan W. Burckhardt and the Hillsdale County Sheriff's Department—agreed that the January 29, 2013 order was case dispositive as to any remaining claims. Stipulation, RE 30, Page ID # 247-249. For the sake of judicial economy, therefore, the remaining parties stipulated to entry of a final

order dismissing as to Stan W. Burckhardt and the Hillsdale County Sheriff's Department for the reasons stated in the district court's January 29, 2013 opinion and order. Stipulation, RE 30, Page ID # 247-250. On June 21, 2013, the district court entered an order dismissing as to Stan W. Burckhardt and the Hillsdale County Sheriff's Department for the reasons stated in the January 29, 2013 opinion and order. Order, RE 31, Page ID 251. Appellant-Plaintiff timely appealed on June 26, 2013. Notice of Appeal, RE 32, Page ID # 252. Appellant-Plaintiff subsequently filed an amendment notice of appeal on June 27, 2013 to make clear a review was sought of both the final order and the January 29, 2013 order upon which it was based. Amended Notice of Appeal, RE 33, Page ID # 253.

## STATEMENT OF FACTS

On January 2, 1986, Mr. Tyler was involuntarily committed due to a brief depression prompted by the short-term pressures of an emotionally devastating divorce. Complaint, RE 1, Page ID # 6. Because Mr. Tyler posed a risk to himself at that time, the Hillsdale County Probate Court ordered that he undergo a treatment program at the Ypsilanti Regional Center hospital for a period of time not to exceed 30 days. Exhibits, RE 1-1, Page ID #16-17. In the twenty-seven years since his commitment, Mr. Tyler has had no other history of mental illness. The depression was a brief reactive episode. Exhibits, RE 1-1, Page ID #20. Exhibits, RE 1-1, Page ID #19-20. Mr. Tyler does not have a criminal history or a problem with substance abuse. Complaint RE 1, Page ID # 6; Exhibits, RE 1-1, Page ID #19, 24. A current evaluation revealed no evidence that Mr. Tyler is mentally ill. Exhibits, RE 1-1, Page ID #20. Mr. Tyler does not pose a risk to himself or others. Complaint RE 1, Page ID # 6.

On or about February 7, 2011, Mr. Tyler attempted to purchase a firearm, but was informed by Defendant Hillsdale County Sheriff's Department that he was denied from obtaining a firearm. Complaint RE 1, Page ID # 6. He was denied because a search of the National Instant Criminal Background Check System (NICS) revealed that his name and/or similar descriptive features matched the following federally prohibitive criteria: "Persons adjudicated as a mental defective

or involuntarily committed to a mental institution or incompetent to handle their own affairs." Complaint RE 1, Page ID # 7. The NICS is maintained and operated by the Federal Bureau of Investigation (FBI). Complaint RE 1, Page ID # 7.

On or about August, 2011, Plaintiff submitted an appeal of his denial to purchase a firearm with the NICS Section of Defendant FBI. On or about January 6, 2012, the NICS Section of the FBI confirmed that Mr. Tyler is prohibited from owning a firearm under 18 U.S.C. § 922(g)(4) (2006). The FBI further advised Mr. Tyler that "[u]ntil your state has an ATF approved relief from disabilities program in place your federal firearm rights may not be restored." Exhibits, RE 1-2, Page ID # 40. 18 U.S.C. § 922(g) (2006) provides the following:

(g) It shall be unlawful for any person–

. . .

 (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Under 18 U.S.C. § 925(c) (2006), an individual prohibited from acquiring a firearm may apply to the Attorney General for relief from the prohibition, which the Attorney General may grant if "the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has promulgated a rule detailing the manner that a review under § 925(c) may be sought. 27 C.F.R. § 478.144 (2011). Notwithstanding those provisions, however, Congress has specifically denied any funding "to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 922(c)." The Consolidated Appropriations Act, 2010, Pub. L. No. 111–117, 123 Stat. 3034, 3128. Due to the above lack of funding, ATF does not in fact provide any review to provide relief from a federal firearm prohibition.

Under the NICS Improvement Amendments Act of 2007 (NIAA), Congress provided an alternate route for relief from a federal prohibition on acquiring a firearm in which the various states may elect to provide an ATF-approved program to review, approve, or deny applications for such relief. NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 121 Stat. 2559, 2569-70. To date, the State of Michigan has failed to institute such an ATF-approved program, and Plaintiff cannot therefore avail himself of any state or federal procedure providing relief from his federal firearm prohibition. Exhibits, RE 1-2, Page ID # 39-40.

On May 21, 2012, Appellant-Plaintiff filed his complaint, alleging that a continuing firearm prohibition without means of review violated his Second Amendment, Fifth Amendment, and Fourteenth Amendment rights when he poses no risk to himself or others. Complaint, RE 1, Page ID # 1-14. On January 29, 2013, the district court entered an opinion and order granting a motion to dismiss as to the federal defendants for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Order, RE 29, Page ID # 246; Opinion, RE 28, Page ID # 234-245.

The lower court acknowledged that the historical evidence "does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible to regain their Second Amendment rights." Opinion, RE 28, Page ID # 239-240. However, the district court found that through § 922(g)(4), Congress has defined mentally ill persons as including anyone previously committed to a mental institution. Opinion, RE 28, Page ID # 240. The district court also noted that the Supreme Court has recognized as "presumptively lawful" longstanding prohibitions on firearm possession by the "the mentally ill." Opinion, RE 28, Page ID # 240 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). Therefore, the lower court reasoned, the Second Amendment as historically understood does not apply to individuals like Mr. Tyler. Opinion, RE 28, Page ID # 240.

The lower court also held that even if the Second Amendment did apply, §
922(g)(4) would survive an intermediate scrutiny review. Opinion, RE 28, Page ID
# 240. The district court noted that the government had multiple important
objectives in enacting § 922(g)(4): preventing firearm violence, preserving
community peace and public safety, and protecting from self-inflicted violence.
Opinion, RE 28, Page ID # 241 n.7. The district court held that § 922(g)(4) is
substantially related to those interests because (1) intermediate scrutiny does not
mandate a perfect fit between the statute and the interest and (2) the statute is
"reasonably related to the government's stated interests." Opinion, RE 28, Page ID
# 243-244. The district court also held that because Appellant-Plaintiff does not
therefore have a fundamental right to keep and bear arms, his Fifth Amendment
claims must fail as well. Order, RE 29, Page ID # 246; Opinion, RE 28, Page ID
#244-245.

Following the district court's January 29, 2013 opinion and order,
Appellant-Plaintiff and the two state defendants remaining in the case agreed that
the opinion and order were case dispositive for the remaining Fourteenth
Amendment claims. Stipulation, RE 30, Page ID # 247-250. The parties reasoned
that the district court's rationale would similarly forestall claims against the state
defendants under the Second Amendment as incorporated under the Fourteenth
Amendment. Stipulation, RE 30, Page ID # 248. The parties further agreed that the

district court's rationale regarding the Fifth Amendment would extend to Appellant- Plaintiff's analogous Fourteenth Amendment Equal Protection and Due Process Clause claims. Stipulation, RE 30, Page ID # 248. For the sake of judicial efficiency, the parties stipulated to an order dismissing the remaining claims based on the January 29, 2013 opinion and order. Stipulation, RE 30, Page ID # 247-50. Appellant-Plaintiff then timely appealed and is requesting a review principally of the district court's January 29, 2013 decision on the federal Defendant's 12(b)(6) motion to dismiss.

## SUMMARY OF ARGUMENT

This question before this Court is whether a federal firearm prohibition triggered by a brief depressive episode infringes upon the Second Amendment by continuing to prohibit firearm possession twenty-seven years later for an individual posing no risk of harm to himself or others. Under this Court's jurisprudence, a law regulates conduct within the scope of the Second Amendment unless the historical evidence *conclusively* demonstrates otherwise. A law may constitutionally burden conduct within the scope of the Second Amendment if it is substantially related to an important government interest. In this case, a continuing firearm prohibition after twenty-seven years for someone without a criminal record, substance abuse problem, or any other history of mental illness is not substantially related to any important government interest when he poses no risk of harm to himself or others.

The firearm prohibition here under 11 U.S.C. § 922(g)(4) clearly burdens conduct within the scope of the Second Amendment because the historical evidence, if anything, suggests the right to keep and bear arms was only subject to modest restrictions to prevent harm. This Court must accept as true that Appellant poses no risk of harm to himself or others, because this appeal is primarily from a district court decision on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Since restrictions on the right to arms were historically understood to be limited to preventing harm and Appellant poses no risk of harm, §

922(g)(4) clearly burdens conduct within the scope of the Second Amendment. Because the historical evidence does not conclusively prove the opposite, this Court must consider whether § 922(g)(4), as applied, constitutionally burdens Appellant's right to keep and bear arms.

The conclusion that § 922(g)(4) burdens conduct within the scope of the Second Amendment is not contradicted by Supreme Court jurisprudence recognizing the presumptive legality of longstanding prohibitions on firearm possession by the mentally ill. The Supreme Court has explicitly stated it has made no determination yet on whether such firearm prohibitions regulate conduct beyond the scope of the Second Amendment. Regardless, an as applied challenge of § 922(g)(4) is permitted because a presumption of legality may be rebutted. Furthermore, a presumption of legality for prohibitions on firearm possession by the mentally ill would not apply to § 922(g)(4) to the extent it prohibits individuals who are not mentally ill.

Moreover, § 922(g)(4) cannot define "mentally ill" so as to place itself beyond the Second Amendment. The plain language of § 922(g)(4) does not indicate Congress meant it as a definition of "mentally ill." Congress also never clearly stated that it intended § 922(g)(4) to define "mentally ill" for the purposes of determining the limits of a fundamental constitutional right. Section § 922(g)(4) is also not consistent with the historical understanding of mental illness, which

focused on a person's mental state, not legal history, and recognized the possibility that mental illness can be cured. Even if Congress did intend § 922(g)(4) to define "mentally ill," modern statutes cannot redefine historical understandings so as to limit the scope of an amendment intended as a limit on Congress. Therefore, nothing about the language of § 922(g)(4) or Supreme Court jurisprudence alters the lack of historical evidence conclusively demonstrating § 922(g)(4), as applied, burdens conduct beyond the scope of the Second Amendment.

Section 922(g)(4) unconstitutionally burdens conduct within the scope of the Second Amendment because, as applied, it is not substantially related to any important government interest. Section 922(g)(4) is not substantially related to any such interest because, as applied, it fails to advance any such interest. Because Appellant poses no risk of harm, as this Court must assume, preventing him from possessing a firearm does not advance the governmental interests of preventing firearm violence, preserving community peace and public safety, or protecting from self-inflicted violence. Appellant's possession of a firearm would not impede these interests any more than does possession of any other safe, sane, stable individual who enjoys the protection of the Second Amendment.

A review pursuant to an as applied challenge of the continued applicability of § 922(g)(4) to an individual who poses no risk of harm would therefore not impede any governmental interests. The fact of a prior commitment, without

consideration of other factors, cannot conclusively demonstrate that an individual is forever mentally ill and therefore poses a risk of harm decades later. The Government has no important interest in disarming individuals who fail to pose a risk of harm. Merely because § 922(g)(4) advances a government interest at the time of a commitment does not mean it still does twenty-seven years later when an individual poses no risk of harm. Because the right to arms is an individual right, the statute as applied must continue to advance a government interest if it may permissibly burden an individual's Second Amendment right.

Furthermore, the administrative difficulties supporting § 922(g)(4) as a pragmatic attempt to single out and address the risks of a minority of mentally ill individuals hidden within a national population are largely absent here. The individual in question has already been identified and is currently under an ongoing firearm prohibition. Nothing about the as applied challenge at hand, therefore, impedes any important government interest.

To find § 922(g)(4) unconstitutional as applied would not be to require a perfect fit between the statute and an important government interest. A perfect fit would entail a full-scale federal adversarial proceeding culminating in a finding that the person is mentally ill and likely to harm himself or others *before* § 922(g)(4) can be given effect with periodic reviews afterward. Appellant is not challenging § 922(g)(4) being given immediate effect upon the occurrence of his

involuntary commitment. He is not contesting that he remains subject to a §
922(g)(4) prohibition until a federal determination otherwise, even after twenty-
seven years without any mental health concerns. Appellant is merely requesting the
opportunity to present evidence so that he may carry the burden of demonstrating
that he poses no risk of harm and that § 922(g)(4) is therefore unconstitutional as
applied to him. Appellant's request is not a requirement of a perfect fit, but a
recognition that the statute must continue to advance an important government
interest.

Notwithstanding the above, the lower court erred by finding that Appellant
had failed to allege a proper claim because § 922(g)(4), as applied, was reasonably
related to an important government interest. Intermediate scrutiny requires a
substantial relation, not a reasonable relation, between the statute and an important
government interest. By exchanging "substantial" for "reasonable," the lower court
lowered the level of scrutiny required, threatening to turn an intermediate scrutiny
review into a rational basis review. Since substantial relation is required and, for all
the reasons above, § 922(g)(4) as applied fails to advance any government interest,
Appellant has stated a valid claim that § 922(g)(4) is unconstitutional as applied.

## ARGUMENT

## STANDARD OF REVIEW

An appellate court reviews *de novo* a trial court's ruling on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Association of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 48 (6th Cir. 2007). When considering a Rule 12(b)(6) motion, the trial court must accept as true all factual allegations in Plaintiff's complaint. *Hill v. Blue Cross and Blue Shield of Michigan,* 409 F.3d 710, 716 (6th Cir. 2005). The court must also "construe the complaint in the light most favorable to the Plaintiffs." *Id.*

## ARGUMENT

This court must reverse because Appellant clearly made a claim pursuant to the Second Amendment for which relief can be granted. *See* Complaint, RE 1, Page ID # 9-10. Therefore, the lower court's January 29, 2013 order granting the Federal Defendant's motion to dismiss, Order, RE 29, Page ID # 246, was in error as to Appellant's Second Amendment claim. The lower court's final order dated June 21, 2013, Order, RE 31, Page ID # 251, was entered based on the agreement and recognition of Appellant and the State Defendants that the January 29, 2013 order was case dispositive as to Appellant's Fourteenth Amendment claim. Stipulation, RE 30, Page ID # 247-249. The January 29, 2013 order was case

18

dispositive because Appellant's Fourteenth Amendment claim relied on an infringement of the Second Amendment as incorporated through the Fourteenth Amendment. *See* Complaint, RE 1, Page ID # 11-12. Since the lower court's January 29, 2013 order was erroneous and the final order was entered only as a direct consequence, both orders must be reversed in part.

On appeal, Appellant does not contest the lower court's ruling regarding Appellant's Fifth Amendment claims. Order, RE 29, Page ID # 246; Opinion, RE 28, Page ID #244-245. Likewise, Appellant does not contest the lower court's rulings to the extent they relate to Appellant's procedural due process and equal protection claims under the Fourteenth Amendment. *See* Order, RE 31, Page ID # 251; Complaint, RE 1, Page ID # 11-12. Appellant agrees that the issues are best considered within the framework of the Second Amendment and of the Fourteenth Amendment to the extant it incorporates the Second Amendment against the states.

Appellant's main argument boils down to the following: the firearm prohibition of 18 U.S.C. § 922(g)(4) is an unconstitutional infringement of the Second Amendment when applied to sane, mentally stable individuals who could demonstrate they pose no risk of harm. The Second Amendment provides the following: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment protects the right of "law-abiding,

responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Appellant readily acknowledges that the Second Amendment is not unlimited. *Id*. at 626. However, the Second Amendment clearly protects the rights of competent individuals who present no risk of harm to themselves or others. *Supra* Part I. When § 922(g)(4) is nonetheless still applied against such competent individuals, it impermissibly infringes on a person's individual Second Amendment right. *Supra* Part II.

This Court has adopted a two prong test to determine whether a statute impermissibly infringes on the Second Amendment. *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). "Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *Id.* If so, then the court considers the second prong: whether the statutory provision is constitutional when applying "the appropriate level of scrutiny." *Id.* After considering both prongs in order, this Court will conclude that § 922(g)(4) is unconstitutional as applied against a safe, sane, mentally stable individual who poses no risk of harm to himself or others.

I.    **18 U.S.C. § 922(g)(4) Burdens Conduct Protected Under the Second Amendment, Because the Government Cannot Conclusively Prove the Conduct was Outside the Second Amendment's Historical Scope.**

Under the first *Greeno* prong, § 922(g)(4) clearly burdens conduct within the historical scope of the Second Amendment because the Government cannot conclusively prove otherwise. Under the first prong, a federal gun law will not violate the Second Amendment if the law "regulate[s] activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified." *Greeno*, 679 F.3d at 518 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). To succeed under the first prong, the Government must conclusively demonstrate that the regulated activity fell outside the right to keep and bear arms *as publically understood in 1791*. *Greeno*, 679 F.3d at 518 (quoting *Ezell*, 651 F.3d at 702-703). The Court must proceed to the second prong "if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected." *Greeno*, 679 F.3d at 518 (quoting *Ezell*, 651 F.3d at 703).

In this case, this Court must certainly proceed to the second prong because the historical evidence is inconclusive regarding whether an involuntary commitment forever disqualified an individual from the right to keep and bear arms. While the *Heller* Court did recognize longstanding prohibitions on firearm possession by the mentally ill as being presumptively legal, the *Heller* Court never

21

held that § 922(g)(4) was a longstanding firearm prohibition regulating activity conclusively beyond the historic scope of the Second Amendment. *See Heller*, 554 U.S. at 626-27. Furthermore, the language of § 922(g)(4) does not conclusively demonstrate that the statute is beyond the historic scope of the Second Amendment, because it does not define "mentally ill" for purposes of Second Amendment analysis. Because the Government cannot conclusively prove § 922(g)(4) regulates activity beyond the scope of the Second Amendment when applied to Mr. Tyler, this Court must consider the second *Greeno* prong.

## A. The Historical Evidence Does Not Conclusively Prove That 18 U.S.C. § 922(g)(4) Regulates Activity Beyond the Scope of the Second Amendment.

The historical evidence certainly fails to demonstrate conclusively that the right to keep and bear arms was publically understood in 1791 to exclude from its scope—merely because of a one-time commitment—individuals like Mr. Tyler: safe, sane, stable individuals who do not present a risk to themselves or others. The lower court acknowledged the lack of such evidence when it stated that "The Court agrees that the historical evidence cited by *Heller* and Defendants does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible to regain their Second Amendment rights." Opinion, RE 28, Page ID # 239-240. The historical evidence instead suggests only that

certain individuals who present a danger to the public may be prevented from possessing a firearm.

Evidence regarding the closest historical predecessor to the Second Amendment fails to conclusively prove that a one-time commitment was historically understood as sufficient to forever disarm an individual. The 1689 English Bill of Rights is widely acknowledged as the predecessor to the American Bill of Rights. *Heller*, 554 U.S. at 593. The English Bill of Rights recognized and protected the "ancient right[]" of Protestant subjects to "have arms for their defence suitable to their conditions and as allowed by law." 1 W. & M., c. 2, in 3 Eng. Stat. at Large 441 (1689). The right was codified in protest to prior acts of the English monarchy to disarm people deemed to be political dissidents. *See Heller*, 554 U.S. at 593; Thomas Cooley, *The General Principles of Constitutional Law in the United States of America* 281 (1891). The English Bill of Rights itself does not elaborate on what limitations were intended in the "suitable to their conditions and allowed by law" language. Notwithstanding the language, in practice a broad right of all Protestants to keep arms was recognized in the years following enactment. Joyce Lee Malcolm, *The Role of the Militia in the Development of the Englishman's Right to be Armed—Clarifying the Legacy*, 5 J. on Firearms & Pub. Pol'y 139 (1993). The right to have arms for defense and use them for lawful purposes was "clear and undeniable." W. Blizard, *Desultory Reflections on Police*

23

59-60 (1785). Nothing in the language of the English Bill of Rights on its own, therefore, conclusively demonstrates § 922(g)(4) regulates conduct beyond the scope of the Second Amendment.

The writings of William Blackstone, the preeminent English legal scholar, also do not conclusively support disarming individuals based solely on a one-time commitment, regardless of whether they pose a risk of harm. Writing between enactment of the English Bill of Rights and the American Bill of Rights, he stated that the right to arms was an auxiliary to the absolute rights of individuals to personal security, personal liberty, and private property. 1 William Blackstone, *Commentaries* *129, *140-41, *143-44. He recognized the right to arms as "a public allowance, under due restrictions, of the natural right of resistance and self-preservation." *Id.* at *143-44. Regarding said "restrictions," he wrote that there must be "gentle," "moderate" restraints. *See id.* at *144. However, no one is restrained from anything except from acts that "would be pernicious either to ourselves or our fellow citizens." *Id.* In other words, immediately preceding the American Revolution, the scope of the right to arms was understood to be properly restricted only to the extent necessary to prevent acts harmful to oneself or to others.

Blackstone's examples of permissible restrictions certainly fail to conclusively support disarming individuals who present no risk of harm.

Blackstone described legal restrictions on hunting armed at night or with faces disguised or painted black to "the breach of the public peace and the terror of his majesty's subjects." 4 William Blackstone, *Commentaries* *143-44. He also wrote of the offense of riding or going armed with dangerous or unusual weapons and thereby breaching the public peace and terrifying the public. *Id.* at *149. These restrictions clearly fit within the gentle, moderate restraints Blackstone wrote were permitted under English law to prevent acts "pernicious" to ourselves or others. *Compare id.* at *143-44, *149 *with* 1 William Blackstone, *Commentaries* *144. Nowhere in Blackstone's *Commentaries*, however, does he write anything regarding disarming individuals who pose no risk of harm merely because of the fact of a prior commitment. Instead, individuals like Mr. Tyler who desire a firearm for self-defense are clearly within the scope of the right to arms as understood under English law so long as they are not committing acts harmful to themselves or others.

Numerous other historical examples fail to conclusively demonstrate that Mr. Tyler would have been disarmed when he poses no risk. For instance, historically society could disarm "any person or persons" judged "dangerous to the Peace of the Kingdome" under the 1662 Militia Act. 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.). Mr. Tyler is not such a dangerous person. The right to arms was "limited to those members of the polity who were deemed capable of exercising it

25

in a virtuous manner." Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. Rev. 657, 671 (2002). Mr. Tyler is capable of exercising his right to arms in a virtuous manner. The right to arms was limited when an individual presented a "*real* danger of public injury." *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents* (1787), *reprinted in* 2 Bernard Schwartz, *The Bill of Rights, A Documentary History* 665 (1971) (emphasis added). Mr. Tyler simply does not present such a *real* danger of public injury.

The historical evidence, therefore, does not conclusively demonstrate that persons who were once committed due to mental illness were thereafter forever ineligible to keep and bear arms. Instead, the historical evidence from immediately preceding enactment of the Second Amendment supports a public understanding of a broad right to arms with modest restrictions to prevent harm. This public understanding immediately preceding the Second Amendment's enactment is crucial, because the Second Amendment did not create a new right to arms; it codified the existing one. *Heller*, 554 U.S. at 593. Accordingly, the right the Second Amendment protects is the same right publically understood as evidenced above: the broad right Blackstone described as subject to modest restraints solely to prevent harm to oneself or others.

The legal landscape immediately following the Second Amendment's enactment also fails to conclusively demonstrate that § 922(g)(4), as applied, regulates activity beyond the scope of the Second Amendment. Firearm restrictions based on mental health were not established until the twentieth century. *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010). A strict originalist argument supporting § 922(g)(4) being beyond the Second Amendment's scope is difficult to make, since eighteenth century laws disarming individuals because of an involuntary commitment did not exist. *See* Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376-80 (2009). The lack of any such laws for more than one hundred years certainly does not support that § 922(g)(4) regulates conduct that in 1791 people understood to be beyond the scope of the Second Amendment when applied to Mr. Tyler.

In summary, the Government cannot conclusively demonstrate that § 922(g)(4) is beyond the Second Amendment's scope when applied to Mr. Tyler because (1) this Court must accept as true Appellant's assertion that he presents no risk of harm and (2) if anything the historical evidence suggests that individuals who pose no risk of harm have a broad right to keep and bear arms. At the very least, the historical evidence is inconclusive. Under the first *Greeno* prong, inconclusive historical evidence necessitates considering the second prong. The

lower court was therefore in error when it found otherwise, Opinion, RE 28, Page ID # 240, and this Court must consider the second *Greeno* prong.

**B. *Heller's* Presumption of Legality for Longstanding Prohibitions on Firearm Possession Did Not Conclusively Determine That 18 U.S.C. § 922(g)(4) Regulates Activity Beyond the Scope of the Second Amendment.**

Despite recognizing the lack of conclusive historical support for the Government's position, the lower court erred by misreading language in *Heller* as meaning that the Second Amendment irrefutably fails to extend to Mr. Tyler. Opinion, RE 28, Page ID # 240. Once the lower court determined that the historical evidence does not conclusively support the Government's position, the analysis under the first *Greeno* prong should have ended there. In *Heller*, the Supreme Court merely stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by . . . the mentally ill." *Heller*, 554 U.S. at 626. In a footnote, the Supreme Court described such prohibitions as "presumptively lawful." *Heller*, 554 U.S. at 627 n.26. Neither of these statements constitute a finding that § 922(g)(4), as applied to individuals like Mr. Tyler, regulates conduct conclusively beyond the historical scope of the Second Amendment.

Yet the lower court read this language as meaning that the scope of the Second Amendment does not extend to the mentally ill. Opinion, RE 28, Page ID # 240. The lower court then found that through § 922(g)(4), Congress has defined mentally ill persons as including anyone previously committed to a mental institution. *Id*. Therefore, the lower court reasoned, the Second Amendment as historically understood does not apply to individuals like Mr. Tyler. *Id.* The lower court erred because (1) the *Heller* Court explicitly stated it was not determining the scope of the Second Amendment, (2) any presumption of legality has been rebutted, and (3) a prohibition on firearm possession by the mentally ill is not synonymous with such a prohibition based on an involuntary commitment.

1. **The *Heller* Court Explicitly Stated It Was Not Determining the Scope of the Second Amendment.**

The lower court erred by misreading the *Heller* as including a determination regarding the historical scope of the Second Amendment, because the Supreme Court made no such determination. The Supreme Court explicitly stated that it was not undertaking "an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The *Heller* Court merely stated that its opinion should not cast doubt on longstanding prohibitions on arms possession by the mentally ill. *Id.* The statement says nothing about whether the scope of the right to arms historically extended to the mentally ill. Such longstanding

prohibitions may certainly be presumptively lawful instead under the second *Greeno* prong.

If anything, analyzing such prohibitions under the second *Greeno* prong *within* the scope of the Second Amendment better comports with the Supreme Court's reference to such longstanding prohibitions as being presumptively lawful. A presumption may generally be rebutted. *E.g.*¸ Fed. R. Evid. 301 (providing that one party must produce evidence to rebut a presumption). If the right to arms did not historically extend to a regulated activity, then a prohibition on the activity is not merely *presumptively* legal; it *is* legal because it is an act of Congress that does not burden the individual's Second Amendment right. Being able to rebut the legality suggests that the law burdens a right that the individual has in the first place—rather than that conduct outside the Second Amendment's historical scope may be brought inside on a case by case basis. To read *Heller* as a determination regarding the historic scope of the Second Amendment is to read far more import into the language than the plain meaning can support.

2. **Longstanding Firearm Prohibitions Are Still Subject to an As-Applied Challenge, Because a Presumption of Legality May Be Rebutted.**

Even if the presumption of legality is regarding the scope of the Second Amendment, § 922(g)(4), Mr. Tyler can rebut such a presumption. In *Greeno*, this

30

Court acknowledged that at least one circuit has suggested that "regulated activity presumably . . . outside the scope of the Second Amendment . . . may still be subject to an as-applied challenge" because such a presumption may be rebutted. See *Greeno*, 679 F.3d at 520-21 (citing *United States v. Barton*, 633 F.3d 168, 172-73 (3d Cir. 2011)).

To successfully bring an as-applied challenge, Mr. Tyler would have to "present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." *Barton*, 633 F.3d at 174. He could do so, for example, by showing that the circumstances of his involuntary commitment do not show he now poses any more risk of harm than a typical law-abiding citizen. *See id.* He could also demonstrates that after decades have passed since his involuntary commitment, he poses no continuing threat to society. *See id*.

In an analogous case to the one at hand, the Supreme Court of North Carolina recently found a state statue unconstitutional under the state constitution as that statute was applied. *Britt v. State*, 681 S.E.2d 320 (N.C. 2009). In that case, the plaintiff was convicted in 1979 of felony possession with intent to sell a controlled substance. *Id.* at 321. In 2004, North Carolina extended prior felony firearm prohibitions to prohibit possession by anyone ever convicted of a felony, including in their own home or business. *Id.* at 321-22. The North Carolina

Supreme Court found the statute as applied to the plaintiff unconstitutional under North Carolina's state constitutional analogue to the Second Amendment. *Id.* at 322-23. The *Britt* court held that [b]ased on the facts of plaintiff's crime, his long post-conviction history of respect for the law, the absence of any evidence of violence by plaintiff, and the lack of any exception or possible relief from the statute's operation, as applied to plaintiff, [the statute] is an unreasonable regulation, not fairly related to the preservation of public peace and safety." *Id.* at 323.

Even though *Britt* is a state law case, it is analogous to the case at hand. Mr. Tyler's involuntary commitment was due to a brief depression prompted by the short-term pressures of an emotionally devastating divorce and not reflective of his long-term mental stability. *See* Complaint, RE 1, Page ID # 3, 6; Exhibits, RE 1-1, Page ID # 16-17, 19-20. In the twenty-seven years since his commitment in 1986, Mr. Tyler has had no other history of mental illness. Exhibits, RE 1-1, Page ID # 20. He currently poses no risk to himself or others. Complaint RE 1, Page ID # 6. Like the plaintiff in *Britt*, no exception to § 922(g)(4) or relief from the statute is available to Mr. Tyler. Complaint, RE 1, Page ID #: 9. Unlike in *Britt*, however, Mr. Tyler is not requesting that this Court determine at this time the ultimate question of whether § 922(g)(4) is unconstitutional as applied; Mr. Tyler is only requesting that this Court make the threshold determination that he properly stated

a claim for which relief can be granted so that can have the opportunity to present evidence on the ultimate question. Taking Mr. Tyler's factual assertions as true, he could rebut the legal presumption referred to in *Heller* and distinguish himself from those historically barred from the Second Amendment's protection.

3.    **Longstanding Prohibitions on Firearm Possession by the Mentally Ill Are Not Synonymous With a Prohibition Based on an Involuntary Commitment.**

Even if *Heller*'s presumption of legality is related to the Second Amendment's scope, *Heller* was referring to prohibitions on the mentally ill, not on individuals who have been previously committed. As discussed *infra*, being involuntary committed is not sufficient to predict whether someone is mentally ill. *Infra* Part II.B.1. Section 922(g)(4) itself seems to recognize this distinction by applying the firearm prohibition both to individuals who have been adjudicated as a mental defective as well as to individuals who have been committed. *See* § 922(g)(4). *Heller*'s presumption of legality is avoided in this case, because Appellant is not challenging a prohibition on possession by the mentally ill. He is instead challenging a prohibition on possession by individuals subject to a prior commitment when applied to a mentally stable individual who poses no risk of harm. He is challenging a prohibition against someone who is not, in fact, mentally ill. This Court must therefore consider the second *Greeno* prong because *Heller*'s

presumption of legality (1) was not relating to the scope of the Second Amendment, (2) can be rebutted, and (3) does not apply to individuals like Mr. Tyler not subject to a prohibition because they are mentally ill.

### C. 18 U.S.C. § 922(g)(4) Does Not Define "Mentally Ill" for Purposes of Determining Whether It Regulates Activity Beyond the Scope of the Second Amendment.

Finally, the lower court erred by finding that individuals who were previously committed must be considered mentally ill for the purposes of a Second Amendment analysis because Congress defined such persons as being mentally ill. Opinion, RE 28, Page ID # 240. The lower court erred because (1) Congress never defined "mentally ill through § 922(g)(4), (2) Congress never clearly stated it intended such a definition to apply in a Second Amendment analysis, (3) § 922(g)(4) conflicts with the historic meaning of "mentally ill," and (4) a modern statute cannot define the 1791 public understanding of the Second Amendment.

#### 1. Nothing About the Plain Language of 18 U.S.C. § 922(g)(4) Indicates That Congress Intended It To Be a Definition of "Mentally Ill."

Congress did not define "mentally ill" in § 922(g)(4). Section 922(g)(4) merely prohibits persons "who has been adjudicated as a mental defective or who has been committed to a mental institution" from shipping, transporting, receiving,

or possessing a firearm. § 922(g)(4). Nowhere does it state anything about the definition of "mentally ill." *See* § 922(g)(4). Section 922(g)(4) merely prohibits possession, among other things, and that is where the plain language ends. Congress could have explicitly stated it was providing a definition of "mentally ill," just as it routinely provides definitions in other statutes, but it simply did not do so here. To read § 922(g)(4) as Congress defining "mentally ill" is to insert meaning where Congress chose to omit it.

2. **Congress Did Not Clearly State That It Intended 18 U.S.C. § 922(g)(4) to Define "Mentally Ill" for Second Amendment Purposes.**

Even if Congress did define "mentally ill" through § 922(g)(4), there is no suggestion that Congress intended such a definition for any purpose other than the particular statutory scheme in question. "Where rights are infringed, where fundamental principles are overthrown . . . the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects." *U.S. v. Fisher*, 6 U.S. 358, 390 (1805). If Congress intended to extend an alleged statutory definition found in § 922(g)(4) to an analysis of the historic scope of the Second Amendment, thereby affecting and delineating the limits of a fundamental right, it ought to have clearly stated that intent. However, nothing about § 922(g)(4) clearly states that Congress intended to

define "mentally ill" for purposes of the Second Amendment. Absent such a clear statement, this Court should decline to extend § 922(g)(4) as a basis for defining the terms that help determine the limits of the Second Amendment.

### 3. The Historical Evidence Suggests That 18 U.S.C. § 922(g)(4) Fails to Convey the Public Understanding of "Mentally Ill" in 1791.

That § 922 (g)(4) does not define "mentally ill" for purposes of determining the public understanding of the scope of the Second Amendment in 1791 is further supported by historical evidence of a meaning conflicting with the statute. In 1791, the terminology for "mentally ill" was "distracted" or "lunatic." Gerald N. Grob, *The Mad Among Us: a History of the Care of America's Mentally Ill* 5 (1994). The 1828 edition of Webster's dictionary defined "distracted" as meaning "[d]eranged; disordered in intellect; raving; furious; mad; frantic." N. Webster, American Dictionary of the English Language (1828) (hereinafter Webster). "Deranged" meant "[p]ut out of order; disturbed; embarrassed; confused; disordered in mind; delirious; distracted." Webster. Webster's definitions of "mad" included "[d]isordered in intellect; distracted; furious" and "proceeding from disordered intellect or expressing it; as a mad demeanor." Webster. A "madman" was someone "raving or furious with disordered intellect; a distracted man." Webster. The 1775 edition of Samuel Johnson's dictionary defined "mad" as "[d]isorderd in the mind; broken in the understanding; distracted; delirious without a fever." 2

Dictionary of the English Language 71 (6th ed.) (hereinafter Johnson). Johnson defined "Mádness" as "[d]istraction; loss of understanding; perturbation of the faculties." Johnson. These definitions all suggest a meaning of "mentally ill" as being something like "deranged," "distracted," or "disordered" in the mind.

A similar meaning of "mentally ill" was espoused by Benjamin Rush, who has been called "the father of American Psychiatry" and was a member of the Continental Congress, signer of the Declaration of Independence, surgeon-general and physician-in-chief for the Continental Army, and staff physician at the first general hospital in America to treat the mentally ill. Albert Deutsch, *The Mentally Ill in America: a History of Their Care and Treatment From Colonial Times* 58, 71, 73 (1946). His lecture subjects included discussions of mental illness and the law. *See, e.g.* Benjamin Rush, *Sixteen Introductory Lectures to Courses of Lectures Upon the Institutes and Practice of Medicine* 363-64 (1811) (mental diseases may exempt individuals from criminal punishment or render individuals incompetent to be witnesses or dispose of property).

Rush referred to mentally ill individuals as "deranged." *Id.* at 366. "Intellectual derangement" consisted of "departure from the ordinary habits of thought, speech, and, in some cases, of conduct." *Id.* Persons in some states of madness may "reason erroneously from true premises, or draw just conclusions from premises that are false." *Id*. at 367. While modern medicine may reject some

of his techniques, such as bloodletting, he advocated various remedies that may sometimes cure madness. *E.g.,* Benjamin Rush, *Medical Inquiries and Observations, Upon the Diseases of the Mind* 174-213 (1812) (describing various remedies for mania). Rush appears, therefore, to have promoted a description of mental illness similar to being mentally "distracted" or "disordered" in that he referred to such individuals as being "deranged" and characterized by erroneous reasoning and a departure from normal ways of thinking. Moreover, Rush appeared to have supported the idea that someone may not currently be mentally ill, even if previously ill, because they were cured of their illness.

Section 922(g)(4) clearly does not express a meaning consistent with the historical evidence of the meaning of "mentally ill."  The commitment portion of the statute most applicable to Mr. Tyler makes no reference to disorders of the mind. The portion referencing persons "adjudicated as a mental defective" provides no definition of what "mental defective" means. Neither portion of the statute makes any allowance for the possibility recognized in 1791 of remedies or cures for mental illness. Assuming for the moment that it were true that being "mentally ill" was recognized in 1791 as rendering someone beyond the scope of the Second Amendment's protection, the understanding of who was "mentally ill" was nothing like § 922 (g)(4), because whether someone is currently mentally ill

was understood to depend upon the current state of a person's mind—not a person's legal history.

Section 922(g)(4) is therefore best viewed as Congress no doubt intended it: a prophylactic remedy meant to reduce the possibility of firearm possession by the mentally ill, not a definition of what it actually means to be "mentally ill." The first *Greeno* prong requires, pursuant to *Heller*, that the Government conclusively demonstrate that § 922(g)(4) regulates conduct beyond the 1791 understanding of the Second Amendment's scope. The Government certainly cannot do so by relying on a purported modern definition that conflicts with the historical understanding.

4. **Definitions in Modern Statutes Cannot Determine the Public Understanding of the Scope of the Second Amendment in 1791.**

Even if § 922(g)(4) is an attempt to define "mentally ill" for Second Amendment purposes, the meaning of "mentally ill" and the scope of the Second Amendment should depend on historical evidence, not modern statutory definitions. It would be odd indeed if Congress could rewrite historical understandings through modern statutes to reimagine the understood scope of the Second Amendment in 1791. To review historical evidence of the public understanding and original intent of the Second Amendment would then be pointless. Congress could instead, in the present, redefine the historical

39

understanding as it sees fit. Given the great weight granted to historical evidence in *Heller*, it is certainly doubtful to read the *Heller* Court as supporting ignoring historical evidence in favor of modern definitions by Congress. *See Heller*, 554 U.S. *passim* (reviewing historical evidence).

Allowing modern statutes to define meanings concerning the historical limits of the Second Amendment would also threaten the Second Amendment's function. The lower court used the very statute under review for infringement of the Second Amendment as itself evidence of a meaning relevant to the limits of the Second Amendment's scope—thereby ensuring that the scope fails to extend to the conduct the statute regulates. *See* Opinion, RE 28, Page ID # 240. The statute has picked itself up by its own bootstraps! If statutes can define historical meanings affecting the Second Amendment's limitations on government as Congress sees fit, the Second Amendment would no longer provide a meaningful limitation on Congress. Instead, Congress would be able to limit the Second Amendment by defining meanings affecting its scope to exclude the activity it seeks to regulate.

A better approach more in keeping with the function of the Second Amendment as a limitation on Congress—rather than Congress as a limitation on the Second Amendment—is to consider the historical understanding of the Second Amendment's scope when it was enacted. The historical understanding then creates the framework within which Congress must operate, ensuring a government

of limited powers. Here, the historical evidence of the meaning of "mentally ill" does not conclusively demonstrate that individuals like Mr. Tyler would have been understood to be mentally ill. Therefore, § 922(g)(4) cannot and should not nonetheless redefine Mr. Tyler as having been understood in 1791 to have been "mentally ill" and therefore beyond the scope of the Second Amendment's protections.

In summary, the historical evidence regarding the amendment's scope is inconclusive, at the very least, on whether § 922(g)(4) regulates conduct beyond the scope when applied to individuals like Mr. Tyler. That point alone necessitates considering the second *Greeno* prong. No language in *Heller* suggests otherwise, since *Heller* (1) did not determine the amendment's scope, (2) merely suggested a presumption that could be rebutted, and (3) referred to firearm prohibitions for the mentally ill, not mentally stable individuals who happen to have been previously committed. Moreover, § 922(g)(4) cannot itself demonstrate that individuals like Mr. Tyler are "mentally ill" for a Second Amendment analysis, as (1) the plain language evidences otherwise, (2) Congress never clearly stated it intended to define "mentally ill" for Second Amendment purposes, (3) the statute conflicts with historic understandings, and (4) modern statutory definitions cannot and should not redefine the public understanding of meanings delineating the Second

Amendment's scope as it was understood when enacted. Therefore, the lower court was in error and this Court must proceed to the Second *Greeno* prong.

## II.    18 U.S.C. § 922(g)(4) as Applied Is Not Substantially Related to an Important Government Interest Because It Fails to Advance any Important Government Interest.

Section 922(g)(4) as applied to Mr. Tyler does not satisfy the appropriate level of scrutiny, as the second *Greeno* prong requires—because it is not substantially related to any important government interest. This Court did not define the appropriate level of scrutiny the statute must satisfy under the second prong. *Greeno*, 679 F.3d at 520 n.2. However, most courts have concluded that intermediate scrutiny is the appropriate level or review. *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2012) (upholding § 922(g)(3) under intermediate scrutiny); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (upholding § 922(g)(8) under intermediate scrutiny); but see *Ezell*, 651 F.3d at 689-90, 708–09 (applying to a city ordinance a "more rigorous" standard than intermediate scrutiny but "not quite 'strict scrutiny' when reviewing a city ordinance requiring range training before owning a gun but also banning training ranges within the city"). "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental

objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *see also Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002).

In comparison, the rational basis test requires that a statute be rationally related to a legitimate government purpose. *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002)(citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)). Under a rational basis review, "a law will be sustained if it can be said to *advance* a legitimate government interest." *Romer*, 517 U.S. at 632 (emphasis added). The Supreme Court has rejected the rational basis standard of review for Second Amendment challenges. *Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

Appellant does not contest here that § 922(g)(4) meets the requirement that the Government have an important objective. Appellant also does not contest that § 922 (g)(4) is in general constitutional. Further, Appellant does not contest that § 922(g)(4) was improper when his commitment initially triggered application of the statute's firearm prohibition to him. Moreover, Appellant is not arguing here that he may currently possess a firearm, because he agrees he should not possess a firearm until there has first been a federal determination on whether § 922(g)(4) continues to apply to him. Appellant *is* arguing, however, that the Second

Amendment affords him at least an opportunity to demonstrate he is the safe, sane, stable individual his doctors say he is and to thereby demonstrate that § 922(g)(4) no longer remains constitutional as applied to him.

Continuing to apply § 922(g)(4) to Mr. Tyler fails to meet intermediate scrutiny because it fails to advance any important government interest. For that matter, § 922(g)(4) as applied to Mr. Tyler would not even meet the rational basis test. Section 922(g)(4) as applied fails to advance any important government interest for four reasons. First, this Court must accept as true Appellant's claims of mental stability. Second, allowing a review of § 922(g)(4) as applied does not impede any important government interest. Third, a review of § 922(g)(4)'s constitutionality as applied to Mr. Tyler would not require a perfect fit between the statute and the government interest. Finally, the lower court erred by reducing the substantial relation requirement to a reasonable relation requirement. For each of these reasons, this Court must reverse in part.

A. **This Court Must Find that § 922(g)(4) As Applied Fails to Advance any Important Government Interest, Because This Court Must Accept as Fact that Appellant is a Safe, Sane, Stable Individual Who Poses No Risk of Harm.**

Section 922(g)(4) fails to advance an important government interest here because, for the purposes of this appeal, Mr. Tyler is as safe, sane, and stable an

individual as anyone who is not subject to a firearm prohibition. For purposes of this appeal from a review of a 12(b)(6) motion, this Court must accept as true all factual allegations in Plaintiff's complaint and "construe the complaint in the light most favorable to the [Plaintiff]." *Hill v. Blue Cross and Blue Shield of Michigan,* 409 F.3d 710, 716 (6th Cir. 2005).

Section 922(g)(4), as applied, does not advance any government interest because Appellant alleges in his Complaint that he "is not a risk to himself or to other people. Complaint, RE 1, Page ID # 3. His brief commitment in 1986 was due to a short-term depression caused by a divorce and was not reflective of his long-term mental stability. Exhibits, RE 1-1, Page ID # 16-17, 19-20. Mr. Tyler has no history of mental illness in the twenty-seven years following his commitment. Exhibits, RE 1-1, Page ID # 20. He has no criminal history. Exhibits, RE 1-1, Page ID # 19. He also does not have a substance abuse problem. Complaint, RE 1, Page ID # 3. Because this Court must accept these facts as true and construe the Complaint in favor of Mr. Tyler, this Court must accept that he is a safe, sane, stable individual who poses no risk of harm and does not have a substance abuse problem.

Applying a firearm prohibition to Mr. Tyler therefore fails to advance any of the important government interests the lower court cited: preventing firearm violence, preserving community peace and public safety, and protecting from self-

inflicted violence. Opinion, RE 28, Page ID # 241 n.7. First, applying § 922(g)(4) to Mr. Tyler fails to protect against firearm violence, because he poses no risk of firearm violence. Second, applying § 922(g)(4) to Mr. Tyler does not prevent a threat to community peace or public safety, because he is a sane, stable, law-abiding citizen who does not present a risk of violence or other mischief. Third, applying § 922(g)(4) to Mr. Tyler does not protect him from self-inflicted violence, because he poses no risk to himself. Whether § 922(g)(4) is applied to Mr. Tyler or whether § 922(g)(4) is not applied, it makes *zero* difference on the outcome: Mr. Tyler still would not present a risk of violence, threaten the community peace or public safety, or present a risk of self-inflicted violence.

While applying § 922(g)(4) to Mr. Tyler therefore has zero effect on advancing such interests, it does have an enormous effect on Mr. Tyler's fundamental rights. Mr. Tyler's exercise of his Second Amendment right is not merely regulated as to time, place, or manner; it is prohibited in its entirety. Completely prohibiting Mr. Tyler from exercising a fundamental right in order to have zero effect on advancing any government interest is an irrational infringement of his individual Second Amendment right. Applying § 922(g)(4) to Mr. Tyler does not even meet the rational basis test, therefore, let alone the tougher intermediate scrutiny standard. Since this Court must accept Mr. Tyler's claims of

competency as true, this Court must reverse because the firearm prohibition advances no government interest.

## B. A Review of 18 U.S.C. § 922(g)(4) As Applied Does not Impede Any Important Government Interest.

A review of a continued § 922(g)(4) prohibition would not impede any important government interest. A prior commitment, on its own, cannot predict any long-term risk of violence. Therefore, some of the individuals who find themselves subject to a § 922(g)(4) prohibition may pose no risk of harm. However, the Government has no important interest in disarming individuals who pose no risk of harm. Therefore, some review must be permitted to consider whether § 922(g)(4) is unconstitutional when applied to individuals who pose no risk of harm.

### 1. The Fact of a Prior Commitment Cannot Alone Predict a Long-Term Risk of Future Violence.

A review of § 922(g)(4), as applied, does not impede any important government interest because a prior commitment, on its own, does not predict any long-term risk of violence. Findings on the outcomes of patients after discharge from acute psychiatric facilities "underscore the inappropriateness of referring to 'discharged mental patients' as a homogeneous class." Henry J. Steadman et al., *Violence by People Discharged From Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*, 55 Archives. Gen. Psychiatry 393, 400 (1998).

The prevalence of violence among individuals without a substance abuse problem is generally the same, regardless of whether they have been committed. *Id.* Remarkably, the prevalence of violence by individuals who have *not* been committed but have a substance abuse problem is *higher* than for individuals who *have* been committed but do not have a substance abuse problem. *See id.* at 399. Indeed, the difficulty of making long-term predictions of violence with adequate scientific support has made some experts question whether mental health professionals act ethically by testifying to such predictions. *See, generally,* Thomas Grisso and Paul S. Appelbaum, *Is It Unethical to Offer Predictions of Future Violence?*, 17 L. & Hum. Behav. 621 (1992) (reviewing the debate).

That a review would not impede any government interest is true even when considering studies on relapses for individuals recently released from commitment, on violence by the mentally ill, or on the dangers of firearms. *E.g.,* S.P. Segal et al., *Factors Associated with Involuntary Return to a Psychiatric Emergency Service within 12 Months*, 49 Psychiatric Services 1212 (1998) (relapses after recent commitment); *E.g.*, Seena Fazel et al., *The Population Impact of Severe Mental Illness on Violent Crime*, 163 Am. J. Psychiatry 1397 (Aug. 2006) (violence by the mentally ill); L.E. Saltzman et al., *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Med. Ass'n 22 (1992) (firearm violence). No study suggests that individuals who have been committed should be

treated as a homogeneous class. No study suggests lumping a man who suffered depression twenty-seven years ago together with drug abusers, schizophrenics, paranoid individuals, and other persons with severe mental illness—and thereby expect the average data for the class to reveal anything predictive about Mr. Tyler specifically. There simply is no scientific consensus confirming a substantial relation between a prior involuntary commitment—without other factors—and the long-term risk of violence.

A review of § 922(g)(4) as applied therefore fails to impede any important government interest because individuals subject long ago to a commitment may currently pose no risk of harm. While a commitment may signal a potential for risk of harm at the time of commitment, that signal is increasingly weak as time progresses because it cannot predict a risk of harm in the long-term. In the case at hand, for instance, Mr. Tyler has been out in public as a member of his community for twenty-seven years after his commitment. During that time, he has not exhibited any mental illness, committed any crimes, or succumbed to substance abuse. Complaint, RE 1, Page ID # 3; Exhibits, RE 1-1, Page ID # 16-17, 19-20. If anything, the nearly three decades of peaceful involvement in his community are a strong indicator of mental health. After so long, the commitment twenty-seven years ago has virtually no bearing as an indication of his current mental stability. A

determination that Mr. Tyler poses no risk of harm would not impede any important government interest.

2. **The Government Has No Important Interest in Disarming Individuals Who Pose No Risk of Harm.**

A review of § 922(g)(4), as applied, would not impede any important government interest because the government has no important interest in disarming individuals who pose no risk of harm. Appellant contends that he is as mentally stable and fit to possess a firearm as any other law-abiding, responsible citizen. Therefore, the fact that guns are dangerous, and even more so in the hands of the mentally ill, is not especially relevant to the question of whether someone who is not mentally ill should be allowed relief from § 922(g)(4). Firearms in general can certainly be dangerous, but we cannot therefore prohibit everyone from owning a gun. *See* U.S. Const. amend. II.

The argument that § 922(g)(4) advances an interest at the time it triggers does not mean a review twenty-seven years later impedes any important government. Appellant agrees with the lower court's analysis of Congressional intent to the extent that its supports a prophylactic firearm prohibition triggered upon involuntary commitment. *See* Opinion, RE 28, Page ID # 243. Hence, Appellant does not contest that Congress intended "to keep firearms out of the hands of *presumptively* risky people." *Dickerson v. New Banner Institute, Inc.*, 460

50

U.S. 103, 112 & n.6 (1983), *superseded by statute on other grounds*, Firearms Owners' Protection Act (FOPA), Pub. L. No. 99, 100 Stat. 449 (1986) *as recognized by Logan v. United States*, 552 U.S. 23, 27 (2007) (emphasis added). Congress certainly intended to people who "by their actions have demonstrated that they are dangerous, or that they *may* become dangerous." 114 Cong. Rec. 14,733 (1968) (statement of Sen. Long) (emphasis added). The Supreme Court has been clear that Congress was concerned "with keeping firearms out of the hands of categories of *potentially* irresponsible persons." *Barrett v. United States*, 423 U.S. 212, 220 (1976) (emphasis added).

However, a review twenty-seven years after commitment impedes no important government interest because an involuntary commitment alone—as the Supreme Court's language in *Dickerson* and *Barrett* suggests—merely indicates that a person is "potentially" or "presumptively" risky or irresponsible. *Id.*; *Dickerson*, 460 U.S. at 112 & n.6. However, presumptions may be rebutted. *Supra* Part I.B.2. The legislative history is clear that Congress sought to address potential risks of gun violence, but nothing suggests Congress recognized an interest in disarming individuals who in fact present no such risk.

Even if Congress did intend to permanently prohibit firearm possession by a whole class, doing so advances no important government interests in this case because the Second Amendment is not a class right. The Second Amendment is an

individual right. *Heller*, 554 U.S. at 592. If an individual can demonstrate he or she in fact poses no risk of harm, the issue is not whether Congress permissibly burdens a class, but whether § 922(g)(4) as applied permissibly burdens that particular individual's Second Amendment right. As discussed previously, the Second Amendment permits modest restrictions only to the extent necessary to avoid harm to oneself or others. *Supra* Part I.A. In this case, Appellant is making no defense of the rights of a class or contesting the legitimacy of § 922(g)(4) when it triggers. Appellant is claiming that after twenty-seven years of continued mental health, § 922(g)(4) as applied specifically to him impermissibly burdens his individual Second Amendment right because he poses no risk of harm

The administrative difficulties of requiring an individualized assessment of risk *before* giving § 922(g)(4) do not insulate the statute from needing to advance an important government interest as it is applied to Mr. Tyler twenty-seven years *after* his commitment. Appellant admits that it would be difficult for the Federal Government to somehow administer a program of continually screening everyone in the U.S. for current mental illness. Besides being especially invasive in the private lives of U.S. citizens, the cost and magnitude of such a task would be overwhelming. The First Circuit correctly recognized that

> "[I]n section 922, Congress did not prohibit gun possession by those who
> were or are mentally ill and dangerous, and such a free floating prohibition

would be very hard to administer, although perhaps not impossible. That is why, as with the ban on prior felons, Congress sought to piggyback on determinations made in *prior judicial proceedings* to establish status. *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) (emphasis in original) (quoted by Opinion, RE 28, Page ID # 243).

Notwithstanding that piggybacking on prior determinations is admittedly a pragmatic necessity for advancing important government interests when § 922(g)(4) triggers, such difficulties are largely absent here for Appellant's individual as-applied challenge. Without § 922(g)(4) triggering a firearm prohibition, the government faces the difficult task of attempting to address the risks presented by a minority of unidentified individuals hidden within a nation: the proverbial needle in the haystack. After § 922(g)(4) triggers and an individual has already been identified and prohibited from possessing a firearm, the needle is in the open. Mr. Tyler has already been screened from the general populace. In this as-applied challenge, he would bear the burden of proving that after twenty-seven years, he poses no potential risk of harm. The pragmatic difficulties supporting § 922(g)(4) as a trigger simply are not present to anywhere near the same degree for this review of a continuing prohibition for an identified individual bearing the burden of proving his own competency.

A review of § 922(g)(4) as applied to Mr. Tyler would therefore not impede any important government interest. The fact of a commitment alone cannot predict the potential for violence. The interests § 922(g)(4) advances at the time it was triggered are therefore no longer advanced twenty-seven years after Mr. Tyler's commitment when he could demonstrate he poses no risk of harm. The legislative history is clear that Congress recognized that a commitment signals the potential or presumption of risk, but Mr. Tyler has rebutted such a presumption. He personally does not *in fact* pose a potential risk of harm. An individual's right to keep and bear arms is permissibly restricted only to prevent harm to oneself or others. Section § 922(g)(4) therefore impermissibly burdens Mr. Tyler's individual Second Amendment right. The pragmatic difficulties supporting § 922(g)(4) are largely absent twenty-seven years later and do not insulate the statute as applied from needing to advance an important government interest to avoid infringing the Second Amendment. Since the statute as applied infringes the Second Amendment, this Court must reverse.

## C. Finding 11 U.S.C. § 922(g)(4) Unconstitutional as Applied Does Not Require a Perfect Fit Between the Statute and an Important Government Interest.

The lower court erred by reasoning that a review of the constitutionality of continuing to apply § 922(g)(4) to Mr. Tyler is not required because intermediate

scrutiny does not mandate a perfect fit between the statute and the interest. Opinion, RE 28, Page ID # 243-244 & n.8. Mr. Tyler is not asking for a perfect fit. A perfect fit would entail a federal full-scale adversarial proceeding culminating in a finding that the person is mentally ill and likely to harm himself or others *before* § 922(g)(4) can be given effect, with periodic reviews afterward. Given the pragmatic difficulties, such a requirement before giving effect to § 922(g)(4) is certainly more than the Constitution requires. *See United States v. Chamberlain*, 159 F.3d 656, 664 (1st Cir. 1998); *Supra* Part II.B.2.

Mr. Tyler is not requesting that level of perfection. He is not challenging the constitutionality of § 922(g)(4) being given immediate effect upon the occurrence of his involuntary commitment. He is not even challenging § 922(g)(4)'s continuing prohibition on his possession of firearms until he first carries the burden of demonstrating that § 922(g)(4) is unconstitutional as applied to him.

Far from perfection, Mr. Tyler is merely requesting the smallest of concessions to his Second Amendment right: that he at the very least have an opportunity to provide evidence regarding his mental competency in a federal proceeding to determine if § 922(g)(4)'s continuing prohibition is still constitutional as applied to him given that he poses no risk of harm.

Allowing § 922(g)(4) to be given effect immediately upon involuntary commitment without regard to individual circumstances is a reasonable concession

from a perfect fit. Allowing § 922(g)(4) to be a continuing prohibition for twenty-seven years against someone who is *in fact* harmless but has not yet been permitted to prove so is a reasonable concession from a perfect fit. Forever denying an individual who could demonstrate he poses no risk of harm any opportunity to do so is not a reasonable concession.

Rather than requiring a perfect fit, a review of the continued constitutionality of § 922(g)(4) as applied is merely a recognition that the statute must, at the very least, continue to advance an important government interest. As argued above, the interests of preventing violence and breaches of community peace are not furthered by prohibiting firearm possession by Mr. Tyler any more than a prohibition would for any other law abiding, mentally stable individual. *Supra* Part II.A-B. When a § 922(g)(4) prohibition has zero effect on such government interests regardless of whether or not it is continued, § 922(g)(4) is clearly no longer substantially related to such interests. Finding that §922(g)(4) is unconstitutional as applied to Mr. Tyler is not a requirement of a perfect fit, but of substantial relation. The lower court's characterization of Mr. Tyler's claim as one for a perfect fit was in error, and this Court must reverse.

**D. 18 U.S.C. § 922(g)(4) Must Be Substantially Related, Not Reasonably Related, to an Important Government Interest.**

The lower court erred by finding that denying relief to individuals who could demonstrate they pose no risk of harm is "*reasonably* related to the government's stated interests." Opinion, RE 28, Page ID # 244 (emphasis added). The lower court erred because intermediate scrutiny requires a statutory scheme to be *substantially* related, not reasonably related, to an important government interest. *Clark*, 486 U.S. at 461. Certainly the Supreme Court's language requiring a *substantial* relation cannot be merely superfluous. Yet the lower court ignored the requirement for a substantial relation and exchanged it for a reasonable relation instead.

The lower court exchanged "substantial" for "reasonable" based on a misreading of *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585 (6th Cir. 2003). Specifically, the lower court relied on language from *Neinast* quoting the Supreme Court: "All that is required is 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" Opinion, RE 28, Page ID # 242 (quoting *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir. 2003) (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989))). The above "fit" language is missing the last part of the

Supreme Court's sentence in *Fox*: "that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Fox*, 492 U.S. at 580. In *Fox*, like in *Neinast*, the "fit" language related to the requirement under the heightened scrutiny test that a law be narrowly tailored to a significant government interest. *Fox*, 492 U.S. at 578-581; *Neinast*, 346 F.3d at 594.

Placed within the discussions in both *Fox* and *Neinast*, the "fit" language is not as broad or loose as to suggest that intermediate scrutiny requires a "reasonable relation," not a "substantial relation." The *Fox* Court was using the "fit" language in the context of explaining that the narrowly tailored requirement did not necessitate using the least restrictive means to achieve a government interest. *Fox*, 492 U.S. at 578-581. Hence, a "perfect fit" was not required. However, the Court also noted that being narrowly tailored does require that the regulation "not 'burden substantially more . . . than is necessary to further the government's legitimate interests.'" *Fox*, 492 U.S. at 578 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Read within the context of *Fox* and *Neinast*, therefore the "fit" language is not the same as requiring merely a "reasonable relation." Rather the language is better understood as a recognition that the Government may reasonably depart from using the least restrictive means provided it does not burden the right affected substantially more than necessary.

This distinction is important because of the significant difference between something being "substantially" related and "reasonably" related. "Substantial" means "considerable in quantity; significantly great." *Substantial*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/substantial (last visited Aug. 4, 2013) (hereinafter Merriam-Webster). "Reasonable" means "not extreme or excessive," "moderate, fair," or "being in accordance with reason." *Reasonable*, Merriam-Webster. Similarly, "rational" means "relating to, based on, or agreeable to reason." *Rational*, Merriam-Webster. Comparing these definitions, clearly "reasonable" conveys less a sense of "considerable in quantity" and "significantly great" than "substantial." "Reasonable" is much closer to "rationale" because both mean being "agreeable to" or "in accordance with" reason.

Reading the intermediate scrutiny test in light of the definitions for "substantial" and "reasonable" demonstrates that exchanging the two has a substantial (i.e., significant) effect. The effect is much like the difference in meaning conveyed if I had ended the immediately preceding sentence with "exchanging the two has a reasonable effect." I intended something with more weight than merely "reasonable." Likewise, the word "substantial" in the intermediate scrutiny test conveys more weight than merely "reasonable." Relying on the definition of "substantial" above, the intermediate scrutiny test might be

reworded as requiring that a statutory scheme be *considerably* and *significantly* related to an important government interest.

If instead the word "substantial" is treated as superfluous and exchanged in favor of "reasonable," as the lower court did here, the intermediate scrutiny test threatens to devolve into the rational basis test. Certainly, "reasonable" has a greater connotation of fairness than "rational." However, demonstrating that a statute is in accordance with or based on reason would nonetheless still generally satisfy both. By removing the requirement of substantial relation, the lower court's "reasonable relation" test becomes little more than the rational basis test in different clothing.

The lower court erred, therefore, because it failed to note that prohibiting firearm possession by individuals like Mr. Tyler must be substantially (i.e., considerably or significantly) related to an important government reason, not merely based on reason. The government need not use the least restrictive means to achieve its objective, but it must still narrowly tailor the means so as to not burden the right affected more than necessary. By reading the intermediate scrutiny test as requiring a reasonable relation, rather than the substantial relation the Supreme Court specified, the lower court was in clear error and must be reversed.

To summarize, this Court must accept Mr. Tyler's claims of competency as true and therefore must reverse, because § 922(g)(4) as applied fails to advance

any important government interest. A past commitment does not indicate the potential of a risk of violence twenty-seven years later. Hence, some individuals like Mr. Tyler subject to § 922(g)(4) may pose no risk of violence. Yet the Government has no important government interest in disarming individuals who pose no risk of harm. Moreover, Second Amendment restrictions are only permissible to the extent necessary to avoid harm to oneself or others. Finding § 922(g)(4) unconstitutional as applied here would not be requiring a perfect fit between the statute and an important government interest. Rather, a finding of unconstitutionality would be appropriate because the statute as applied fails to meet the substantial relation (not reasonable relation) requirement of the intermediate scrutiny test. Therefore the lower court was in error because the statute as applied does not pass muster under the second *Greeno* prong, and this Court must reverse in part.

## CONCLUSION

For the reasons stated above, § 922(g)(4) as applied clearly burdens conduct within the scope of the Second Amendment, and Appellant has certainly stated a valid claim that § 922(g)(4) is unconstitutional as applied. Therefore, this Court must reverse in part the district court's January 29, 2013 opinion and order to the extent the district court found that Appellant failed to state a claim under the Second Amendment. Likewise, this Court must vacate the district court's June 21,

2013 order to the extent it relies on the reasoning and findings of the January 29, 2013 opinion and order. The case must then be remanded for further proceedings consistent with this Court's opinion.

Executed on August 8, 2013.

**/s/** Lucas J. McCarthy
Lucas J. McCarthy
Hartwell Failey & McCarthy PLC
233 Fulton St. E., Ste. 104
Grand Rapids, MI 49503
(616) 965-1088
luke@hfmlaw.com

Attorney for Appellant Clifford Tyler

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because this brief contains 13,475 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii) and 6th Cir. R. 28(b).

This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed on August 8, 2013.

**/s/** Lucas J. McCarthy
Lucas J. McCarthy
Hartwell Failey & McCarthy PLC
233 Fulton St. E., Ste. 104
Grand Rapids, MI 49503
(616) 965-1088
luke@hfmlaw.com

Attorney for Appellant Clifford Tyler

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2013, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Sixth Circuit using the CM/ECF system, which will provide notification of such filing to all counsel of record.

**/s/** Lucas J. McCarthy
Lucas J. McCarthy
Hartwell Failey & McCarthy PLC
233 Fulton St. E., Ste. 104
Grand Rapids, MI 49503
(616) 965-1088
luke@hfmlaw.com

Attorney for Appellant Clifford Tyler

## ADDENDUM: DESIGNATIONS OF RELEVANT
## DISTRICT COURT DOCUMENTS

Pursuant to 6th Cir. R. 30(f)(1), Appelant designates the following district

court documents as relevant to this appeal:

RE #1, Complaint, Page ID # 1

RE #16, Motion to Dismiss, Page ID # 82

RE #18, Answer, Page ID # 93

RE #19, Stipulation, Page ID # 114

RE #21, Order, Page ID # 122

RE# 23 Motion to Dismiss, Page ID # 124

RE #24 Response to Motion to Dismiss, Page ID # 188

RE #26, Order, Page ID # 214

RE #27, Reply, Page ID # 215

RE #28, Opinion, Page ID # 234

RE #29, Order, Page ID # 246

Re # 30, Stipulation, Page ID # 247

Re #31, Order, Page ID # 251

RE #32, Notice of Appeal, Page ID # 252

RE #33, Amended Notice of Appeal, Page ID # 253