No. 13-1876

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

CLIFFORD CHARLES TYLER,

Plaintiff-Appellant,

v.

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, ET AL.,

Defendants-Appellees.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

———————————

**BRIEF FOR THE FEDERAL APPELLEES**

———————————

STUART F. DELERY
 *Assistant Attorney General*

PATRICK A. MILES, JR.
 *United States Attorney*

MICHAEL S. RAAB
 (202) 514-4053
ANISHA S. DASGUPTA
 (202) 514-5428
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7320*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., N.W.*
 *Washington, D.C.  20530*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff challenges the constitutionality of a federal criminal statute restricting the possession of firearms by a person who "has been committed to a mental institution," 18 U.S.C. § 922(g)(4).  Because of the importance of the issues involved, the federal appellees respectfully request oral argument.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF THE ISSUES ............................................................................1

STATEMENT OF THE CASE ................................................................................1

STATEMENT OF FACTS .......................................................................................2

STANDARD OF REVIEW .....................................................................................12

SUMMARY OF ARGUMENT ...............................................................................12

ARGUMENT ............................................................................................................14

A.    PLAINTIFF'S CLAIMS CONCERN CONDUCT THAT IS
       OUTSIDE THE SCOPE OF THE SECOND AMENDMENT .....................14

B.    EVEN IF THE SECOND AMENDMENT WERE IMPLICATED BY
       PLAINTIFF'S CLAIMS, THE APPLICATION OF SECTION
       922(g)(4) IS CONSISTENT WITH HIS CONSTITUTIONAL
       RIGHTS ...................................................................................................18

CONCLUSION ........................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Cases:**                                                                                        <u>**Page**</u>

*Clark v. Jeter*,
    486 U.S. 456 (1988) ................................................................ 14, 19, 24, 25

*Connecticut Dep't of Public Safety v. Doe*,
    538 U.S. 1 (2003) ................................................................................. 29

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..........................................2, 11, 13, 15, 16, 17, 19

*Entertainment Productions, Inc. v. Shelby County*,
    721 F.3d 729 (6th Cir. 2013) .......................................................... 24

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) ........................................................................ 24

*In re Grand Jury Subpoena John Doe v. United States*,
    150 F.3d 170 (2d Cir. 1998) ........................................................... 24

*Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*,
    731 F.3d 556 (6th Cir. Sept. 24, 2013) .......................................... 12

*Kachalsky v. Cacace*,
    133 S. Ct. 1806 (2013) ................................................................... 29

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ........................................................28, 29

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010) ................................................................... 14

*Mullis v. United States*,
    230 F.3d 215 (6th Cir. 2000) ...........................................................6

*Nat'l Rifle Ass'n of America, Inc. v. Reno*,
    216 F.3d 122 (D.C. Cir. 2000) .........................................................6

*Petramala v. U.S. Dep't of Justice,*
      481 Fed. Appx. 395 (9th Cir. 2012) ........................................................ 16

*Rondigo, L.L.C. v. Township of Richmond,*
      641 F.3d 673 (6th Cir. 2011) ................................................................. 26

*Schall v. Martin,*
      467 U.S. 253 (1984) ...................................................................... 13, 23

*Turner Broad. Sys., Inc. v. FCC,*
      512 U.S. 622 (1994) ............................................................................. 28

*United States v. Bass,*
      404 U.S. 336 (1971) ............................................................................. 24

*United States v. Bean,*
      537 U.S. 71 (2002) ............................................................................. 5, 6

*United States v. Carey,*
      602 F.3d 738 (6th Cir. 2010) ............................................................ 14, 30

*United States v. Chapman,*
      666 F.3d 220 (4th Cir. 2012) ................................................................ 29

*United States v. Emerson,*
      270 F.3d 203 (5th Cir. 2001) ................................................................ 18

*United States v. Greeno,*
      679 F.3d 510 (6th Cir. 2012) ....................................................... 14, 15, 18

*United States v. Mahin,*
      668 F.3d 119 (4th Cir. 2012) ................................................................ 19

*United States v. Marzzarella,*
      614 F.3d 85 (3d Cir. 2010) ................................................................... 29

*United States v. McRobie,*
      No. 08-4632, 2009 WL 82715 (4th Cir. Jan. 14, 2009) ......................... 16

*United States v. Rehlander,*
      666 F.3d 45 (1st Cir. 2012) ............................................................. 16, 27

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ................................................................ 17

*United States v. Williams,*
    616 F.3d 685 (7th Cir. 2010) .................................................................. 27

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) ............................................................ 17, 18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................................ 13, 23

*Weinberger v. Salfi,*
    422 U.S. 749 (1975) .............................................................................. 27

**Statutes:**

18 U.S.C. § 922 ..............................................................................................7

18 U.S.C. § 922(a)(4) .....................................................................................9

18 U.S.C. § 922(d)(4) ............................................... 4, 6, 8, 12, 15, 21, 25

18 U.S.C § 922(g) ....................................................................................4, 19

18 U.S.C. § 922(g)(1) .................................................................................. 26

18 U.S.C. § 922(g)(4) ....................................1, 2, 4, 6, 8, 11, 12, 13, 14, 15, 16
                                    18, 19, 21, 25, 26, 27, 28, 29

18 U.S.C. § 922(g)(4) (2006) ..................................................................... 11

18 U.S.C. § 922(g)(8) .................................................................................. 28

18 U.S.C. § 922(h) ..........................................................................................4

18 U.S.C. § 925(c) ...................................................................... 5, 6, 27, 28

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ................................................................................................1

1662 Militia Act, 13 &14 Car. 2, c. 3 ............................................ 16

1974 Mich. Pub. Acts 937 ............................................................... 10

1974 Mich. Pub. Acts 938 ............................................................... 10

1974 Mich. Pub. Acts 939 ............................................................... 10

1975 Mich. Pub. Acts 381 ............................................................... 10

1982 Mich. Pub. Acts 494 ............................................................... 10

Ala. Code § 22-52-10.8(b) ...............................................................8

Ariz. Rev. Stat. § 13-925 ..................................................................8

Conn. Gen. Stat. § 45a-100 ..............................................................8

Consolidated and Further Continuing  Appropriations Act of 2012,
    Pub. L. 112-55, 125 Stat. 552 ...................................................6

Del. Code Ann. tit. 11, § 1448A(k) .................................................8

Fla. Stat. § 790.065(d) .....................................................................8

Firearm Owners' Protection Act,
    Pub. L. No. 99-308, 100 Stat. 449 (1986)..................................5

Gun Control Act of 1968,
    Pub. L. No. 90-618, 82 Stat. 1213 (1968)........................3, 4, 24

Idaho Code Ann. § 66-356................................................................8

430 Ill. Comp. Stat. 65/10(c) ..........................................................8

Ind. Code §§ 33-23-15-1 - 33-23-15-3.............................................8

Iowa Code § 724.31..........................................................................8

Kan. Stat. Ann. § 75-7c27 ...........................................................................................8

Ky. Rev. Stat. Ann § 237.108 .....................................................................................8

La. Rev. Stat. Ann. § 28:57 .........................................................................................8

MD Code  Ann. Pub. Safety § 5-133.3 ......................................................................8

Mich. Comp. Laws § 330.1401 ................................................................................ 10

Mich. Comp. Laws § 330.1453 ................................................................................ 10

Mich. Comp. Laws § 330.1454 ................................................................................ 10

Mich. Comp. Laws § 330.1455 ................................................................................ 10

Mich. Comp. Laws § 330.1459 ................................................................................ 10

Mich. Comp. Laws § 330.1465 ................................................................................ 10

Mich. Comp. Laws Ann. § 28.425b(7)(k), (n) (2009) ............................................ 25

Mo. Rev. Stat. § 571.092 .............................................................................................8

Neb. Rev. Stat. § 71-963 .............................................................................................8

Nev. Rev. Stat. § 179A.163 .........................................................................................8

N.D. Cent. Code § 62.1-02-01.1 .................................................................................8

N.J. Stat. Ann §§ 30:4-80.8 - 30:4-80.10 ..................................................................8

N.Y. Mental Hyg. Law § 13.09(g) ..............................................................................8

NICS Improvement Amendments Act of 2007,
    Pub. L. No. 110-180, 121 Stat. 2559 ....................................... 6, 7, 8, 21, 22, 23, 24

Or. Rev. Stat. § 161.387(1) ..........................................................................................8

Pub. L. No. 103-159, § 103(b), 107 Stat. 1536 (1993) ..........................................6

Tex. Health & Safety Code Ann. § 574.088 .........................................................8

Treasury, Postal Service, and General Government Appropriations Act, 1993,
    Pub. L. No. 102-393, 106 Stat. 1729 ...............................................5

Va. Code Ann. §§ 18.2-308.1:1 - 18.2-308.1:3 ................................................8

W. Va. Code § 61-7A-5 ..............................................................................8

Wis. Stat. §§ 51.20, 51.45, 54.10, 55.12 ........................................................8

**Regulations:**

27 C.F.R. § 478.144 ..................................................................................5

28 C.F.R. § 0.130(a)(1) ...............................................................................5

28 C.F.R. § 25.6(c)(1)(iv) .............................................................................6

28 C.F.R. § 25.7 ........................................................................................6

Commerce in Firearms and Ammunition; Final Rule,
    53 Fed. Reg. 10,480 (Mar. 31, 1988) ...........................................5

**Legislative Materials:**

114 Cong. Rec. 13,219 (1968) ..................................................................20

114 Cong. Rec. 21,774 (1968) ..............................................................3, 20

114. Cong. Rec. 21,784 (1968) .................................................4, 21, 23, 24

114 Cong. Rec. 21,809-10 (1968) ..........................................................4, 21

114 Cong. Rec. 21,811 (1968) ..............................................................3, 20

114 Cong. Rec. 21,829 (1968) .............................................................13, 21

114 Cong. Rec. 92,747 (1968) ....................................................................3

153 Cong. Rec. H16926 (Dec. 19, 2007) .................................................22

153 Cong. Rec. 28,948 (2007) ...........................................................23, 28

Hearings Before the Subcomm. to Investigate Juvenile Delinquency
    of the S. Comm. on the Judiciary, 88th Cong. 3375 (1963) ..................3

H.R. Rep. No. 90-1577 (1968) ..................................................................28

H.R. Rep. No. 102-618 (1992) ..........................................................5, 6, 28

Federal Firearms Legislation: Hearings Before the Subcomm. to Investigate
    Juvenile Delinquency of the S. Comm. on the Judiciary,
    90th Cong. 92 (1968) ........................................................................ 2, 19

S. Rep No. 88-1340 (1964) ...........................................................2, 13, 20

S. Rep. No. 89-1866 (1966) ..........................................................3, 20, 28

S. Rep. No. 102-353 (1992) .................................................................5, 28

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. R.1 ¶ 19 at Page ID #6 (Complaint). The district court granted the federal defendants' motion to dismiss on January 29, 2013, *see* R.28 at Page ID ##234-245, and on June 21, 2013, entered a final order dismissing plaintiff's claims against the remaining defendants, R.31 at Page ID #251. Plaintiff filed a timely notice of appeal on June 27, 2013. R.33 at Page ID #253. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Federal law restricts the possession of firearms by a person who "has been committed to a mental institution." 18 U.S.C. § 922(g)(4). The issue presented is whether the district court correctly dismissed this as-applied constitutional challenge to Section 922(g)(4) for failure to state a claim.

## STATEMENT OF THE CASE

Plaintiff Clifford Charles Tyler brings this pre-enforcement challenge to the constitutionality of a federal criminal statute restricting the possession of firearms by a person who "has been committed to a mental institution," 18 U.S.C. § 922(g)(4). The district court dismissed Tyler's claims that the restriction was inconsistent with his rights of equal protection and due process and his rights under the Second Amendment, holding that the complaint failed to state a valid legal claim. R.28 at

Page ID ##234-245; R.31 at Page ID #251.  Tyler then filed this timely appeal,

raising only the Second Amendment issue.

## STATEMENT OF FACTS

### A. Statutory Background.

1. Federal law includes "longstanding prohibitions on the possession of

firearms by felons and the mentally ill."  *District of Columbia v. Heller*, 554 U.S. 570, 626

(2008).  As relevant here, these restrictions provide that any person who "has been

committed to a mental institution" may not ship, transport, possess, or receive

firearms and ammunition. 18 U.S.C. § 922(g)(4).

Congress enacted these restrictions following a multi-year inquiry into violent

crime that included "field investigation and public hearings."  S. Rep. No. 88-1340, at

1-2 (1964).  Local officials testified that despite "enact[ing] legislation designed to

keep guns out of the hands of those likely to use them irresponsibly[,] * * * such as

criminals, juveniles, and the mentally ill," they could not prevent such persons from

misusing firearms because "[a]s long as the escaped criminal, or mental patient, or

addict can obtain a firearm by crossing a bridge or mailing an order, no State or local

government can protect its residents adequately, and that pertains to all types of

firearms."  *Federal Firearms Legislation: Hearings Before the Subcomm. to Investigate Juvenile*

*Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 92 (1968) ("1968 Hearings")

(testimony of New York City Mayor John V. Lindsay).  Federal law enforcement

officials noted the "number of tragedies and crimes" resulting from the circumvention

of local firearms laws, including an incident involving a "mentally ill youth who bought a gun in a Fairfax gunshop * * * and used it to kill a high school student." *Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 88th Cong. 3375 (1963) ("1963 Hearings") (testimony of James Bennett, Director, U.S. Bureau of Prisons).

Congress's investigations also revealed a problem of suicide by firearm. The evidence before Congress showed that "[i]n 1966, 6,855 Americans were murdered by gun[] [whereas] 10,407 suicides and 2,600 fatal accidents involved firearms," 114 Cong. Rec. 21,774 (1968) (statement of Rep. Rosenthal), and that "[i]n the last decade, 92,747 Americans took their own lives with a firearm, reflecting the fact that the surest and easiest way to commit suicide is with a gun," *id.* at 21,811 (statement of Rep. Schwengel).

Congress sought to address these problems by "regulat[ing] more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them." S. Rep. No. 89-1866, at 1 (1966). "[P]ersons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances," 114 Cong. Rec. 21,829 (statement of Rep. Bingham), were among those whose access to firearms concerned Congress.

Congress thus enacted as part of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968), statutory provisions addressed to "individuals who by their

previous conduct or mental condition or irresponsibility have shown themselves incapable of handling a dangerous weapon in the midst of an open society," 114 Cong. Rec. at 21,809-10 (statement of Rep. Tenzer), such as "persons with a history of mental disturbances," *id.* at 21,784 (statement of Rep. Celler). These include the provision that "[i]t shall be unlawful for any person * * * * who has been committed to any mental institution * * * * to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Pub. L. No. 90-618, § 102, 82 Stat. 1220-21 (formerly codified at 18 U.S.C. § 922(g)-(h), now consolidated at 18 U.S.C. § 922(g)(4)); *see also* 18 U.S.C. § 922(d)(4) (restriction on sale or transfer of firearms to such persons).

As originally enacted, the Gun Control Act also included a provision under which an individual who was barred from firearm possession because of a conviction for certain non-firearm and non-weapons-related-offenses could apply to the federal government for "relief from the disabilities imposed by Federal laws" based on a showing "that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Pub. L. No. 90-618, § 102, 82 Stat. 1225. Congress subsequently expanded that relief-from-disabilities program to cover any person whom the Gun Control Act "prohibited from possessing, shipping, transporting, or receiving

firearms." Firearms Owners' Protection Act, Pub. L. No. 99-308, § 105(1)(A), 100 Stat. 449, 459 (1986) (codified as amended at 18 U.S.C. § 925(c)).[1]

The federal program for "relief from the disabilities imposed by Federal [firearms] laws," 18 U.S.C. § 925(c), was in effect from 1986 until 1992, when Congress suspended its funding through an appropriations restriction on the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), which administered the program. *See* Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732; *United States v. Bean*, 537 U.S. 71, 74-75 (2002). Congress noted that the review of Section 925(c) applications is "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made." S. Rep. No. 102-353, at 19 (1992). "Under the relief procedure, ATF officials are required to guess whether a convicted felon or a person committed to a mental institution can be entrusted with a firearm." H.R. Rep. No. 102-618, at 14 (1992). Even "[a]fter ATF agents spend many hours investigating a particular applicant for relief, there is no way to know with any certainty whether the applicant is still a danger to public safety[,] * * * * [t]hus, officials are * * * forced to make these decisions knowing that a mistake could have

---

[1] To implement this statutory revision, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") promulgated final regulations on March 31, 1988 setting forth the requirements for a relief application. *See* Commerce in Firearms and Ammunition; Final Rule, 53 Fed. Reg. 10,480, 10,506 (Mar. 31, 1988) (codified at 27 C.F.R. § 478.144); *see also* 28 C.F.R. § 0.130(a)(1) (delegating to ATF the Attorney General's authority to "[i]nvestigate, administer, and enforce" the Gun Control Act).

devastating consequences for innocent citizens." *Ibid.* Congress's appropriations restriction on ATF has remained in place since 1992 without interruption, thereby "suspend[ing] § 925(c)'s operation." *Mullis v. United States*, 230 F.3d 215, 219 (6th Cir. 2000); *see also Bean*, 537 U.S at 75 n.3; Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. 112-55, 125 Stat. 552, 609.

2. Congress subsequently found deficiencies in the reporting of information to the national instant criminal background check system ("NICS") that made it possible for individuals with documented mental health problems to purchase and misuse firearms notwithstanding 18 U.S.C. § 922(d)(4) and (g)(4).[2] In April 2007, "a student with a history of mental illness at the Virginia Polytechnic Institute and State University shot to death 32 students and faculty members, wounded 17 more, and then took his own life." NICS Improvement Amendments Act of 2007,

---

[2] "The Brady Handgun Violence Prevention Act of 1993 required the Attorney General to establish a 'national instant criminal background check system,' known as the NICS, to search the backgrounds of prospective gun purchasers for criminal or other information that would disqualify them from possessing firearms." *Nat'l Rifle Ass'n of America, Inc. v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000); Pub. L. No. 103-159, § 103(b), 107 Stat. 1536 (1993). "A computerized system operated by the FBI, the NICS searches for disqualifying information in three separate databases." 216 F.3d at 125. The databases contain information from both state and federal sources, but state information constitutes the bulk of the information accessed by the NICS. *See* Federal Bureau of Investigation, *National Instant Criminal Background Check System*, http://www.fbi.gov/about-us/cjis/nics. "Before selling a weapon, firearm dealers must submit the prospective purchaser's name, sex, race, date of birth, and state of residence to the NICS operations center at the FBI." 216 F.3d at 125; 28 C.F.R. § 25.7. If a search reveals that the prospective purchaser may not legally possess a firearm, the dealer receives a purchase "denied" response from the NICS operations center. 216 F.3d at 125; 28 C.F.R. § 25.6(c)(1)(iv).

Pub L. No. 110-180, § 2(9), 121 Stat. 2559, 2560 (2008) (codified at 18 U.S.C. § 922 note). "In spite of a proven history of mental illness, the shooter was able to purchase the two firearms used in the shooting," which was "the deadliest campus shooting in United States history." *Ibid.* Congress found that "[i]mproved coordination between State and Federal authorities could have ensured that the shooter's disqualifying mental health information was available to NICS." *Ibid.*

Congress found that a March 2002 "senseless shooting, which took the lives of a priest and a parishioner at the Our Lady of Peace Church in Lynbrook, New York," likewise demonstrated "the need to improve information-sharing that would enable Federal and State law enforcement agencies to conduct a complete background check on a potential firearm purchaser." Pub L. No. 110-180, § 2(8), 121 Stat. 2560. As Congress noted, "[t]he man who committed this double murder had a prior disqualifying mental health commitment and a restraining order against him, but passed a Brady background check because NICS did not have the necessary information to determine that he was ineligible to purchase a firearm under Federal or State law." *Ibid.*

Congress accordingly enacted the NICS Improvement Amendments Act of 2007, Pub L. No. 110-180, 121 Stat. 2559 (2008). The Act, *inter alia*, authorizes federal grants to assist States to improve the quality of information they make available to the databases searched by NICS. *Id.* § 103(a)(1), 121 Stat. 2567. To be eligible for such a grant, a State must certify to ATF that it has implemented a program under which

7

persons who "pursuant to State law" have been adjudicated mentally defective or committed to a mental institution may "apply to the State for relief from the disabilities imposed by [18 U.S.C. § 922(d)(4) and (g)(4)]." Pub L. No. 110-180, § 103(c), 121 Stat. 2568; *id.* § 105(a), 121 Stat. 2569. A State may receive federal authorization to provide relief from the federal firearm disabilities at Section 922(d)(4) and (g)(4) — and thereby be eligible for a grant — only if its program provides for a specified State authority to "grant the relief, pursuant to State law and in accordance with the principles of due process, if * * * the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.* § 105(a)(2), 121 Stat. 2569-70. The State program must also "permit[] a person whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." *Id.* § 105(a)(3), 121 Stat. 2570. At present, twenty-four States have created qualifying programs.[3]

---

[3] This information is accurate as of the filing of this brief but is potentially subject to change because States may join the list by creating qualifying programs and may also be removed from the list if they cease to maintain qualifying programs. *See* ALA. CODE § 22-52-10.8(b); ARIZ. REV. STAT. § 13-925; CONN. GEN. STAT. § 45a-100; DEL. CODE ANN. tit. 11, § 1448A(k); FLA. STAT. § 790.065(d); IDAHO CODE ANN. § 66-356; 430 ILL. COMP. STAT. 65/10(c); IND. CODE §§ 33-23-15-1 - 33-23-15-3; IOWA CODE § 724.31; KAN. STAT. ANN. § 75-7c27; KY. REV. STAT. ANN § 237.108; LA. REV. STAT. ANN. § 28:57; MD. CODE ANN. PUB. SAFETY § 5-133.3; MO. REV. STAT. § 571.092; NEB. REV. STAT. § 71-963; NEV. REV. STAT. § 179A.163; N.J. STAT. ANN §§ 30:4-80.8 – 30:4-80.10; N.Y. MENTAL HYG. LAW § 13.09(g); N.D. CENT. CODE § 62.1-02-01.1; OR. REV. STAT. § 161.387(1); Oregon PSRB Order # 2-2011;

**B. Facts and Prior Proceedings.**

1. Plaintiff Clifford Charles Tyler challenges the constitutionality, as applied to him, of 18 U.S.C. § 922(a)(4)'s restriction on firearm possession by a person who "has been committed to a mental institution."  R.1 ¶ 31 at Page ID #7.[4]  Tyler alleges that he wishes "to acquire firearms both for personal protection and for recreation but is prevented from doing so by the Defendants' enforcement" of the restriction, *id.* ¶ 5 at Page ID #3, and the lack of "any state or federal procedure providing relief from a federal prohibition on acquiring a firearm," *id.* ¶ 42 at Page ID #9.  He asserts that the restriction is inconsistent with his rights under the Second Amendment.  Appellant Br. 19.

According to the complaint, Tyler was involuntarily committed by a Michigan probate court in 1986 "on the belief that he might commit suicide during an emotionally devastating divorce."  R.1 ¶ 5 at Page ID #3.  The order of commitment attached to the complaint shows that, in January 1986, the probate court found "[b]y

TEX. HEALTH & SAFETY CODE ANN. § 574.088; VA. CODE ANN. §§ 18.2-308.1:1 – 18.2-308.1:3; W. VA. CODE § 61-7A-5; WIS. STAT. §§ 51.20, 51.45, 54.10, 55.12.

[4] The defendants are the Hillsdale County Sheriff's Office; Stan W. Burchart as Sheriff of Hillsdale County; Eric Holder as United States Attorney General; the United States Department of Justice; ATF; B. Todd Jones as Director of ATF; Thomas E. Brandon as Deputy Director of ATF; the Federal Bureau of Investigation; the Director of the FBI; and the United States of America. *See* Appellant Br. 5 (noting plaintiff's abandonment of his individual-capacity claims).  James B. Comey, the current Director of the FBI, is substituted for Robert S. Mueller, III, the former Director of the FBI, pursuant to Fed. R. App. P. 43(c)(2) (automatic substitution of officeholder).

clear and convincing evidence" that Tyler was "a person requiring treatment because [he] is mentally ill, and as a result of that mental illness * * * can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation."  R.1, Exh. A at Page ID #16.[5]  The court entered this finding after a hearing at which Tyler was represented by counsel and presented evidence.  *Ibid.*[6]  The court further found that no "treatment program other than hospitalization [is] adequate to meet the person's treatment needs" and accordingly ordered that Tyler undergo a treatment program "for a period not to exceed 90 days," including "hospitalization for a period not to exceed 30 days" and alternative treatment under the supervision of hospital staff.  *Id.*, Exh. A at Page ID ##16-17.

The complaint alleges that in February 2011, Tyler attempted to purchase a firearm but was told by the Hillsdale County Sheriff's Office that his prior

---

[5] *See also* 1975 Mich. Pub. Acts 381, Mich. Comp. Laws § 330.1401 (definition of person requiring treatment); 1974 Mich. Pub. Acts 939, Mich. Comp. Laws § 330.1465 ("A judge or jury shall not find that an individual is a person requiring treatment unless that fact has been established by clear and convincing evidence.")

[6] *See also* 1974 Mich. Pub. Acts 937, Mich. Comp. Laws § 330.1453 (right to notice); 1974 Mich. Pub. Acts 938-39, Mich. Comp. Laws § 330.1459 (right to present evidence and cross-examine witnesses); 1982 Mich. Pub. Acts 494, Mich. Comp. Laws § 330.1454 (right to counsel); *ibid.*, Mich. Comp. Laws § 330.1455 (right to be present at all hearings).

commitment prohibited the transaction. *Id.* ¶¶ 26-28 at Page ID ##6-7. Tyler unsuccessfully appealed the denial to the NICS Section of the Federal Bureau of Investigation, which informed him that 18 U.S.C. § 922(g)(4) barred him from purchasing a firearm. *Id..* ¶¶ 30-34 at Page ID ##7-8; *id.,* Exh. E at Page ID #29-30; *id.*, Exh. F at Page ID ##33-34. Tyler then filed this suit seeking declaratory and injunctive relief barring defendants "from enforcing against Plaintiff 18 U.S.C. § 922(g)(4) (2006) and all its derivative regulations, and all related laws, policies, and procedures * * * unless Plaintiff is afforded an opportunity to demonstrate his fitness and thereby seek relief from 18 U.S.C. § 922(g)(4) (2006) and all related laws, derivative regulations, policies, and procedures." *Id.* at Page ID #13.

2. The district court dismissed the suit for failure to state a claim.[7] The court observed that "Plaintiff's position that the right to keep and bear arms, as historically understood, extends to previously committed individuals who are no longer a 'real danger,' is not supported by the case law or historical evidence," and that "[t]he Supreme Court has recognized as 'presumptively lawful' longstanding prohibitions on the possession of firearms by * * * 'the mentally ill.'" R.28 at Page ID #240 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008)). The court thus

---

[7] The district court granted the federal defendants' motion to dismiss in an opinion and order issued on January 29, 2013. R.28 at Page ID ##234-245. On June 21, 2013, the court dismissed plaintiff's claims against the remaining defendants — the Hillsdale County Sheriff's Department and Stan W. Burchardt as Sheriff of Hillsdale County — for the reasons given in its January 29, 2013 opinion and order. R.31 at Page ID #251.

reasoned "that the Second Amendment, as historically understood, does not extend to Plaintiff." *Ibid.*

The court further concluded that even if this suit implicated plaintiff's Second Amendment rights, Section 922(g)(4) would satisfy intermediate scrutiny — the standard of review supported both by *Heller* and by subsequent appellate decisions. *Id.* at Page ID ##240-241.  The court observed that intermediate scrutiny does not require a "perfect fit * * * to the government's important interest in preventing firearm violence, public safety, and reducing self-inflicted violence," *id.* at Page ID #243, and that here Congress justifiably "elected to rely on a person's history of past commitment and judicial adjudications of mental incompetence as indicators of a risk of gun-related violence," *id.* at Page ID #244.

## STANDARD OF REVIEW

The district court's grant of summary judgment is subject to de novo review. *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. Sept. 24, 2013).

## SUMMARY OF ARGUMENT

Plaintiff Clifford Tyler seeks preenforcement review of federal restrictions on the possession of firearms by a person who "has been committed to a mental institution."  18 U.S.C. § 922(g)(4); *see also id.* § 922(d)(4).  He contends that, as applied to him, these restrictions are inconsistent with the Second Amendment.  The district court properly rejected that argument.

12

Tyler was involuntarily committed for inpatient hospital care after a probate court found that he was mentally ill and had engaged in acts substantially supporting a reasonable expectation that he might seriously physically injure himself or others. History and common sense confirm that restricting the firearm possession of persons with a history of mental disturbance is not inconsistent with "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The Second Amendment is thus not implicated by the application to Tyler of Section 922(g)(4)'s "longstanding prohibition[] on the possession of firearms by * * * the mentally ill," *Heller*, 554 U.S. at 626.

In any event, even if Tyler's claims implicate the Second Amendment, Section 922(g)(4)'s restrictions on his firearm possession readily withstand heightened scrutiny. Congress enacted Section 922(g)(4) to address the problem of "firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances," 114 Cong. Rec. 21,829 (statement of Rep. Bingham), and the problem of suicide by firearm, S. Rep. No. 88-1340, at 3. The Supreme Court has long recognized the government's "legitimate and compelling" interest "in protecting the community from crime," *Schall v. Martin*, 467 U.S. 253, 264 (1984) (internal quotation marks omitted), and its "unquestionably important and legitimate" interest in suicide prevention, *Washington v. Glucksberg,* 521 U.S. 702, 735 (1997). Disarming Tyler — a person who was involuntarily committed based on a procedurally sound finding that he is mentally ill

13

and poses a risk of injury to himself and others — is at least "substantially related," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), to these interests.

## ARGUMENT

### Section 922(g)(4) Is Fully Consistent With The Second Amendment.

#### A.    Plaintiff's Claims Concern Conduct That Is Outside The Scope Of The Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court provided a non-"exhaustive" list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," and explained that "nothing in [its] opinion should be taken to cast doubt on" such measures. *Id.* at 626, 627 n.26. The Court "repeat[ed] those assurances" in *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (plurality).

This Court has understood *Heller*'s language to establish that "the Second Amendment right * * * is specifically *limited* in the case of felon prohibitions," and has concluded on that basis that "prohibitions on felon possession of firearms do not violate the Second Amendment." *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) (emphasis in original); *see also United States v. Greeno*, 679 F.3d 510, 517-18 (6th Cir. 2012)). As the Court has explained, "[b]ecause [*Heller*'s] list [of presumptively lawful regulatory measures] contains the prohibition on the possession

14

of firearms by felons, this Circuit has relied on it to reject Second Amendment challenges to federal felon-in-possession of a firearm convictions and related expungement exceptions." *Greeno*, 679 F.3d at 517.

The same analysis applies to Tyler's Second Amendment challenge to federal restrictions on the possession of firearms by a person "who has been committed to a mental institution," 18 U.S.C. § 922(g)(4); *see also id.* § 922(d)(4). Tyler was involuntarily committed to a Michigan hospital after a probate court found "[b]y clear and convincing evidence" that he was "a person requiring treatment because [he] is mentally ill, and as a result of that mental illness * * * can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." R.1, Exh. A at Page ID #16. The court found no "treatment program other than hospitalization adequate to meet [Tyler's] treatment needs" and accordingly ordered Tyler to undergo a treatment program "for a period not to exceed 90 days," including "hospitalization * * * for a period not to exceed 30 days" and alternative treatment under the supervision of hospital staff. *Id.*, Exh. A, at Page ID ##16-17.

Tyler does not allege any inadequacy in the procedures by which these determinations were made, and the order of commitment attached to his complaint shows that the probate court's findings were entered after a properly noticed hearing at which Tyler was represented by counsel and presented evidence. R.1, Exh. A at

Page ID #16. There is thus no basis for Tyler's contention (Appellant Br. 18) that — notwithstanding *Heller*'s treatment of "longstanding prohibitions on the possession of firearms by * * * the mentally ill" as "presumptively lawful regulatory measures," 554 U.S. at 626 & 627 n.26 — Section 922(g)(4)'s restrictions on his possession of a firearm implicate the Second Amendment. Indeed, although this Court has not yet had occasion to apply *Heller*'s language in a case challenging the constitutionality of the federal firearm restriction at Section 922(g)(4), two other courts of appeals have relied on that language to summarily reject such challenges in cases where the predicate for Section 922(g)(4)'s restriction was established under procedurally adequate circumstances. *Petramala v. U.S. Dep't of Justice*, 481 Fed. Appx. 395 (9th Cir. 2012); *United States v. McRobie*, No. 08-4632, 2009 WL 82715 (4th Cir. Jan. 14, 2009).[8]

*Heller* was limited to recognition of "the right of law-abiding, *responsible* citizens to use arms in defense of hearth and home," 554 U.S. at 635 (emphasis added), and the historical record supports the caution with which courts have approached requests to extend that holding by recognizing a Second Amendment right for a person "who has been committed to a mental institution," 18 U.S.C. § 922(g)(4). The Court in *Heller* recognized as "the predecessor of our Second Amendment," 554 U.S. at 593, the right to arms in the 1689 English Declaration of Rights, which was understood to

---

[8] *See also United States v. Rehlander*, 666 F.3d 45, 48 (1st Cir. 2012) (concluding that Section 922(g)(4) did not apply where emergency hospitalization was ordered "without any adversary proceeding and with no finding by an independent judicial or even administrative officer that the subject is either mentally disturbed or dangerous").

16

be consistent with the disarmament of "any person or persons" judged "dangerous to the Peace of the Kingdome" under the 1662 Militia Act, 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.). *See* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS 123 (1994). In the American colonies, disarmament of individuals perceived to be dangerous was also frequent, and such actions were not viewed as inconsistent with the right to bear arms. *Id.* at 140-41; *see also United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir. 2010).

The documentary record surrounding adoption of the Constitution confirms this view. One of the "Second Amendment precursors" identified by *Heller* as "highly influential," 554 U.S. at 603-04 — a proposal offered by the Pennsylvania anti-federalist faction at the Pennsylvania Convention — provided that "the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals* * * * *," The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Bernard Schwartz, THE BILL OF RIGHTS, A DOCUMENTARY HISTORY 665 (1971) (emphasis added). Samuel Adams' proposal at the ratifying convention in Massachusetts — identified by *Heller* as another "highly influential" "Second Amendment precursor[]," 554 U.S. at 603-04 — recommended "that the said Constitution be never construed to authorize Congress * * * to prevent the people of

17

the United States *who are peaceable citizens*, from keeping their own arms," Schwartz, THE BILL OF RIGHTS, *supra*, 674-75, 681 (emphasis added).

Historical sources further show that the colonial public did not view persons with a history of mental disturbance as being among those who could bear arms without "real danger of public injury," *id.* at 665; *see also United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001). "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry" that did not include such persons. *Yancey*, 621 F.3d at 685. Indeed, persons with a history of mental disturbance were often physically isolated from the community at large through confinement at home or in welfare and penal institutions. Gerald N. Grob, THE MAD AMONG US: A HISTORY OF THE CARE OF AMERICA'S MENTALLY ILL 5-21, 29, 43 (1994); *see also* Mary Ann Jimenez, CHANGING FACES OF MADNESS: EARLY AMERICAN ATTITUDES AND TREATMENT OF THE INSANE 92, 103-04 (1987). Thus, "the absence of historical statutory prohibitions on firearm possession [by such persons] may have been the consequence of the fact that in eighteenth-century America, justices of the peace were authorized to lock up lunatics who were dangerous to be permitted to go abroad," *Yancey*, 621 F.3d at 685 (quotation marks omitted), obviating the need for laws formally disarming them.

18

**B. Even If The Second Amendment Were Implicated By Plaintiff's Claims, The Application Of Section 922(g)(4) Is Consistent With His Constitutional Rights.**

Even if plaintiff's claims implicated a Second Amendment interest, his constitutional challenge nonetheless fails because Section 922(g)(4)'s restrictions satisfy "the appropriate level of scrutiny," *Greeno*, 679 F.3d at 518 — here, intermediate scrutiny, under which a law is constitutional if it is "substantially related to an important governmental objective," *Clark v. Jeter*, 486 U.S. 456, 461(1988). A more demanding standard would be inconsistent with *Heller*'s recognition that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful," 554 U.S. at 626 & 627 n.26; *see also United States v. Mahin*, 668 F.3d 119, 123 (4th Cir. 2012) (noting that "the courts of appeals have generally applied intermediate scrutiny" at most when evaluating post-*Heller* challenges to the firearm restrictions at 18 U.S.C § 922(g) and citing cases).

1. Congress enacted Section 922(g)(4) following a multi-year inquiry into violent crime that revealed "a serious problem of firearms misuse in the United States," S. Rep. No. 89-1866, at 3, 53, and "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities," *id.* at 19. Local officials reported that despite "enact[ing] legislation designed to keep guns out of the hands of those likely to use them irresponsibly[,] * * *such as criminals, juveniles, and the mentally ill," they could not prevent such persons from misusing

19

firearms because "[a]s long as the escaped criminal, or mental patient, or addict can obtain a firearm by crossing a bridge or mailing an order, no State or local government can protect its residents adequately." 1968 Hearings, *supra*, at 92 (testimony of New York City Mayor John V. Lindsay). Federal authorities likewise testified to a need for greater federal regulation, noting that despite the District of Columbia's "fairly strict" firearms laws, "a number of tragedies and crimes have occurred in our area as a result of this lack of uniform control," including an incident involving a "mentally ill youth who bought a gun in a Fairfax gunshop * * * and used it to kill a high school student." 1963 Hearings, *supra*, at 3375 (testimony of James Bennett, Director, U.S. Bureau of Prisons).

Congress's investigation of firearm-related killings also revealed that firearms "were the agency of death" in over half of all suicides. S. Rep. No. 88-1340, at 3. The evidence before Congress showed that "[i]n 1966, 6,855 Americans were murdered by gun[] [whereas] 10,407 suicides and 2,600 fatal accidents involved firearms," 114 Cong. Rec. 21,774 (statement of Rep. Rosenthal), and that "[i]n the last decade, 92,747 Americans took their own lives with a firearm, reflecting the fact that the surest and easiest way to commit suicide is with a gun," *id.* at 21,811 (statement of Rep. Schwengel).

To address these problems, Congress undertook to "regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them." S. Rep. No. 89-1866, at 1; *see*

*also* 114 Cong. Rec. 13,219 (statement of Sen. Tydings) ("Within the context of Federal control of traffic in firearms, States and localities can move effectively to keep these lethal weapons out of the hands of criminals, drug addicts, mentally disordered persons, juveniles, and other persons whose possession of them is too high a price in danger to us all to allow."). Congress sought to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances," 114 Cong. Rec. 21,829 (statement of Rep. Bingham).

To that end, Congress enacted statutory provisions addressed to "individuals who by their previous conduct or mental condition or irresponsibility have shown themselves incapable of handling a dangerous weapon in the midst of an open society," 114 Cong. Rec. 21,809-10 (statement of Rep. Tenzer), such as "persons with a history of mental disturbances," *id.* at 21,784 (statement of Rep. Celler). These provisions include Section 922(g)(4), which makes it unlawful for any person "who has been committed to a mental institution * * * * to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce"; *see also* 18 U.S.C. § 922(d)(4) (restriction on sale or transfer of firearms to such persons).

Congress subsequently found that, notwithstanding these restrictions, individuals with disqualifying mental health histories were continuing to acquire and misuse firearms because of deficiencies in the reporting of their background

information to the national instant criminal background check system.  In April 2007, "a student with a history of mental illness at the Virginia Polytechnic Institute and State University shot to death 32 students and faculty members, wounded 17 more, and then took his own life."  Pub L. No. 110-180, § 2(9), 121 Stat. 2559, 2560 (2008). "In spite of a proven history of mental illness, the shooter was able to purchase the two firearms used in the shooting," which was "the deadliest campus shooting in United States history." *Ibid.*; *see also* 153 Cong. Rec. H16926 (Dec. 19, 2007) (statement of Rep. Boucher) (noting that "[t]he perpetrator of the Virginia Tech tragedy had been adjudicated to be a risk to himself and committed for outpatient mental evaluation").  Congress found that "[i]mproved coordination between State and Federal authorities could have ensured that the shooter's disqualifying mental health information was available to NICS."  Pub L. No. 110-180, § 2(9), 121 Stat. 2560.

Congress found that a March 2002 "senseless shooting, which took the lives of a priest and a parishioner at the Our Lady of Peace Church in Lynbrook, New York," likewise demonstrated "the need to improve information-sharing" between State and federal authorities.   Pub L. No. 110-180, § 8, 121 Stat. 2560.  As Congress found, "[t]he man who committed this double murder had a prior disqualifying mental health commitment and a restraining order against him, but passed a Brady background check because NICS did not have the necessary information to determine that he was ineligible to purchase a firearm under Federal or State law."  *Ibid.*

To address these problems, Congress authorized federal grants to help States improve the quality of information they make available to the NICS databases. Pub L. No. 110-180, § 103(a)(1), 125 Stat. 2567. "[R]ecogniz[ing] that mental illness is not necessarily a permanent impediment," Congress also provided that where a federal disqualification rests on a State's "determination of mental illness, that State should be able to remove that determination" and thereby lift the disqualification by "establish[ing] procedures that permit a person disqualified on the basis of legal mental illness to prove to the State that he or she no longer poses a danger to society." 153 Cong. Rec. 28,948 (2007) (statement of Rep. McCarthy). To receive federal authorization to lift the federal disqualification, a State's relief program must provide for a specified State authority to "grant the relief, pursuant to State law and in accordance with the principles of due process, if * * * the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Pub L. No. 110-180, § 105(a)(2), 121 Stat. 2569-70. The State program must also "permit[] a person whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." *Id.* § 105(a)(3), 121 Stat. 2570.

2. The government's interest "in protecting the community from crime" is "legitimate and compelling," *Schall v. Martin*, 467 U.S. 253, 264 (1984) (internal quotation marks omitted), as is its interest in preventing suicide, *see Washington v.*

23

*Glucksberg,* 521 U.S. 702, 735 (1997) (recognizing the government's interest in suicide prevention as "unquestionably important and legitimate"); *In re Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (noting the "compelling governmental interest[]" in "prevention of suicide").    And there is at least a "substantial" relationship, *Clark*, 486 U.S. at 461, between these interests and disarming "persons with a history of mental disturbances," 114 Cong. Rec. 21,784 (statement of Rep. Celler).  That connection is shown by the legislative history of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, and the Supreme Court's recognition that the "various evils that prompted [the] statute * * * would be most thoroughly mitigated by forbidding every possession of any firearm by specified classes of especially risky people," *United States v. Bass*, 404 U.S. 336, 345 (1971).  It is further shown by the legislative history of the NICS Improvement Amendments Act of 2007, Pub L. No. 110-180, 121 Stat. 2559.[9]

Tyler, a resident of Michigan, was involuntarily committed for in-patient hospital care after a Michigan probate court found "[b]y clear and convincing

---

[9] The connection between Congress's objectives and disarming "persons with a history of mental disturbances," 114 Cong. Rec. 21,784 (Rep. Celler), also finds confirmation in "history, consensus, and simple common sense," *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks omitted); *see also Entertainment Productions, Inc. v. Shelby County,* 721 F.3d 729, 739 (6th Cir. 2013) (upholding State law and municipal ordinance under intermediate scrutiny based on "body of evidence * * * which included the experiences of other states and municipalities, judicial opinions, crime statistics, anecdotes from police, their own prior experiences with regulating adult-oriented businesses, and plain common sense").

evidence" that he was "a person requiring treatment because [he] is mentally ill, and as a result of that mental illness * * * can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation."  R.1, Exh. A at Page ID #16; *see also* R.1, ¶ 23 at Page ID #6 (alleging that "[t]he primary reason for commitment was a risk that Plaintiff might commit suicide due to an emotionally devastating divorce").  Michigan, as a matter of State law, bars such a person from receiving a concealed weapons permit that must otherwise issue upon a finding that, *inter alia*, "[i]ssuing a license to the applicant to carry a concealed pistol in this state is not detrimental to the safety of the applicant or to any other individual."   Mich. Comp. Laws Ann. § 28.425b(7)(k), (n) (2009).[10] Michigan has also declined to establish procedures for such a person to lift this State firearm disability, or any federal firearm disability imposed by 18 U.S.C. § 922(d)(4) and (g)(4).

Applying Section 922(g)(4) in these circumstances is at least "substantially related," *Clark*, 486 U.S. at 461, to the problems that Congress sought to address. Although this Court need not accept as true Tyler's conclusory assertions (Appellant

---

[10]  *See also* Third Analysis of House Bill 4530 as enrolled, at 3 (Jan. 4, 2001), http://www.legislature.mi.gov/documents/1999-2000/billanalysis/House/htm/ 1999-HLA-4530-C.htm (noting legislature's intention to prevent the carrying of concealed pistols by persons with "a history of mental illness," including "clinical depression") (last visited Nov. 18, 2013).

Br. 45-46) that he "does not prevent a threat to community peace or public safety, because he is a sane, stable, law-abiding citizen who does not present a risk of violence or other mischief," the requisite fit between Section 922(g)(4) and Congress's objectives exists in Tyler's case even if the truth of those allegations is assumed.[11]

"Research shows that risk factors for suicide include * * * prior suicide attempt," and that "the risk for suicide is associated with changes in brain chemicals called neurotransmitters, including serotonin[,] [d]ecreased levels of [which] have been found in people with * * * a history of suicide attempts." National Institute of Mental Health, Suicide in the U.S.: Statistics and Prevention.[12] Public health statistics show that "older Americans [aged 65 and older] are disproportionately likely to die by suicide" and that use of "firearms in the home[] [is] the method used in more than half of suicides." *Ibid.* That Tyler has been involuntarily hospitalized based on "a risk that [he] might commit suicide," R.1 ¶ 23 at Page ID #6, "defeats any claim he has that [Section 922(g)(4)] is not substantially related to preventing him from committing

---

[11] Tyler's pleadings establish that he is "*dissimilarly* situated," *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 684 (6th Cir. 2011), to a person who has never been determined to be mentally ill and further show that notwithstanding the federal prohibition on his possession of a firearm, he "enjoys shooting pistols competitively," R.1, Exh. B at Page ID #20, "he has used guns as a hobby," *ibid.*, and "he goes to gun shows where he swaps and trades guns on the weekends," *id.*, Exh. C at Page ID #22. "In short, [his] allegations * * * are exposed as little more than 'legal conclusions couched as factual allegations' and need not be accepted as true under Rule 12(b)(6) scrutiny." *Rondigo, L.L.C.*, 641 F.3d at 684.

[12] Available at http://www.nimh.nih.gov/health/publications/suicide-in-the-us-statistics-and-prevention/index.shtml (last visited Nov. 18, 2013)

further [self-harm]," *United States v. Williams,* 616 F.3d 685, 693 (7th Cir. 2010) (rejecting as-applied challenge to 18 U.S.C. § 922(g)(1) based on convicted felon's "own violent past").

In any event, Tyler's acknowledgment of "the difficulty of making long-term predictions of violence with adequate scientific support" (Appellant Br. 48) underscores the error of his reliance on allegations concerning his current mental condition. This acknowledgment also shows the error of his insistence (Appellant Br. 43-44) "that the Second Amendment affords him at least an opportunity to demonstrate he is the safe, sane, stable individual his doctors say he is and to thereby demonstrate that § 922(g)(4) no longer remains constitutional as applied to him." As Tyler recognizes (Appellant Br. 52), "it would be difficult for the Federal Government to somehow administer a program of continually screening everyone in the U.S. for current mental illness." Indeed, it is because addressing "gun possession by those who were or are mentally ill and dangerous" through "a free floating prohibition would be very hard to administer" that "Congress sought to piggyback on determinations" of mental illness made in prior proceedings, including "*prior judicial proceedings*[,] to establish status." *Rehlander*, 666 F.3d at 50 (emphasis in original).

Here, "Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid," *Weinberger v. Salfi*, 422 U.S. 749, 777 (1975), concluded that disarming persons with a history of mental disturbance "would protect against [that] occurrence, and that the expense and other difficulties of

individual determinations justified the inherent imprecision of a prophylactic rule," *ibid.* "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994); *see also Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). As Congress noted when deciding to discontinue funding for the federal program for "relief from the disabilities imposed by Federal [firearms] laws," 18 U.S.C. § 925(c), even "[a]fter ATF agents spend many hours investigating a particular applicant for relief, there is no way to know with any certainty whether the applicant is still a danger to public safety," H.R. Rep. No. 102-618, at 14; *see also* S. Rep. No. 102-353, at 19 (noting that review of Section 925(c) applications is "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made").[13]

---

[13] Congress's provision of a mechanism for a State to remove its "initial determination of mental illness" for purposes of Section 922(g)(4) when "a person disqualified on the basis of legal mental illness * * * prove[s] to the State that he or she no longer poses a danger to society," 153 Cong. Rec. 28,948 (statement of Rep. McCarthy), is consistent with the principles of federalism that are reflected in the Gun Control Act. *See, e.g.,* H.R. Rep. No. 90-1577, at 6 (1968) (noting that the "principal purpose" of the Act was "to assist the States effectively to regulate firearms traffic within their borders"); S. Rep. No. 89-1866, at 19 (recognizing that federal regulation was necessary to address "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities").

Tyler's insistence that the Second Amendment does not permit Section 922(g)(4) to be applied to him unless he can be shown to "*in fact* pose a potential risk of harm" (Appellant Br. 46) (emphasis in original), cannot be squared with his recognition that intermediate scrutiny permits Congress to "reasonably depart from using the least restrictive means provided it does not burden the right affected substantially more than necessary," (Appellant Br. 58). As the Fourth Circuit has observed when rejecting an as-applied Second Amendment challenge to an analogous restriction at 18 U.S.C. § 922(g)(8): "[T]he prohibitory net cast by [the statute] may be somewhat over-inclusive given that not every person who falls within in it would misuse a firearm * * * if permitted to possess one," but "[t]his point does not undermine the [statute's] constitutionality * * * because it merely suggests that the fit is not a perfect one[] [and] a reasonable fit is all that is required under intermediate scrutiny." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012).[14] Because the constitutionality of Section 922(g)(4)'s restriction does not turn on whether Tyler himself "would misuse a firearm * * * if permitted to possess one," *Chapman*, 666 F.3d at 231, the restriction's applicability need not be limited to circumstances where there

_____

[14] *See also Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (noting that intermediate scrutiny does not require "that the legislature's chosen means is narrowly tailored or the least restrictive available means to serve the stated governmental interest," and that "[t]o survive intermediate scrutiny, the fit between the challenged regulation need only be substantial, not perfect" (internal quotation marks omitted)), *cert. denied sub. nom. Kachalsky v. Cacace*, 133 S. Ct. 1806 (2013); *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011) (explaining that intermediate scrutiny only "require[s] the fit between the challenged regulation and the asserted objective be reasonable, not perfect").

is a procedure for continuing dangerousness review. *See Connecticut Dep't of Public Safety v. Doe*, 538 U.S. 1, 6-8 (2003) ("[E]ven assuming, *arguendo*, that respondent has been deprived of a liberty interest," due process does not require "any hearing on current dangerousness" where "the law's requirements turn on an offender's conviction alone — a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest."); *see also United States v. Carey*, 602 F.3d 738, 739, 741 (6th Cir. 2010) (rejecting defendant's claim that "because expungement of his [felony] conviction would allow him to regain his Second Amendment rights, a court's denial of expungement" based on the absence of any federal provision for expungement of a valid conviction "infringes upon his fundamental right").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

STUART F. DELERY
   *Principal Deputy Assistant Attorney General*

PATRICK A. MILES, JR.
   *United States Attorney*

MICHAEL S. RAAB
   (202) 514-4053
   /s/ Anisha S. Dasgupta
ANISHA S. DASGUPTA
   (202) 514-5428
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7320*

*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530*

November 21, 2013

## CERTIFICATE OF COMPLIANCE

I hereby certify that, according to the word count provided in Microsoft Word 2010, the foregoing brief contains 8,115 words.  The text of the brief is composed in 14-point Garamond typeface.


 /s/ Anisha Dasgupta
ANISHA S. DASGUPTA

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2013, I filed and served the foregoing Brief for the Federal Appellees and served it on all registered counsel by causing a copy to be electronically filed via the appellate CM/ECF system.

 /s/ Anisha Dasgupta
ANISHA S. DASGUPTA

## DESIGNATION OF DISTRICT COURT DOCUMENTS

The defendants-appellees hereby designate the following portions of the

district court record for the Court's consideration:

| Record No. | Page ID # Range | Description of Entry | Date |
|---|---|---|---|
| 1 | 1-52 | Plaintiff's Complaint and Attachments | 5/21/2012 |
| 28 | 234-245 | Opinion Regarding Federal Defendants' Motion to Dismiss | 1/29/2013 |
| 31 | 251 | Order Dismissing Plaintiff's Complaint as to Defendants Hillsdale County Sheriff's Department and Stan W. Burchardt | 6/21/2013 |
| 33 | 253 | Plaintiff's Amended Notice of Appeal | 6/27/2013 |