IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

CLIFFORD CHARLES TYLER,
*Plaintiff-Appellant,*

v.

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, et al.,
*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHICAN

———————————

SUPPLEMENTAL BRIEF FOR FEDERAL APPELLEES

———————————

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney
  General*

PATRICK A. MILES, JR.
  *United States Attorney*

MARK B. STERN
  (202) 514-5089
MICHAEL S. RAAB
  (202) 514-4053
ABBY C. WRIGHT
  (202) 514-0664
*Attorneys, Appellate Staff
U.S. Department of Justice
Civil Division, Room 7252
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..........................................................................................1

STATEMENT.............................................................................................2

ARGUMENT ...............................................................................................7

I.      Section 922(g)(4) Is Subject, At Most, To Intermediate Scrutiny .........................7

II.     Section 922(g)(4) Survives Intermediate Scrutiny.................................................15

CONCLUSION .........................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                               **Page(s)**

*Bonidy v. U.S. Postal Serv.*,
    __ F.3d ___, 2015 WL 3916547 (10th Cir. June 26, 2015) ................................. 11, 14

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ....................................................... 1, 2, 7, 8, 9, 10, 11, 12

*Entertainment Prods., Inc. v. Shelby Cnty*,
    721 F.3d 729 (6th Cir. 2013) ...................................................................17

*Florida Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) ...............................................................................16

*In re Grand Jury Subpoena John Doe v. United States*,
    150 F.3d 170 (2d Cir. 1998) .....................................................................16

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) .............................................................................2

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012) .......................................................................17

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v.*
    *Michigan Gaming Control Bd.*, 276 F.3d 876 (6th Cir. 2002) ......................... 2, 9

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .................................................................................8

*Mullis v. United States*,
    230 F.3d 215 (6th Cir. 2000) ................................................................ 3, 15

*NRA v. ATF,,*
    700 F.3d 185 (5th Cir. 2012) .............................................................2, 11, 12

*Pontarelli v. Dep't of Treasury*,
    285 F.3d 216 (3d Cir. 2002) ....................................................................15

*Schall v. Martin,*
467 U.S. 253 (1984) ........................................................................15

*State v. Reid,*
1 Ala. 612 (1840) ...........................................................................11

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ........................................................................17

*United States v. Bean,*
537 U.S. 71 (2002)............................................................................3

*United States v. Carey,*
602 F.3d 738 (6th Cir. 2010) ..................................................2, 8, 12

*United States v. Carter,*
669 F.3d 411 (4th Cir. 2012) ........................................................13

*United States v. Chapman,*
666 F.3d 220 (4th Cir. 2012) ........................................................16

*United States v. Chovan,*
735 F.3d 1127 (9th Cir. 2013) ..............................................2, 12, 20

*United States v. Greeno,*
679 F.3d 510 (6th Cir. 2012) ......................................................6, 8

*United States v. McRobie,*
No. 08-4632, 2009 WL 82715 (4th Cir. 2009)................................12

*United States v. Rehlander,*
666 F.3d 45 (1st Cir. 2012) ......................................................13, 17

*United States v. Rozier,*
598 F.3d 768 (11th Cir. 2010) ....................................................2, 12

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) ........................................................13

*United States v. Torres-Rosario,*
658 F.3d 110 (1st Cir. 2011) ....................................................19, 20

*United States v. Vongxay*,
594 F.3d 1111 (9th Cir. 2010) ................................................. 2, 12

*United States v. White*,
593 F.3d 1199 (11th Cir. 2010) ............................................... 2, 12

*Vartelas v. Holder*,
132 S. Ct. 1479 (2012) .................................................................9

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ...................................................................16

*Weinberger v. Salfi*,
422 U.S. 749 (1975) ...................................................................17

**Statutes:**

NICS Improvement Amendments Act of 2007,
Pub. L. No. 110-180, § 2(9), 121 Stat. 2559 (2008) ........................3, 4, 18, 19

18 U.S.C. § 922 note .................................................................3

18 U.S.C. § 922(d)(4) ................................................................3

18 U.S.C. § 922(g)(3) ...............................................................13

18 U.S.C. § 922(g)(4) ...........................................................*passim*

18 U.S.C. § 922(g)(8) ...............................................................16

18 U.S.C. § 925(c) ...................................................................14

Mich. Comp. Laws § 330.1401 ................................................. 4, 5

**Regulations:**

27 C.F.R. § 478.11 ....................................................................3

**Legislative Materials:**

114 Cong. Rec. 21,829 (1968) ...................................................13

153 Cong. Rec. 28,948 ..............................................................20

153 Cong. Rec. H16926 (daily ed.) (Dec. 19, 2007) ...............18

H.R. Rep. No. 90-157 (1968) ...................................................18

H.R. Rep. No. 102-618 (1992) .................................................14

S. Rep. No. 102-353 (1993) ......................................................14

**Other Authorities:**

Amicus Br. at 25-26, *Dist. of Columbia v. Heller,*
  554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201 ......................9

Treatment Advocacy Center, *Stand Standards Charts for Assisted Treatment*
  (June 2011)*, available at* http://www.treatmentadvocacycenter.org/
  storage/documents/State_Standards_Charts_for_Assisted_Treatment_-
  _Civil_Commitment_Criteria_and_Initiation_Procedures.pdf...................5

# INTRODUCTION

The federal appellees respectfully submit this supplemental brief in accordance with this Court's order of April 23, 2015.

There is no dispute that Congress may prevent mentally unstable individuals from possessing firearms. The Gun Control Act and its implementing regulations accomplish that end by prohibiting persons from possessing firearms if they have been involuntarily committed to a mental institution after being determined to be a danger to themselves or others as a result of their mental condition. *See* 18 U.S.C. § 922(g)(4). Assuming that those adjudicated to have been mentally ill even fall within the compass of Second Amendment protections, the restriction in section 922(g)(4) is plainly a tailored means for achieving a compelling purpose—keeping firearms out of the hands of persons who may be mentally unstable.

Plaintiff's objection at bottom is not a claim that persons adjudicated to be a danger to themselves or others are constitutionally entitled to possess firearms. The contention, instead, is that an involuntary commitment ceases to be probative after some unspecified period of time. The Constitution does not, however, require Congress to minimize the significance of judicially determined mental instability. The stakes, as measured by the potential threat to human life, could hardly be higher, and the determination of mental illness that is the predicate for the prohibition is of the utmost relevance and made with all the protections of due process.

Plaintiff (joined by the NRA) would stand the reasoning of *District of Columbia v.*

*Heller*, 554 U.S. 570 (2008) on its head, urging that section 922(g)(4) should be subjected to strict scrutiny. The Court in *Heller* declared that prohibitions of the sort at issue here are "presumptively lawful[.]" *Id.* at 627 n.6. By applying strict scrutiny, plaintiff would make the prohibition presumptively unlawful. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.,* 276 F.3d 876, 879 (6th Cir. 2002) (strict scrutiny begins with "presuming that the ordinance is unconstitutional"). That contention is foreclosed by *Heller* and conflicts with the analysis of this Court and every other court of appeals to consider a challenge to a federal firearms prohibition. *See, e.g., United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir. 2010); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. Chovan*, 735 F.3d 1127, 1137-38 (9th Cir. 2013); *United States v. White*, 593 F.3d 1199, 1205-06 (11th Cir. 2010); *NRA v. ATF*, 700 F.3d 185, 196 (5th Cir. 2012).

## STATEMENT

1. Federal law prohibits any person who "has been committed to a mental institution" or "adjudicated as a mental defective" from shipping, transporting, possessing, or receiving firearms and ammunition. 18 U.S.C. § 922(g)(4); *see also Johnson v. United States*, 135 S. Ct. 2551, 2555 (2015) ("Federal law forbids certain people—such as convicted felons, persons committed to mental institutions, and drug users—to ship, possess, and receive firearms."). In order to be prohibited from

possessing a firearm, a person must be "[c]ommitted to a mental institution" through "[a] formal commitment . . . by a court, board, commission, or other lawful authority" and the commitment must be involuntary. 27 C.F.R. § 478.11.

States may, but are not required to, establish programs by which they remove section (g)(4) firearms disabilities. *See* NICS [National Instant Criminal Background Check System] Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 2(9), 121 Stat. 2559, 2560 (2008) (codified at 18 U.S.C. § 922 note).[1] The NICS Improvement Amendments authorize federal grants that help States to improve the quality of information they make available to the databases searched by NICS. *Id.* § 103(a)(1), 125 Stat. at 2567. To be eligible for such a grant, a State must certify to the U.S. Department of Alcohol, Tobacco, Firearms and Explosives (ATF) that it has implemented a program under which persons who "pursuant to State law" have been adjudicated mentally defective or committed to a mental institution may apply "to the State for relief from the disabilities imposed by [18 U.S.C. § 922(d)(4) and (g)(4)]." Pub. L. No. 110-180, § 105(a), 121 Stat. at 2569; *id.* § 103(c), 121 Stat. at 2568. A State may receive federal authorization to provide relief from the federal firearms

---

[1] Section § 925(c) authorizes a process by which individuals may seek relief from firearms disabilities from the Director of ATF. Since 1992, however, Congress, in its annual appropriations for ATF, has precluded expenditure of funds on this program. *See United States v. Bean*, 537 U.S. 71, 74-75 (2002); *Mullis v. United States*, 230 F.3d 215, 219 (6th Cir. 2000).

disabilities contained in section (g)(4) only if its program provides for a specified state authority to "grant the relief, pursuant to State law and in accordance with the principles of due process, if . . . the person's record and reputation[] are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.* § 105(a)(2), 121 Stat. at 2569-70. The State program must also "permit[] a person whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." *Id.* § 105(a)(3), 121 Stat. at 2570. At present, 31 States—though not Michigan, where plaintiff resides—have created qualifying programs.

2. Plaintiff Clifford Charles Tyler was involuntarily committed to a mental institution by a Michigan probate court in 1986. RE 1 ¶ 5, Page ID #3. After a hearing at which plaintiff was represented by counsel, the court found "[b]y clear and convincing evidence" that plaintiff was "a person requiring treatment because [he] is mentally ill, and as a result of that mental illness . . . can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." RE 1-1, Ex. A, Page ID #16; Mich.

Comp. Laws § 330.1401.[2] The court further found that no "treatment program other than hospitalization" would be adequate and ordered that plaintiff undergo a treatment program, including hospitalization "for a period not to exceed 30 days." RE 1-1, Ex. A, Page ID #16-17.

In February 2011, plaintiff attempted to purchase a firearm and to obtain a permit for concealed carry, but was informed that his prior commitment prohibited the transaction. RE 1 ¶¶ 26-28, Page ID #6-7. After an unsuccessful appeal of the denial, *id.* ¶¶ 30-34, Page ID #7-8; RE 1-2, Ex. E-F, Page ID #28-37, plaintiff filed this lawsuit, seeking declaratory and injunctive relief barring the federal government from enforcing section 922(g)(4) against plaintiff unless he was given the opportunity to demonstrate his current mental health. RE 1, Page ID #13.

3. The district court dismissed the suit for failure to state a claim. The court observed that "Plaintiff's position that the right to keep and bear arms, as historically understood, extends to previously committed individuals who are no longer a 'real danger,' is not supported by the case law or historical evidence," and held that the Second Amendment therefore did not extend to plaintiff. RE 28, Page ID #240.

---

[2] *See also* Treatment Advocacy Center, *Stand Standards Charts for Assisted Treatment* (June 2011)*, available at* http://www.treatmentadvocacycenter.org/ storage/documents/State_Standards_Charts_for_Assisted_Treatment_- _Civil_Commitment_Criteria_and_Initiation_Procedures.pdf (providing a state survey of applicable law).

The district court further concluded that even if the suit implicated plaintiff's Second Amendment rights, section 922(g)(4) would satisfy intermediate scrutiny. RE 28, Page ID #240-41. The court observed that intermediate scrutiny does not require a "perfect fit . . . to the government's important interest in preventing firearm violence," promoting "public safety, and reducing self-inflicted violence." *Id.* at Page ID #243. The Court further concluded that Congress justifiably "elected to rely on a person's history of past commitment and judicial adjudications of mental incompetence as indicators of a risk of gun-related violence." *Id.* at Page ID #244.

4. A panel of this Court reversed the judgment and remanded the case. The panel majority applied this Court's two-step approach to Second Amendment challenges. Panel Op. 10-11 (citing *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)).

Under step one of its analysis, the panel majority concluded that the government had not established that "§ 922(g)(4) regulates conduct falling outside the scope of the Second Amendment as it was understood in 1791." Panel Op. 16. At step two of the analysis, the panel majority began by determining that it would apply strict scrutiny to section 922(g)(4), relying primarily on the fact that *Heller* referred to the Second Amendment right as a "fundamental right" and that *Heller* had rejected rational basis review. Panel Op. 25. In so doing, the panel majority gave little weight to the Supreme Court's statement that prohibitions on the possession of firearms by

6

felons and the mentally ill were "presumptively lawful." Panel Op. 19-22.

The panel majority recognized the government's compelling interest in protecting the public from firearms violence and recognized that "a law forbidding possession of firearms by 'the mentally ill' is most likely constitutional and satisfies narrow tailoring." Panel Op. 28-29, 30. Although it acknowledged that "Congress, in its efforts to keep firearms away from the mentally ill, may cast a wider net than is necessary to perfectly remove the harm," the majority held that the government had not "establish[ed] that the law is narrowly tailored to achieve its interests." Panel Op. 29, 31.

Concurring in the result, Judge Gibbons noted that the parties had agreed that the statute was subject to intermediate scrutiny, Panel Op. 47 (Gibbons, J., concurring), and concluded that plaintiff should prevail under that standard.

5. This Court granted the government's petition for rehearing en banc, vacated the panel decision, and ordered the parties to submit supplemental briefs.

## ARGUMENT

## I.     Section 922(g)(4) Is Subject, At Most, To Intermediate Scrutiny.

A. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects the right of law-abiding, responsible citizens to bear arms for purposes of self-defense in the home. The Court made explicit, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at

626. The Court stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The controlling opinion in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), reaffirmed this statement, emphasizing that the Court "made it clear in *Heller* that [its] holding did not cast doubt on . . . longstanding regulatory measures." *Id.*

B. As explained in the government's brief as appellee, the Supreme Court's statement in *Heller* that restrictions on gun ownership by the mentally ill and felons are "presumptively lawful" indicates that prohibiting these groups of individuals from possessing firearms does not implicate the Second Amendment. This Court has so recognized with respect to individuals with prior felony convictions, explaining that "[i]n short, *Heller* states that the Second Amendment right is not unlimited, and in fact, it is specifically limited in the case of felon prohibitions." *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *see also United States v. Greeno*, 679 F.3d 510, 517-18 (6th Cir. 2012). The same is true of prohibitions on gun ownership by mentally unstable individuals.

That the Supreme Court did not list the prohibitions contained in the Gun Control Act by statutory code citation is of no moment. The language in *Heller* tracks

particular provisions of the Gun Control Act and the description of those provisions in the government's amicus brief in *Heller*. That brief supported an individual right to bear arms, but explained that both the prohibition on felon possession and the prohibition on possession by those who had previously been committed to a mental institution were consistent with the Second Amendment. *See* Amicus Br. at 25-26, *Dist. of Columbia v. Heller,* 554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201. In referring to "the mentally ill" in *Heller*, the Supreme Court was thus describing those prohibited from firearms possession by virtue of mental illness, a category captured by section 922(g)(4). *Cf. Vartelas v. Holder*, 132 S. Ct. 1479, 1489 n.7 (2012) (describing section 922(g)(4) as addressing the issue of "mentally unstable persons purchasing guns").

C. The Supreme Court's statement that prohibitions on firearms possession by felons and the mentally ill are "presumptively lawful" appears to preclude any challenge to those restrictions on Second Amendment grounds. In any event, it would be clear error to turn "presumptively lawful" restrictions presumptively unlawful by subjecting them to strict scrutiny. *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.,* 276 F.3d 876, 879 (6th Cir. 2002) (strict scrutiny requires that a court presume that a statute is unconstitutional).

Plaintiff and the NRA seek to avoid this difficulty by disregarding the relevant portion of the Supreme Court's decision, and omitting any reference to the Court's

characterization of the restriction at issue as "presumptively lawful." Plaintiff, who, unlike the amicus, focuses on the provision actually at issue, stresses *Heller's* reference to the rights of "law-abiding" citizens. *See, e.g.,* Supp. Br. 5, 8. But *Heller* also spoke of "law-abiding, *responsible* citizens." 554 U.S. at 635. *Heller* does not preclude Congress from determining that the prohibition on gun possession should extend to persons who have been involuntarily committed by court order because of the serious threat they pose to themselves or others.

The NRA, suggesting that this Court depart from its own precedent, urges that strict scrutiny applies to every provision of the Gun Control Act, including prohibitions on felon possession. NRA Amicus Br. 8-9. The NRA relies almost exclusively on the Supreme Court's description of the Second Amendment as protecting a "fundamental right," as if that description resolves the question of the level of scrutiny. If it did, the Court's express declaration that the Second Amendment right is not "unlimited" and is not offended by prohibitions on ownership by certain classes of individuals, *Heller,* 554 U.S. at 626, would be inexplicable. Moreover, as the Tenth Circuit recently explained, the Second Amendment right differs in a significant respect from other fundamental rights described by the Supreme Court: "[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint

10

discrimination, which can be exercised without creating a direct risk to others." *Bonidy v. U.S. Postal Serv.*, __ F.3d ___, 2015 WL 3916547, at *4 (10th Cir. June 26, 2015). Thus, [i]ntermediate scrutiny makes sense in the Second Amendment context." *Id.*

It also fails to advance the argument to rely on the *Heller* majority's rejection of Justice Breyer's dissenting opinion, as that reliance depends upon a misunderstanding of Justice Breyer's approach. NRA Amicus Br. 6-7. Rejection of Justice Breyer's "interest balancing test" does not equate to a holding that intermediate scrutiny does not apply in the Second Amendment context. Justice Breyer did not advocate intermediate scrutiny, and the *Heller* majority rejected Justice Breyer's approach because it held that a law that "'under the pretence of regulating, amounts to a destruction of the right'" would not pass constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." 554 U.S. at 628–29 (quoting *State v. Reid*, 1 Ala. 612, 616–617 (1840)); *see also NRA v. ATF*, 700 F.3d 185, 197 (5th Cir. 2012) ("[B]y faulting a dissenting opinion for proposing an interest-balancing inquiry *rather* than a traditional level of scrutiny, the Court's language suggests that intermediate and strict scrutiny are on the table").

Unsurprisingly, every court of appeals, including this Court, to consider a Second Amendment challenge to a section 922(g) prohibition has applied

intermediate scrutiny. *See* Panel Op. 22-24 (citing cases);[3] *see also, e.g., United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. Chovan*, 735 F.3d 1127, 1137-38 (9th Cir. 2013); *United States v. White*, 593 F.3d 1199, 1205-06 (11th Cir. 2010); *NRA v. ATF*, 700 F.3d 185, 196 (5th Cir. 2012).. Plaintiff offers no reason to conclude that section 922(g)(4) is categorically different from other section 922(g) prohibitions. As discussed above, the legitimacy of Congress's determination that mentally ill persons should not possess firearms should be beyond dispute. Here, for example, plaintiff's involuntary civil commitment was predicated on a determination "[b]y clear and convincing evidence" that plaintiff could "be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." RE 1-1, Ex. A, Page ID #16. Even though plaintiff has no prior criminal convictions, Panel Op. 29, the record demonstrates that absent forced treatment, plaintiff was

---

[3] The Fourth Circuit in an unpublished opinion has rejected a Second Amendment challenge to the provision at issue in this case. *United States v. McRobie*, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. 2009) (unpublished) ("While the *Heller* opinion recognized a Second Amendment right for citizens to bear arms, it specifically cautioned that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.'" (quoting *Heller*, 554 U.S. at 626)).

without the ability to control his actions and would likely have acted violently. The Second Amendment does not preclude Congress from acting to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances." *See* 114 Cong. Rec. 21,829 (1968).

D. Plaintiff and the NRA urge that the Second Amendment requires an individualized inquiry for every person prohibited from possessing a firearm under 18 U.S.C. § 922(g)(4), but they fail to grapple with the reality of such a rule. As the First Circuit has explained, "Congress did not prohibit gun possession by those who were or are mentally ill and dangerous, and such a free floating prohibition would be very hard to administer, although perhaps not impossible. This is why, as with the ban on prior felons, Congress sought to piggyback on determinations made in *prior judicial proceedings* to establish status." *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012); *see also United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court."); *United States v. Carter*, 669 F.3d 411, 420 (4th Cir. 2012) (rejecting argument that 18 U.S.C. § 922(g)(3) was constitutionally overbroad "because it generally disarms all illicit drug users without requiring an individualized determination that a particular drug user poses a

genuine threat to public safety"); *Bonidy*, 2015 WL 3916547, at *12 ("But the USPS is not required to tailor its safety regulations to the unique circumstances of each customer.").

The precise workings of the individualized inquiry urged by plaintiff and the NRA are unclear, but would presumably involve ad hoc, standardless determinations by district courts that are poorly equipped to make difficult predictions regarding the future mental stability of individuals and the likelihood of future violence. As Congress noted when deciding to discontinue funding for the federal program for "relief from the disabilities imposed by Federal [firearms] laws," 18 U.S.C. § 925(c), even "[a]fter ATF agents spend many hours investigating a particular applicant for relief, there is no way to know with any certainty whether the applicant is still a danger to public safety," H.R. Rep. No. 102-618, at 14 (1992); *see also* S. Rep. No. 102-353, at 19 (1993) (noting that review of Section 925(c) applications is "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made").

The difficulties Congress described for ATF determinations, made after extensive investigation and pursuant to broad investigatory powers, are even more pronounced for district courts. As the Third Circuit explained in denying a similar claim made by an individual with a prior felony conviction, "courts possess neither the resources to conduct the requisite investigations nor the expertise to predict

accurately which felons may carry guns without threatening the public's safety."
*Pontarelli v. Dep't of Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc); *see Mullis v. United States*, 230 F.3d 215, 219 (6th Cir. 2000) ("[D]istrict courts are well equipped to make credibility judgments and factual determinations, [but] they are without the tools necessary to conduct a systematic inquiry into an applicant's background."). Because courts "are without the tools necessary to conduct a systematic inquiry into an applicant's background . . . they would be forced to rely primarily—if not exclusively—on information provided by the felon," and, "[a]s few felons would volunteer adverse information, the inquiry would be dangerously one-sided." *Pontarelli*, 285 F.3d at 231 (internal quotation marks omitted); *Mullis*, 230 F.3d at 219. Such determinations would also threaten to overwhelm the resources of district courts, as the NICS database contains over 3 million records of mental health disqualifications. This Court should thus reject plaintiff's invitation to turn federal district courts into large-scale arbiters of mental health.

## II.  Section 922(g)(4) Survives Intermediate Scrutiny.

A.1. As discussed, plaintiff's challenge is subject at most to intermediate scrutiny. Application of that standard requires affirmance of the district court's decision. The government's interest "in protecting the community from crime" is "legitimate and compelling," *Schall v. Martin*, 467 U.S. 253, 264 (1984) (internal quotation marks omitted), as is its interest in preventing suicide, *see Washington v.*

*Glucksberg,* 521 U.S. 702, 735 (1997) (recognizing the government's interest in suicide prevention as "unquestionably important and legitimate"); *In re Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (noting the "compelling governmental interest[]" in "prevention of suicide").

The question then is one of "fit" between the government's compelling interest and the means Congress has adopted to serve that interest. As the Fourth Circuit observed when rejecting an as-applied Second Amendment challenge to an analogous restriction: "[T]he prohibitory net cast by [the statute] may be somewhat over-inclusive given that not every person who falls within in it would misuse a firearm . . . if permitted to possess one," but "[t]his point does not undermine the [statute's] constitutionality . . . because it merely suggests that the fit is not a perfect one[] [and] a reasonable fit is all that is required under intermediate scrutiny." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012) (upholding 18 U.S.C. § 922(g)(8), which prohibits a person subject to a domestic violence protective order from possessing a firearm).

It cannot seriously be disputed that prior involuntary civil commitment— following an adversarial proceeding and a judicial finding by clear and convincing evidence that an individual poses a safety risk, as was the case for plaintiff—is relevant to the risk of current or future mental illness. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (relying on "history, consensus, and simple common sense")

(internal quotation marks omitted); *Entertainment Prods., Inc. v. Shelby Cnty,* 721 F.3d 729, 739 (6th Cir. 2013); *cf. Rehlander*, 666 F.3d at 50 (holding that temporary emergency hospitalization was not a "commitment" under § 922(g)(4) because of lack of judicial determination following an adversary proceeding). Here, Congress, "its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid," *Weinberger v. Salfi*, 422 U.S. 749, 777 (1975), concluded that disarming persons with a history of involuntary commitment for mental disturbance "would protect against [that] occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule," *id.* As the Supreme Court has explained, "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994); *see also Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012).

The statute would not be unconstitutional even if plaintiff could demonstrate that there were some number of people who were involuntarily committed to a mental institution in the past, but pose no greater risk of firearms violence than the general public currently. It is impossible to predict future dangerousness with absolute certainty, and Congress acted reasonably in adopting a highly probative objective indicator.

17

The relevance of a person's mental health history to a propensity toward future firearms violence is further supported by the legislative history of the NICS Improvement Amendments. As particularly relevant here, in 2007, Congress found that, notwithstanding the restrictions put in place in 1968, individuals with disqualifying mental health histories were continuing to acquire firearms because of deficiencies in the reporting of their background information to NICS. Congress therefore determined that increased reporting of involuntary commitments to the NICS database would decrease future incidents of firearms violence.

For example, Congress observed that in April 2007, "a student with a history of mental illness at the Virginia Polytechnic Institute and State University shot to death 32 students and faculty members, wounded 17 more, and then took his own life." Pub. L. No. 110-180, § 2(9), 121 Stat. at 2560. "In spite of a proven history of mental illness, the shooter was able to purchase the two firearms used in the shooting," which was "the deadliest campus shooting in United States history." *Id.*; *see also* 153 Cong. Rec. H16926 (daily ed.) (Dec. 19, 2007) (statement of Rep. Boucher) (noting that "[t]he perpetrator of the Virginia Tech tragedy had been adjudicated to be a risk to himself and committed for outpatient mental evaluation"). Congress found that "[i]mproved coordination between State and Federal authorities could have ensured that the shooter's disqualifying mental health information was available to NICS." Pub. L. No. 110-180, § 2(9), 121 Stat. at 2560.

Congress further found that a March 2002 "senseless shooting, which took the lives of a priest and a parishioner at the Our Lady of Peace Church in Lynbrook, New York," likewise demonstrated "the need to improve information-sharing" between State and federal authorities. Pub. L. No. 110-180, § 8, 121 Stat. at 2560. As Congress found, "[t]he man who committed this double murder had a prior disqualifying mental health commitment and a restraining order against him, but passed a Brady background check because NICS did not have the necessary information to determine that he was ineligible to purchase a firearm under Federal or State law." *Id.* To address these problems, Congress authorized federal grants to help States improve the quality of information they make available to the NICS databases. Pub. L. No. 110-180, § 103(a)(1), 125 Stat. at 2567.

2. That plaintiff has brought an "as applied" challenge does not change the analysis under intermediate scrutiny. Plaintiff cannot plausibly contend that his involuntary commitment is without significance. His argument, at best, must be that its significance has diminished with time. But for the reasons already discussed, Congress could reasonably rely on official determinations of dangerousness without affixing an expiration date to their relevance, and other courts of appeals have cautioned against requiring district courts to determine the constitutionality of a federal statute on a case-by-case basis hinged on complex and constantly changing individual characteristics. *See United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir.

19

2011) ("[S]uch an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning."); *see also United States v. Chovan*, 735 F.3d 1127, 1142 (9th Cir. 2013).

B. Plaintiff appears to concede that the statute would be constitutional if Michigan provided a means for restoration of his firearms rights, and the final section of his supplemental brief urges that the constitutionality of the statute should not "turn on accidents of geography." Pl. Supp. Br. 12 (capitalization altered). The government agrees. Under the panel's reasoning, now vacated, the statute would have been constitutional in Kentucky, which has a firearms restoration procedure, but not in Michigan. For the reasons explained above, the statute survives intermediate scrutiny whether or not a State provides for restoration of firearms rights. The existence of such a procedure in some circumstances does not call into question the constitutionality of the statute.

Congress's provision of a mechanism for a State to remove its "initial determination of mental illness" for purposes of Section 922(g)(4) when "a person disqualified on the basis of legal mental illness . . . prove[s] to the State that he or she no longer poses a danger to society," 153 Cong. Rec. 28,948 (statement of Rep. McCarthy), is also consistent with the principles of federalism that are reflected in the Gun Control Act. *See, e.g.,* H.R. Rep. No. 90-1577, at 6 (1968) (noting that the

"principal purpose" of the Act was "to assist the States effectively to regulate firearms traffic within their borders"). There is nothing constitutionally suspect about permitting each State to determine whether it believes it appropriate to make determinations that an individual is no longer a threat to public safety, and a State may quite reasonably make the policy judgment that it does not wish to do so. The fact that Michigan is among the States that have chosen not to provide a mechanism for restoration of federal firearms rights following an involuntary commitment does not render the statute unconstitutional. Although plaintiff asserts that "citizens of Michigan are no less capable of recovery than the citizens of Kentucky," Pl. Supp. Br. 15, that is an argument best directed to the legislature of Michigan.

Nor does the fact that Congress chose to enact a provision for restoration of federal firearms rights, which is now defunded, indicate that such a procedure is constitutionally required. Congress may permissibly enact laws more protective of constitutional rights than is required by the Constitution. Congress may, for example, limit the actions of law enforcement officers beyond the strictures of the Fourth Amendment, and it may provide more procedural protections that the Due Process component of the Fifth Amendment requires.

## CONCLUSION

For the reasons stated above, the district court's decision should be affirmed.

Respectfully submitted,

BENJAMIN C. MIZER
*Principal Deputy Acting Assistant*
*Attorney General*

PATRICK MILES, JR.
*United States Attorney*

s/ Abby C. Wright
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
*(202) 514-0664*
*Attorneys, Appellate Staff*
*Civil Division, Room 7252*
*Washington, DC 20530*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation provided in this Court's order of April 23, 2015, because it is fewer than 25 pages.

s/ *Abby C. Wright*
Abby C. Wright
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2015, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by

using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be

accomplished by the appellate CM/ECF system.


 s/ *Abby C. Wright*
Abby C. Wright
Attorney