No. 13-1876

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CLIFFORD CHARLES TYLER,

*Plaintiff-Appellant,*

v.

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Michigan

**BRIEF OF *AMICUS CURIAE***
**BRADY CENTER TO PREVENT GUN VIOLENCE**
**IN SUPPORT OF DEFENDANTS-APPELLEES AND**
**AFFIRMANCE UPON REHEARING *EN BANC***

Jonathan E. Lowy
Alla Lefkowitz
Kelly Sampson
Brady Center to Prevent
Gun Violence
Legal Action Project
840 First Street, NE, Suite 400
Washington, DC 20002
(202) 370-8104
jlowy@bradymail.org
*Of Counsel*

Harry Frischer
Karen E. Clarke
Hang (Helena) Zheng
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
hfrischer@proskauer.com
*Counsel for* Amicus Curiae *Brady Center to Prevent Gun Violence*

August 3, 2015

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 13-1876          Case Name: Tyler v. Hillsdale County Sheriff's Dept.

Name of counsel:  Harry Frischer

Pursuant to 6th Cir. R. 26.1,  Brady Center To Prevent Gun Violence, amicus curiae,
                                        *Name of Party*
makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

> No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ August 3, 2015 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Harry Frischer

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# Table of Contents

Table of Authorities ................................................................................. ii

INTEREST OF *AMICUS CURIAE* ...........................................................1

ARGUMENT ...............................................................................................1

I.    The *Heller* Decision Forecloses Strict Scrutiny in This Case ...........2

II.   The Other Circuits Have Uniformly Chosen Intermediate Scrutiny
      for Section 922(G) Challenges .........................................................3

III.  At Most, Intermediate Scrutiny Should Be Applied Here ................7

IV.   Individual Circumstances Do Not Alter the Analysis ......................9

V.    Section 922(g)(4) Serves Compelling Governmental Interests by
      Reducing the Risk of Gun Suicides and Other Gun Deaths and
      Injuries ..........................................................................................10

CONCLUSION...........................................................................................13

CERTIFICATE OF COMPLIANCE.........................................................14

CERTIFICATE OF SERVICE ..................................................................14

# Table of Authorities

Page(s)

**Cases**

*Bonidy v. U.S. Postal Serv.,*
___ F.3d ___, 2015 WL 3916547 (10th Cir. June 26, 2015) ..................................9

*Clark v. Jeter,*
486 U.S. 456 (1988)...................................................................................................9

*District of Columbia v. Heller,*
554 U.S 570 (2008)...............................................................1, 2, 3, 4, 6, 7, 10

*FCC v. League of Women Voters of Cal.,*
468 U.S. 364 (1984)...................................................................................................8

*Friedman v. City of Highland Park,*
784 F.3d 406 (7th Cir. 2015) ..............................................................................10

*Jackson v. City & Cnty. of San Francisco,*
746 F.3d 953 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 2799 (2015) ...............5, 9

*Kachalsky v. Cnty. of Westchester,*
701 F.3d 81 (2d Cir. 2012) ....................................................................................6, 9

*McDonald v. City of Chicago,*
561 U.S. 742 (2010).............................................................................................3, 4, 10

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
*Firearms, & Explosives,*
700 F.3d 185 (5th Cir. 2012), *cert. denied,* 134 S. Ct. 1364 (2014) ...........5, 7, 8

*Piszczatoski v. Filko,*
840 F. Supp. 2d 813 (D.N.J. 2012), *aff'd sub nom. Drake v. Filko,*
724 F.3d 426 (3d Cir. 2013), *cert. denied sub nom. Drake v.*
*Jerejian,* 134 S. Ct. 2134 (2014)...........................................................................8

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,*
775 F.3d 308 (6th Cir. 2014),
*vacated,* 2015 U.S. App. LEXIS 6638 (6th Cir. Apr. 21, 2015) ................*passim*

*United States v. Bena,*
  664 F.3d 1180 (8th Cir. 2011) ..................................................3

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011) ....................................................4

*United States v. Chapman,*
  666 F.3d 220 (4th Cir. 2012) ...............................................4, 9

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ..................................................4

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 187 (2014) ...............4, 9

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ..................................................6, 9

*United States v. Masciandaro,*
  638 F.3d 458 (4th Cir. 2011) ..................................................6

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ............................................4, 5, 8

*United States v. Rehlander,*
  666 F.3d 45 (1st Cir. 2012) ....................................................7

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ..................................................4

*United States v. Yancey,*
  621 F.3d 681 (7th Cir. 2010) ...............................................3, 7

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ...........................................................9

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ..........................................................10

## Constitutional Provisions, Statutes, and Regulations

U.S. Const. amend. I .............................................................4

U.S. Const. amend. II.............................................. 1, 3, 4, 5, 6, 7, 8, 9, 10

U.S. Const. amend. XIV ........................................................................4

18 U.S.C. § 922(b)(1)............................................................................5

18 U.S.C. § 922(g) ............................................................................4, 7

18 U.S.C. § 922(g)(4).............................................................1, 2, 7, 8, 10

18 U.S.C. § 922(g)(8)........................................................................4, 5

18 U.S.C. § 922(g)(9)...........................................................................4

18 U.S.C. § 922(k) ...............................................................................6

27 C.F.R. § 478.11 ...............................................................................7

MICH. COMP. LAWS § 330.1401 ...........................................................8

MICH. COMP. LAWS § 330.1403 ...........................................................8

MICH. COMP. LAWS § 330.1465.............................................................8

## Other Authorities

*Attempters' Longterm Survival*, HARVARD UNIV. SCH. OF PUB.
    HEALTH, http://www.hsph.harvard.edu/means-matter/means-
    matter/survival/ (last visited July 28, 2015) .....................................11

Catherine W. Barber & Matthew J. Miller, *Reducing a Suicidal
    Person's Access to Lethal Means of Suicide*, 47(3S2) AM. J. PREV.
    MED. (Sept. 2014).............................................................................13

*Firearm Access is a Risk Factor for Suicide*, HARVARD UNIV. SCH. OF
    PUB. HEALTH, http://www.hsph.harvard.edu/means-matter/means-
    matter/risk/ (last visited July 28, 2015) ...........................................12

FIREARM & INJURY CENTER AT PENN, *Firearm Injury in the U.S.*,
    *available at*
    http://www.thecrimereport.org/system/storage/2/73/6/1011/ficap.pdf ..............12

Fox Butterfield, *Hole in Gun Control Law Lets Mentally Ill Through*,
  N.Y. TIMES (Apr. 11, 2000),
  http://www.nytimes.com/2000/04/11/us/hole-in-gun-control-law-
  lets-mentally-ill-through.html?pagewanted=all&src=pm ................................. 11

Garen J. Wintemute, *The Epidemiology of Firearm Violence in the
  Twenty-First Century United States*, 36 ANN. REV. PUB. HEALTH 5
  (2015), *available at*
  http://www.annualreviews.org/doi/abs/10.1146/annurev-
  publhealth-031914-122535 ................................................................. 12

*Means Matter*, HARVARD UNIV. SCH. OF PUB. HEALTH,
  http://www.hsph.harvard.edu/means-matter/ (last visited July 28, 2015) .......... 13

Rebecca S. Spicer & Ted R. Miller, *Suicide Acts in 8 States:
  Incidence and Case Fatality Rates by Demographics and Method*,
  90(12) AM. J. PUB. HEALTH 1885 (Dec. 2000) ................................. 12

*Suicide and Self-Inflicted Injury*, CENTERS FOR DISEASE CONTROL
  AND PREVENTION (Feb. 6, 2015),
  http://www.cdc.gov/nchs/fastats/suicide.htm ....................................... 12

*US Mass Shootings,1982-2015: Data From Mother Jones'
  Investigation*, MOTHER JONES,
  http://m.motherjones.com/politics/2012/12/mass-shootings-
  mother-jones-full-data (last visited July 30, 2015)............................... 11

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae*, Brady Center to Prevent Gun Violence, is the nation's

largest, non-partisan, non-profit organization dedicated to reducing gun violence

through education, research and legal advocacy. Through its Legal Action Project,

the Brady Center has filed numerous *amicus curiae* briefs in cases involving

firearms. The Brady Center brings a deep perspective to the issues in this case and

has a compelling interest in ensuring that the Second Amendment is construed

properly to permit reasonable government action to prevent gun violence. A

party's counsel has not authored this brief in whole or in part, nor has a party,

party's counsel, or any other person other than *amicus*, its members, or its counsel,

contributed money intended to fund preparing or submitting this brief.

## ARGUMENT

Congress may enact laws to prevent the mentally ill from obtaining access to

guns. The statute at issue, 18 U.S.C. § 922(g)(4), furthers that substantial interest

by prohibiting a person "who has been adjudicated as a mental defective or has

been committed to a mental institution" from possessing firearms. That

prohibition is lawful and does not violate the Second Amendment, as confirmed by

the Supreme Court's observation in *District of Columbia v. Heller* that barring the

possession of firearms by the mentally ill is lawful 554 U.S. 570, 626 (2008).

The Panel here erred by subjecting the statute to a "strict scrutiny" standard,

under which it held that the prohibition was overbroad and unconstitutional as applied to Tyler. Under intermediate scrutiny, which the Panel should have applied, the statute is lawful because it is "substantially related" to an "important governmental objective." The high incidence of suicide involving firearms and other data on gun violence highlight the importance of restricting gun possession by persons with a demonstrated history of mental illness, as § 922(g)(4) does.

## I.     The *Heller* Decision Forecloses Strict Scrutiny in This Case

The *Heller* Court explicitly stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by ... the mentally ill," *id.* at 626, which it characterized as "presumptively lawful." *Id.* at 627 n.26. The Supreme Court approved this prohibition without saying that laws prohibiting the possession of firearms by the mentally ill would be lawful only if they survived the strict scrutiny standard, or that these laws had to be "narrowly tailored" to achieve the government's interest.

*Heller* likewise identified a number of other "longstanding" prohibitions and regulations on gun possession that are "presumptively lawful" -- including "possession of firearms by felons," laws "forbidding the carrying of firearms in sensitive places such as schools and government buildings," and laws "imposing conditions and qualifications on the commercial sale of arms" – again without suggesting that these prohibitions and regulations would be subject to strict

scrutiny. *Id.* at 626-27 & n.26.[1] By approving these prohibitions and regulations without a strict scrutiny analysis, *Heller* "implicitly" rejected the strict scrutiny standard. *Id.* at 688 (Breyer, J., dissenting).

The *Heller* Court's rejection of Justice Breyer's "interest-balancing" test does not require a different result, and the Panel misread *Heller* in concluding otherwise. *Tyler*, 775 F.3d at 328-29. The *Heller* majority contrasted the interest-balancing test proposed by Justice Breyer with the "traditionally expressed levels" of constitutional review, including intermediate scrutiny, and concluded that the test proposed by the dissent was *not* one of the traditionally applied tests, but something new and different, and not supported by precedent, 554 U.S. at 634:

> [Justice Breyer] proposes, explicitly at least, none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowered 'interest-balancing inquiry'....

Nothing in *Heller* precludes application of the "traditionally expressed" level of intermediate scrutiny in assessing a claim under the Second Amendment.

## II. The Other Circuits Have Uniformly Chosen Intermediate Scrutiny for Section 922(G) Challenges

Prior to the Panel's ruling, every circuit court to address the level of scrutiny

---

[1] These restrictions were reaffirmed in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). The "longstanding" prohibitions referenced in *Heller* are not limited to restrictions that were in place in 1791 when the Second Amendment was adopted. *See Heller*, 554 U.S. at 582; *United States v. Bena*, 664 F.3d 1180, 1182 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010).

for a challenge to a § 922(g) provision – the First, Fourth, Seventh, Ninth, and Tenth Circuits – has chosen to apply the intermediate scrutiny standard. *See United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013) (upholding § 922(g)(9)); *United States v. Chapman*, 666 F.3d 220, 225-26 (4th Cir. 2012) (upholding § 922(g)(8)); *United States v. Booker*, 644 F.3d 12, 25-26 (1st Cir. 2011) (upholding § 922(g)(9)); *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010) (addressing § 922(g)(9)); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (upholding § 922(g)(8)); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*) (upholding § 922(g)(9)).[2]

In *Chester*, for example, the Fourth Circuit addressed a challenge to § 922(g)(9) barring firearms for persons convicted of domestic violence offenses. The Fourth Circuit held that intermediate scrutiny was appropriate because Chester's claim was "not within the core right identified in *Heller* – the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant." 628 F.3d at 683 (citing *Heller*, 554 U.S. at 634-35).

---

[2] The NRA declares, erroneously, that all Second Amendment challenges must be subject to strict scrutiny because the Second Amendment is a "fundamental" right, applicable to the states under the 14th Amendment as the Supreme Court held in *McDonald*. NRA Brief at 3-6. But – as has repeatedly been discussed by the circuit courts and was acknowledged by the Panel here – it is well-established that intermediate scrutiny is often applied under the First Amendment, which also involves "fundamental" rights and is also incorporated into the 14th Amendment.

In *Reese*, the Tenth Circuit applied intermediate scrutiny to § 922(g)(8), which applies to persons subject to domestic protection orders, and upheld the statute as against Reese's as-applied challenge. The court found intermediate scrutiny proper because § 922(g)(8) "applies only to a narrow class of persons, rather than to the public at large," and the narrow class was of persons who, based on their past behavior, are more likely to engage in domestic violence. 627 F.3d at 802. The court also rejected Reese's argument that that he no longer presented a legitimate threat, and that the 50-year term of the protective order was unreasonably long, stating that "those concerns are simply not relevant ..., even for purposes of considering Reese's as-applied challenge to § 922(g)(8)." *Id.* at 805.

Several circuits have also applied intermediate scrutiny in other Second Amendment contexts. For example, in *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 205-06 (5th Cir. 2012), the Fifth Circuit applied intermediate scrutiny to uphold 18 U.S.C. § 922(b)(1), which prohibits firearms dealers from selling handguns to persons under 21. The court reasoned that intermediate scrutiny was the appropriate standard because the ban does not disarm an entire community but has a "narrow ambit" and because restricting the rights of young persons does not violate the Second Amendment's central concern to protect "responsible" citizens.[3]

---

[3] *See also Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 968 (9th Cir.

The Panel acknowledged that several other circuits have adopted intermediate scrutiny as the proper test, but attempted to distinguish these cases by devising a new four-part test under which strict scrutiny would be applied to a prohibition on gun possession where: "its prohibition is permanent; it applies potentially to non-violent individuals; it applies potentially to law-abiding individuals; and it punishes potentially non-volitional conduct." *Tyler,* 775 F.3d at 336. This is an unprecedented construct, not supported by *Heller* or used in other cases. First, it inappropriately focuses on select factors and excludes others, such as *Heller*'s holding that the Second Amendment applies to "responsible" individuals. *Heller,* 554 U.S at 635. Second, the Panel's test considers the irrelevant factor of whether a mentally ill person's impairment or a drug user's addiction is the result of "volitional" or "non-volitional" conduct – which is irrelevant to the danger posed by such a person if he obtains a firearm. In fact, an individual acting under non-volitional impulses may pose more of a danger to the public. The Panel's newly-constructed test does not provide a sound basis to reject

---

2014) (applying intermediate scrutiny to uphold ordinance prohibiting sale of certain ammunition within San Francisco); *Kachalsky v. Cnty. of Westchester,* 701 F.3d 81, 93-94 (2d Cir. 2012) (applying intermediate scrutiny to uphold New York requirement to demonstrate "proper cause" to obtain concealed-gun license); *United States v. Masciandaro,* 638 F.3d 458, 470-71 (4th Cir. 2011) (applying intermediate scrutiny to uphold federal regulation barring possession of loaded gun in national park); *United States v. Marzzarella,* 614 F.3d 85, 96-97 (3d Cir. 2010) (applying intermediate scrutiny to uphold 18 U.S.C. § 922(k), which criminalizes possession of guns with obliterated serial numbers).

intermediate scrutiny and declare the statute unconstitutional.

## III.   At Most, Intermediate Scrutiny Should Be Applied Here

Applying the analyses discussed in the cases cited above compels the conclusion that, at most, intermediate scrutiny is the applicable standard here.

First, § 922(g)(4) does not strike at the core of the Second Amendment protection identified by *Heller*, because it is directed exclusively to a class of persons who are outside the core group of "responsible citizens" entitled to bear arms. 554 U.S. at 626, 635. Section 922(g)(4) prohibits the possession of firearms by persons with a proven history of mental illness.[4] These are persons who, based on their adjudicated mental status, are among the narrow classes of higher-risk persons who fall outside the core protected group of the Second Amendment. *See NRA*, 700 F.3d at 200-01, 205-06; *Yancey*, 621 F.3d at 685-86. Indeed, the federal regulations under § 922(g) make clear that the "committed to a mental institution" label applies only to the narrow category of persons who are *involuntarily* committed by an appropriate judicial authority following due process safeguards to ensure that the commitment is appropriate. *See* 27 C.F.R. § 478.11 (definition of

---

[4]  For clarity, Congress defined the term "the mentally ill" by identifying two categories of persons as to whom a determination of mental illness or deficiency had been made in a prior judicial proceeding. *See United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012). The statute does not contrast the term "mentally ill" with those committed to a mental institution in the past, as the Panel erroneously suggested. *Tyler*, 775 F.3d at 317.

"Committed to a mental institution"); *see, e.g.,* MICH. COMP. LAWS §§ 330.1401(1), 330.1403 *et seq.*, 330.1465 (involuntary hospitalization requires a court hearing, where it is "established by clear and convincing evidence" that a "person requiring treatment," which includes "an individual who has mental illness," can "reasonably be expected … to … seriously physically injure himself, herself, or another individual").

Second, the limited focus of § 922(g)(4) also means that it imposes only a small burden on the protected right of "the People" to bear arms. Because § 922(g)(4) applies only to "a narrow class of persons, rather than to the public at large," there is only a slight encroachment on protected activity. *Reese*, 627 F.3d at 802; *see NRA*, 700 F.3d at 205.

Third, the Second Amendment implicates "unique considerations," *Tyler*, 775 F.3d at 328 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 376-77 (1984)), insofar as it, unlike any other amendment, protects an inherently dangerous activity. The Second Amendment "is unique among all other constitutional rights to the individual because it permits the user of a firearm to cause serious personal injury – including the ultimate injury, death – to other individuals, rightly or wrongly." *Piszczatoski v. Filko*, 840 F. Supp. 2d 813, 816 (D.N.J. 2012), *aff'd sub nom. Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013).

As the Tenth Circuit recently held, "Intermediate scrutiny makes sense in the

Second Amendment context" because "[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test," *Bonidy v. U.S. Postal Serv.*, __ F.3d ___, 2015 WL 3916547, at *4 (10th Cir. June 26, 2015). Given the finality and irreversibility of gun violence, it is especially important that the government be allowed to take preventive measures before it occurs.

## IV.   Individual Circumstances Do Not Alter the Analysis

Intermediate scrutiny focuses on the statute, not the claimant. To survive intermediate scrutiny, the statute must be "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The statute does not need to be "narrowly tailored" nor the "least restrictive means" of serving the government's interest. *See Jackson*, 746 F.3d at 966 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)); *Kachalsky*, 701 F.3d at 97; *Marzzarella*, 614 F.3d at 98. The statute need only present a "reasonable, not perfect" fit with the stated objectives. *See Chapman*, 666 F.3d at 228, 231; *Chovan*, 735 F.3d at 1139; *Marzzarella*, 614 F.3d at 98. And the Government does not need to prove that there is "no burden whatsoever on [the claimant's] assumed *arguendo* right under the Second Amendment." *Chapman*, 666 F.3d at 228.

The fact that some states may have provisions for relief from the disabilities of § 922(g)(4) while others do not is not a basis for finding the statute

9

unconstitutional, as the Panel erroneously held. *Heller* and *McDonald*

notwithstanding, different states may continue to enact differing regulations. *See*

*Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) ("*McDonald*

circumscribes the scope of permissible experimentation by state and local

governments, but it does not foreclose *all* possibility of experimentation. Within

the limits established by the Justices in *Heller* and *McDonald,* federalism and

diversity still have a claim."). Each state's regulations will be upheld if

"substantially related" to an important governmental interest.

## V. Section 922(g)(4) Serves Compelling Governmental Interests by Reducing the Risk of Gun Suicides and Other Gun Deaths and Injuries

The substantial governmental interest served by § 922(g)(4) is not limited to

preventing recurrence of events such as the highly publicized campus shooting at

Virginia Tech, where a gunman with a "proven history of mental illness" killed

and wounded multiple innocent victims. *Tyler*, 775 F.3d at 333. Regulations like

§ 922(g)(4) also serve the equally compelling purpose of reducing the high

incidence of suicide involving firearms. *See id.* at 331; *Washington v. Glucksberg*,

521 U.S. 702, 735 (1997) (the government's interest in preventing suicides is

"unquestionably important and legitimate").

However, the Panel's decision minimizes the connection between previous

involuntary commitment and the government's interest in both crime and suicide

prevention. *E.g.*, 775 F.3d at 342. In fact, data supports the government's

conclusion that prior involuntary commitment and hospitalization are significant risk factors for future violence toward oneself or others. *See, e.g., Attempters' Longterm Survival*, HARVARD UNIV. SCH. OF PUB. HEALTH ("[H]istory of suicide attempt is one of the strongest risk factors for suicide. 5% to 11% of hospital-treated attempters *do* go on to complete suicide, a far higher proportion than among the general public where annual suicide rates are about 1 in 10,000.")[5]; Fox Butterfield, *Hole in Gun Control Law Lets Mentally Ill Through*, N.Y. TIMES (Apr. 11, 2000) (out of "the 100 episodes of rampage killings examined" "half the killers were people with a history of serious mental health problems, and at least eight had been involuntarily committed").[6]

Firearms are the method of choice for the majority of suicides. For 2013, the Centers for Disease Control and Prevention reported 21,175 firearms suicides

---

[5] http://www.hsph.harvard.edu/means-matter/means-matter/survival/ (last visited July 28, 2015) (also finding that "approximately 40% of those dying by suicide had previously attempted").

[6] http://www.nytimes.com/2000/04/11/us/hole-in-gun-control-law-lets-mentally-ill-through.html?pagewanted=all&src=pm. In another study of the 71 mass shootings from 1982 through 2015, 43 were identified as having prior signs of possible mental illness, and out of those, 22 committed suicide at the scene. *US Mass Shootings,1982-2015: Data From Mother Jones' Investigation*, MOTHER JONES, http://m.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (last visited July 30, 2015).

out of 41,149 self-inflicted deaths, representing 51.4% of the total.[7] A recent study

published in the *Annual Review of Public Health* showed that suicide accounted for

60.5% of all firearm deaths.[8] On average, there are 49.8 suicide deaths out of 82.3

gun deaths every day. *Id.* at 8.

Firearms are also the most lethal of suicide methods. One study found that

82% of suicide attempts by gun resulted in death.[9] Another study, from the

University of Pennsylvania, confirmed that "[s]uicide attempts with a gun are the

most fatal of all gun injury and result in death 70-90% of the time."[10]

The academic literature also reflects that reducing access to firearms reduces

suicides. According to some studies comparing states in the U.S., "where there are

more guns, there are more suicides. The higher suicide rates result from higher

firearm suicides ...."[11] "Access to firearms is a risk factor for suicide. ... Reducing

---

[7] *Suicide and Self-Inflicted Injury*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 6, 2015), http://www.cdc.gov/nchs/fastats/suicide.htm.

[8] Garen J. Wintemute, *The Epidemiology of Firearm Violence in the Twenty-First Century United States*, 36 ANN. REV. PUB. HEALTH 5, 6 (2015).

[9] Rebecca S. Spicer & Ted R. Miller, *Suicide Acts in 8 States: Incidence and Case Fatality Rates by Demographics and Method*, 90(12) AM. J. PUB. HEALTH 1885, 1888 (Dec. 2000).

[10] FIREARM & INJURY CENTER AT PENN, *Firearm Injury in the U.S.*, at 12, *available at* http://www.thecrimereport.org/system/storage/2/73/6/1011/ficap.pdf.

[11] *Firearm Access is a Risk Factor for Suicide*, HARVARD UNIV. SCH. OF PUB. HEALTH, http://www.hsph.harvard.edu/means-matter/means-matter/risk/ (last visited July 28, 2015).

access to lethal means saves lives." [12]

## CONCLUSION

The Court should affirm the decision of the District Court.

August 3, 2015

Respectfully Submitted,

/s/ Harry Frischer

| | |
|---|---|
| Jonathan E. Lowy | Harry Frischer |
| Alla Lefkowitz | Karen E. Clarke |
| Kelly Sampson | Hang (Helena) Zheng |
| Brady Center to Prevent Gun Violence | Proskauer Rose LLP |
| Legal Action Project | Eleven Times Square |
| 840 First Street, NE, Suite 400 | New York, NY 10036-8299 |
| Washington, DC 20002 | (212) 969-3000 |
| (202) 370-8104 | hfrischer@proskauer.com |
| jlowy@bradymail.org | *Counsel for* Amicus Curiae *Brady* |
| *Of Counsel* | *Center to Prevent Gun Violence* |

---

[12] *Means Matter*, HARVARD UNIV. SCH. OF PUB. HEALTH,
http://www.hsph.harvard.edu/means-matter/ (last visited July 28, 2015). *See also*
Catherine W. Barber & Matthew J. Miller, *Reducing a Suicidal Person's Access to
Lethal Means of Suicide*, 47(3S2) AM. J. PREV. MED. S264 (Sept. 2014)
("Reducing access to lethal means saves lives when people who cannot readily
obtain a highly lethal method either attempt with a method less likely to prove fatal
or do not attempt at all.").

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) because this brief is no more than half the length authorized for the parties' supplemental briefs, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, namely, 14-point Times New Roman font.

Date: August 3, 2015

/s/ Harry Frischer

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2015, I filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit via electronic mail. The Clerk of the Court will provide service to all registered attorneys participating in the case.

Date: August 3, 2015

/s/ Harry Frischer