TENDERED
FOR FILING

AUG 17 2015

DEBORAH S. HUNT, Clerk

No. 13-1876

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

AUG 1 9 2015

DEBORAH S. HUNT, Clerk

CLIFFORD CHARLES TYLER,

*Plaintiff-Appellant,*

v.

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Michigan
Honorable Gordon J. Quist
Civil Case No. 1:12-cv-00523

**BRIEF OF *AMICUS CURIAE*
THE LAW CENTER TO PREVENT GUN VIOLENCE
IN SUPPORT OF THE GOVERNMENT**

SIMON J. FRANKEL (Cal. Bar No. 171552)
REBECCA JACOBS (Cal. Bar No. 294430)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: (415) 591-6000
Fax: (415) 591-6091

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .......................................................................... 1

INTRODUCTION ................................................................................................ 2

ARGUMENT ...................................................................................................... 4

I.   STRICT SCRUTINY IS NOT AUTOMATICALLY APPLICABLE,
     OR EVEN "PREFERRED," SIMPLY BECAUSE THE SECOND
     AMENDMENT PROTECTS A FUNDAMENTAL RIGHT ...................... 4

     A.   Analogous First Amendment Precedent Provides a Roadmap
          for How to Determine the Appropriate Level of Review ................... 6

II.  INTERMEDIATE SCRUTINY IS THE MORE APPROPRIATE
     STANDARD OF REVIEW FOR SECOND AMENDMENT CASES ........ 7

     A.   Exercising Second Amendment Rights Increases the Risk of
          Injury or Death to Self or Others .......................................................... 8

     B.   *Heller* and *McDonald* Implicitly Reject Strict Scrutiny ...................... 9

     C.   Complex Issues of Causation Regarding Specific Gun Safety
          Policies Justify Greater Judicial Deference in this Area .................... 10

     D.   The Second Amendment's Text and the History of Early
          American Firearm Laws Are Inconsistent with Strict Scrutiny ......... 12

CONCLUSION ................................................................................................. 13

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, the Law Center to Prevent Gun Violence states that it has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bonidy v. USPS,*
    790 F.3d 1121 (10th Cir. 2015) ..................................................8, 9

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ..................................................................5

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ..................................................................8

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..........................................................*passim*

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ..................................................5

*Kachalsky v. Cnty. of Westchester,*
    701 F.3d 81 (2d Cir. 2012) ..................................................6, 11

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ..........................................................*passim*

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ..........................................................6, 11

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,*
    775 F.3d 308 (6th Cir. 2014) ..................................................2, 4

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ..................................................4, 6

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012) ..................................................5, 7

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ..................................................4, 6, 7

*United States v. Masciandaro,*
    638 F.3d 458 (2010) ..........................................................*passim*

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)..............................................................6

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. II.................................................*passim*

**OTHER AUTHORITIES**

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683,
    693-700 (Feb. 2007) ...........................................*passim*

Eric W. Fleegler, et al., *Firearm Legislation and Firearm-Related Fatalities
in the United States*, JAMA INTERN. MED. (May 13, 2013),
    http://archinte.jamanetwork.com/article.aspx?articleid=1661390 ...........10

Garen J. Wintemute, *Guns, Fear, the Constitution, and the Public's Health*,
    358 NEW ENG. J. MED. 1421 (Apr. 3, 2008).........................8

J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of
Law*, 95 VA. L. REV. 253 (April 2009) ...............................12

Law Center to Prevent Gun Violence, Gun Laws Matter 2012:
    Understanding the Link Between Weak Laws and Gun Violence (Nov.
    14, 2012), http://smartgunlaws.org/gun-laws-matter-2012-understanding-
    the-link-between-weak-laws-and-gun-violence .....................10

Law Center to Prevent Gun Violence, Gun Violence Statistics,
    http://smartgunlaws.org/category/gun-studies-statistics/gun-violence-
    statistics.................................................*passim*

Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the
Constitutional Case for Gun Control* (June 17, 2015) 92 WASH. U. L.
REV., Forthcoming; Chapman Univ., Fowler Law Research Paper No.
15-05, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2414681 .......*passim*

Mayors Against Illegal Guns, *Trace the Guns: The Link Between Gun Laws
and Interstate Gun Trafficking* (Sept. 2010),
    http://everytown.org/article/trace-the-guns. .....................10

Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early
American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (Nov. 2004) ......13

Saul Cornell, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND
    THE ORIGINS OF GUN CONTROL IN AMERICA (2006) ...........................................13

# INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* the Law Center to Prevent Gun Violence ("the Law Center")
is a non-profit, national law center dedicated to reducing gun violence and the
devastating impact it has on communities. The Law Center focuses on providing
comprehensive legal expertise to promote smart gun laws. These efforts include
tracking all Second Amendment litigation nationwide and providing support to
jurisdictions facing legal challenges to their gun laws. As an *amicus*, the Law
Center has provided informed analysis in a variety of firearm-related cases,
including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v.
City of Chicago*, 561 U.S. 742 (2010).

As a result of its expertise, the Law Center has a particular interest in this
litigation as it relates directly to how courts determine the proper level of judicial
review for Second Amendment challenges to gun safety laws. In the hundreds of
Second Amendment cases analyzed by the Law Center since *Heller*, no court—
until the vacated Panel opinion—has endorsed the general application of strict
scrutiny. In this brief, the Law Center seeks to highlight several important legal
arguments as to why the Panel's level of scrutiny holding was reached in error.

---

[1] *Amicus curiae* makes the following disclosure pursuant to Fed. R. App. P.
29(c)(5): no party's counsel authored this brief in whole or in part. No party,
party's counsel, nor any other person contributed any money to fund the
preparation or submission of this brief, other than amicus curiae. All parties have
consented to the filing of this brief.

# INTRODUCTION

With more than 100,000 Americans killed or injured by guns each year, the use and misuse of firearms implicate serious public safety concerns that not only justify, but demand, legislative solutions.[2] This case presents a crucial question regarding the standard of review to be used in Second Amendment challenges to gun safety laws. Breaking from every other federal court in the country, the Panel erred in its adoption of strict scrutiny as the proper level of review for such cases. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 329 (6th Cir. 2014), *reh'g en banc granted, opinion vacated* (Apr. 21, 2015) ("applying strict scrutiny puts us on a different course than that taken by other circuits.").

The Panel's holding was overbroad and unnecessary given that "both parties agree that intermediate scrutiny is the appropriate standard." *Id.* at 344 (Gibbons, J., concurring). Moreover, as the government has argued, no heightened review— let alone strict scrutiny—was warranted in this case in light of the Supreme Court's statement in *Heller* that laws prohibiting firearm possession by the mentally ill are "presumptively lawful."[3] Even assuming, however, that some form of heightened

---

[2] *See* Law Center to Prevent Gun Violence, Gun Violence Statistics, *available at*: http://smartgunlaws.org/category/gun-studies-statistics/gun-violence-statistics.

[3] Supplemental Brief for Federal Appellees (Dkt. No. 62) at 8-10 (July 27, 2015).

scrutiny was appropriate here, the Panel still erred severely in its analysis and conclusions.

As an initial matter, strict scrutiny is not warranted whenever a law implicates a fundamental right. In the analogous area of First Amendment jurisprudence, for example, strict scrutiny is not uniformly applied, nor is there a "preference" for strict scrutiny, even though speech rights are fundamental. Similarly, in Second Amendment cases, no circuit has adopted a uniform level of review, and no other circuit has yet applied strict scrutiny. Rather, courts use a flexible approach that examines the nature of the challenged law. Using this analysis under similar circumstances, other courts have applied intermediate scrutiny, and the Panel should have done the same in this case.

On a more general level, there are several reasons why intermediate scrutiny is optimal in the Second Amendment context. First, the Second Amendment right is unique among other constitutional rights in that its exercise increases the risk of injury and death to self or others. Second, *Heller* and *McDonald* implicitly reject strict scrutiny. Third, empirical complexities in this area weigh in favor of a form of review that allows for greater judicial deference to the legislative branch. Finally, the Second Amendment's text and the tradition of firearm regulation in early America are both inconsistent with strict scrutiny.

For the foregoing reasons, this Court should reject the Panel's holding that strict scrutiny is the default level of review in Second Amendment cases, and should apply intermediate scrutiny to the present case.

## ARGUMENT

### I. STRICT SCRUTINY IS NOT AUTOMATICALLY APPLICABLE, OR EVEN "PREFERRED," SIMPLY BECAUSE THE SECOND AMENDMENT PROTECTS A FUNDAMENTAL RIGHT.

Assuming that some form of heightened scrutiny is warranted in this case, the mere fact that the Second Amendment protects a fundamental right is not sufficient to require strict scrutiny. As several courts have noted, "[s]trict scrutiny does not apply automatically any time an enumerated right is involved." *United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010); *see United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010) (same). The Panel spoke of a "presumption" in favor of strict scrutiny, *Tyler*, 775 F.3d at 326-27, but, to the contrary, the Supreme Court applies strict scrutiny to only a minority of enumerated rights, and, even then, only to rights arising from just two textual provisions within certain amendments.[4] For example, the Court does not apply strict scrutiny to cases that arise under the Third, Fourth, Sixth, Seventh, Eighth, Ninth, or Tenth

---

[4] *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 693-700 (Feb. 2007).

Amendments.[5] The highest level of review is instead reserved for First and Fifth Amendment cases, where even there it is only applied selectively.[6]

There is no "presumption" in favor of strict scrutiny. "The Court has not said, [] and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake." *Heller v. District of Columbia* (*"Heller II"*), 670 F.3d 1244, 1256 (D.C. Cir. 2011). Rather, the Supreme Court has recognized in many cases that the level of scrutiny invoked should depend on the extent that a fundamental right is burdened. *See United States v. Decastro*, 682 F.3d 160, 167 (2d Cir. 2012) ("[t]he weight of the burden matters in assessing the permissible bounds of regulation in other constitutional contexts . . . such as takings, abortion, and free speech."). The right to vote, for example, is fundamental, and yet the Court has stated that "the rigorousness of our inquiry into the propriety of a state election law *depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.*" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (emphasis added). Accordingly, fundamental rights, including those protected by the Second Amendment, do not call for the uniform application of strict scrutiny.

---

[5] *Id.* at 694.
[6] *Id.* at 694-696.

## A. Analogous First Amendment Precedent Provides a Roadmap for How to Determine the Appropriate Level of Review.

Circuit courts frequently reference First Amendment jurisprudence—which hardly employs a uniform approach to standards of review—in determining the appropriate level of scrutiny in Second Amendment cases. *See, e.g., Heller*, 554 U.S. at 582, 591-92, 595, 635; *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 91-92 (2d Cir. 2012); *Marzzarella*, 614 F.3d at 96. These courts have noted, for example, that content-based restrictions of noncommercial speech are subject to strict scrutiny, while laws regulating commercial speech are subject to a form of intermediate scrutiny. *See, e.g., Kachalsky*, 701 F.3d at 94. Likewise, "time, place, or manner" regulations on *any* speech need only be "reasonable" and "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation and internal quotation marks omitted). In other words, laws that do not heavily burden core protected speech do not warrant strict scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

The Second Amendment calls for a similarly nuanced approach, where the proper level of review depends on the nature of the law in question, rather than a categorical approach. *See, e.g., Chester*, 628 F.3d at 683. The *Heller* Court explained that the "core" protection of the Second Amendment is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S.

at 635. As a result, circuit courts draw a distinction between the "core" and

residual protections of the Second Amendment, and have held that strict scrutiny is

only appropriate where the law in question substantially burdens the core right.

*See, e.g., Decastro*, 682 F.3d at 166 (gathering circuit court cases adopting this

approach).

As in the First Amendment context, this approach appropriately calibrates

the level of review based on the contours of the challenged law. *Marzzarella*, 614

F.3d at 96-97 ("[T]he right to free speech, an undeniably enumerated fundamental

right . . . is susceptible to several standards of scrutiny, *depending upon the type of*

*law challenged and the type of speech at issue* . . . [w]e see no reason why the

Second Amendment would be any different.") (citation omitted) (emphasis added).

The Panel's blanket adoption of strict scrutiny, in contrast, was out of step with

well-established principles of constitutional jurisprudence, and also ignored several

critical legal arguments weighing in favor of intermediate scrutiny.

## II. INTERMEDIATE SCRUTINY IS THE MORE APPROPRIATE STANDARD OF REVIEW FOR SECOND AMENDMENT CASES.

There are several important arguments favoring intermediate scrutiny that

that courts should consider when choosing the appropriate level of review for

Second Amendment cases.

## A. Exercising Second Amendment Rights Increases the Risk of Injury or Death to Self or Others.

Unlike other fundamental rights, the Second Amendment right is unique in that its exercise creates a risk of physical harm to self or others.[7] Where such safety risks exist, a level of legislative oversight is warranted that is not consistent with strict scrutiny. As the Tenth Circuit recently explained, "[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test . . . which can be exercised *without creating a direct risk to others.*" *Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015) (emphasis added).

The uniform application of strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 539 (1997)—to all gun regulations could endanger important laws designed to promote public safety and prevent acts of violence. *See, e.g., United States v. Masciandaro*, 638 F.3d 458, 471 (2010). With more than 100,000 Americans killed or injured by guns

---

[7] Numerous empirical studies establish that a person's decision to possess a firearm in the home correlates with an increased risk of injury and death. *See, e.g.,* Garen J. Wintemute, *Guns, Fear, the Constitution, and the Public's Health*, 358 New Eng. J. Med. 1421-1424 (Apr. 3, 2008). There is a higher probability that a gun kept in the home will be used in a suicide or to kill or injure an innocent occupant than an illegal intruder. *See, supra,* n.2, Gun Violence Statistics.

each year,[8] firearm safety policies implicate serious public safety concerns that mitigate against strict scrutiny.

Intermediate scrutiny, in contrast, "appropriately places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Bonidy*, 790 F.3d at 1126.

## B. *Heller* and *McDonald* Implicitly Reject Strict Scrutiny.

Uniform application of strict scrutiny is particularly inappropriate since the *Heller* Court identified of categories of "presumptively lawful" firearm regulations. 554 U.S. at 626-27 & n.26. These categories, which include broad prohibitions on firearm possession for felons and—as relevant here—the mentally ill, *id.*, do not square with the notion that strict scrutiny is required by the Second Amendment, *id.* at 688 (Breyer, J., dissenting). In the words of Justice Breyer: "the majority implicitly, and appropriately, rejects [strict scrutiny] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear." *Id.* Justice Alito in *McDonald* was also careful to point out that "incorporation [of the Second Amendment] does not imperil every law regulating firearms." 561 U.S. at 786.

Strict scrutiny, however, demands a very narrow tailoring that is especially difficult to achieve in the context of public safety regulations. Since such laws are

---

[8] *Supra*, n.2, Gun Violence Statistics.

often necessarily over- or under-inclusive, there is a heightened risk that the uniform application of strict scrutiny to Second Amendment challenges will be strict in theory but fatal in fact—a result that could have deadly consequences.[9] *Masciandaro*, 638 F.3d at 471 (noting that strict scrutiny would likely have the effect of "handcuffing lawmakers' ability to prevent armed mayhem.") (citation and internal marks omitted). In contrast, intermediate scrutiny fits much more closely with the Court's assurances in both *Heller* and *McDonald* because it upholds the "presumptively lawful" categories of gun control.

### C. Complex Issues of Causation Regarding Specific Gun Safety Policies Justify Greater Judicial Deference in this Area.

Numerous studies show that comprehensive gun safety laws are effective in reducing overall rates of gun crime and violence;[10] however, proving direct

---

[9] Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control* (June 17, 2015) 92 WASH. U. L. REV., Forthcoming; Chapman Univ., Fowler Law Research Paper No. 15-05 (manuscript at 48) (hereafter, "Rosenthal"), *available at*: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2414681.

[10] Eric W. Fleegler, et al., *Firearm Legislation and Firearm-Related Fatalities in the United States*, JAMA INTERN. MED. (May 13, 2013);173(9):732-740, *available at*: http://archinte.jamanetwork.com/article.aspx?articleid=1661390; Law Center to Prevent Gun Violence, Gun Laws Matter 2012: Understanding the Link Between Weak Laws and Gun Violence (Nov. 14, 2012), *available at*: http://smartgunlaws.org/gun-laws-matter-2012-understanding-the-link-between-weak-laws-and-gun-violence; Mayors Against Illegal Guns, *Trace the Guns: The Link Between Gun Laws and Interstate Gun Trafficking* (Sept. 2010), *available at*: http://everytown.org/article/trace-the-guns.

causation—something likely required by strict scrutiny—is empirically fraught. As Professor Rosenthal explains, "given the myriad methodological difficulties in demonstrating the effect of any one regulation in isolation on crime rates," it would be difficult to "mount a convincing empirical demonstration that a *particular regulation* was narrowly tailored to achieve a compelling governmental interest."[11] A default strict scrutiny regime could threaten a number of individual policies that have been shown to be effective when employed collectively.

When faced with similar issues in other contexts, the Court has shown deference to legislative judgments. In *City of Cleburne v. Cleburne Living Ctr.*, for example, the Court found disability classification to be a "difficult and often [] technical matter," which was "very much a task for legislators guided by qualified professionals." 473 U.S. 432, 442-45 (1985). As a result, the Court concluded that disability classification necessitates "a certain amount of flexibility and freedom from judicial oversight." *Id.* Accordingly, the Court declined to apply any form of heightened review, let alone strict scrutiny.

As the Second Circuit has noted, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments." *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad.*, 512 U.S. at

---

[11] *See, supra*, n.9, Rosenthal at 48 (emphasis added).

665); *see also* J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253, 297 (April 2009) (addressing "the inability of courts to decide issues of gun policy.").[12]  Strict scrutiny is inappropriate for challenges to gun safety laws, where there is strong evidence that such laws save lives, but direct causation may be difficult to establish.

### D.    The Second Amendment's Text and the History of Early American Firearm Laws Are Inconsistent with Strict Scrutiny.

Unlike other enumerated constitutional rights, the Second Amendment is unique in its textual reference to a robust level of regulation that is inconsistent with strict scrutiny.  The preamble of the Amendment states that it is a *"well regulated* Militia" that is "necessary to the security of a free State."  U.S. Const., amend. II. (emphasis added).  In fact, "[t]he Second Amendment, read in light of its preamble, reflects a textual commitment to regulation found nowhere else in the Bill of Rights," and this "provides textual and originalist reasons to reject strict scrutiny."[13]

The post-ratification history of firearm regulation in early America lends further support for the general rejection of strict scrutiny.  As historians Saul Cornell and Nathan DeDino have noted, "[i]f one simply looks at the gun laws

---

[12] *See also, supra*, n.4, Winkler at 713.

[13] *See, supra*, n.9, Rosenthal at 45-48.

adopted in the Founding Era and early Republic . . . the evidence for robust regulation is extensive."[14] Historical research shows that "a variety of gun regulations were on the books . . . when the Second Amendment was adopted" and "the decades after ratification of the Second Amendment saw increased, not decreased, levels of regulation."[15] The adoption of strict scrutiny is not compatible with this history and tradition, or with the text of the Second Amendment itself.

## CONCLUSION

For all the foregoing reasons, this Court should reject the Panel's blanket adoption of strict scrutiny, and should analyze the present case using intermediate scrutiny as the proper level of review.

DATED:  August 17, 2015

_s/ Simon J. Frankel_
SIMON J. FRANKEL
REBECCA A. JACOBS
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: +1 415 591 6000
Fax: +1 415 591 6091

_Counsel for Amicus Curiae_

---

[14] _See generally_ Saul Cornell & Nathan DeDino, _A Well-Regulated Right: The Early American Origins of Gun Control_, 73 FORDHAM L. REV. 487, 505 (Nov. 2004). _See also_ Saul Cornell, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).

[15] _Supra_, n.14, Cornell & DeDino at 502-505.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B) because the brief is no more than half the length of the parties' supplemental briefs on rehearing *en banc*, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  August 17, 2015            COVINGTON & BURLING LLP

                                   By:  *s/ Rebecca A. Jacobs*
                                        REBECCA A. JACOBS

                                   Attorneys for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2015, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit via electronic mail.  The Clerk of the Court will provide service to all registered attorneys in the case.

Dated:  August 17, 2015          COVINGTON & BURLING LLP


By:   *s/ Rebecca A. Jacobs*
      REBECCA A. JACOBS

Attorneys for *Amicus Curiae*