Case No. 13-1876

---

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

---

CLIFFORD CHARLES TYLER,

      Plaintiff – Appellant,

v.

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, et al.,

      Defendants – Appellees.

---

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
Case No. 1:12-cv-00523

---

Brief of *Amici Curiae*

---

Ronda Cress (OH-0080570)
Michael Kirkman (OH-0009854)
Kristen Henry (OH-0082382)
Ohio Disability Rights Law & Policy Center, Inc.
Disability Rights Ohio
50 West Broad Street, Suite 1400
Columbus, Ohio 43215-5923
T: 614-466-7264
F: 614-644-1888
RCress@DisabilityRightsOhio.org
MKirkman@DisabilityRightsOhio.org
KHenry@DisabilityRightsOhio.org

*Counsel for Amici Curiae*
*Ohio Disability Rights Law & Policy Center, Inc.*
*Kentucky Protection & Advocacy*
*Disability Rights Tennessee*
*Ohio Empowerment Coalition*
*NAMI Ohio*

{00212552-10}

# DISCLOSURE OF CORPORATE AFFILIATIONS
# AND FINANCIAL INTEREST

Sixth Circuit
Case No.: 13-1876                                   *Tyler v. Hillsdale County Sheriff's*
*Department, et al.*

Pursuant to Fed. R. App. P. 26.1(a) and 29(c)(1), and 6 Cir. R. 26.1, *amici*

*curiae* Ohio Disability Rights Law and Policy Center, Kentucky Protection and

Advocacy, Disability Rights Tennessee, the Ohio Empowerment Coalition, and

NAMI Ohio make the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If

yes, list below the identity of the parent corporation or affiliate and the relationship

between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a

financial interest in the outcome? If yes, list the identity of such corporation and

the nature of the financial interest:

No.

s/ Ronda Cress
Ronda Cress (OH-0080570)
*Counsel for Amici Curiae*
*Ohio Disability Rights Law & Policy Center, Inc.*
*Kentucky Protection & Advocacy*
*Disability Rights Tennessee*
*Ohio Empowerment Coalition*
*NAMI Ohio*

# TABLE OF CONTENTS

Disclosure of Corporate Affiliations and Financial Interest....................................... i

Table of Contents ...................................................................................... ii

Table of Authorities ................................................................................... iii

Brief of *Amici Curiae*.................................................................................1

I.      Statement of Interest of *Amici Curiae* .........................................................1

II.     Background.................................................................................3

III.    Argument ....................................................................................4

      A.      Current research dispels the myths about mental illness relied upon by the Government. ...................................................................6

           1.      Persons with mental illness are a diverse group, many of whom recover or successfully function in society..............................6

           2.      Mental illness is not an accurate predictor for violence. ............7

      B.      Reliance upon U.S. Supreme Court *dicta* is misplaced. .....................11

IV.     Conclusion ................................................................................12

Certificate of Compliance .............................................................................A

Certificate of Service ................................................................................B

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)..................................................................... 2, 5, 11

*McDonald v. City of Chicago, Illinois*
   561 U.S. 742 (2010)..................................................................... 2, 5, 11

**Statutes**

18 U.S.C. § 922(g)(4).......................................................................... 3, 4, 5

18 U.S.C. § 925(c) .................................................................................3

**Other Authorities**

Allen, M.,
   *Separate and Unequal: The Struggle of Tenants with Mental Illness to Maintain Housing,* Nat'l Clearing House for Legal Services (1996)...................................10

Barry, C., *et al.,*
   *After Newtown–Public Opinion on Gun Policy and Mental Illness,* 368 New Eng. J. Med. 1077 (2013)...................................................................10

Bazelon Center for Mental Health Law & Policy,
   Policy Documents, available at:
   www.bazelon.org/Where-We-Stand/Community-Integration/Housing.aspx......10

Consortium for Risk-Based Firearm Policy,
   *Guns, Public Health and Mental Illness: An Evidence-based Approach for Federal Policy* (2013) ...................................................................10

Dr. Jeff Swanson,
   *Violence and Mental Illness: Finding the Haystack in a Needle,* available at https://www.youtube.com/watch?v=HNsiHaGmdno .............................................8

Elbogen, E.B. and Johnson, S.C.,
   *The Intricate Link Between Violence and Mental Disorder: Results from the National Epidemiologic Survey on Alcohol and Related Conditions,* 66 Arch. Gen. Psychiatry 152 (Feb. 2009) .........................................................8

*Gun Violence: Prediction, Prevention, and Policy,*
    APA Panel of Experts Report (2013).............................................. 10, 11

Harding, C. and Zahniser, J.,
    *Empirical Correction of Seven Myths About Schizophrenia with Implications for*
    *Treatment,* Area Psychiatric (1994) .......................................................7

Metzl, J. and MacLeish, K.,
    *Framing Health Matters: Mental Illness, Mass Shootings, and the Politics of*
    *American Firearms,* Am. J. of Public Health, Vol. 105:2, 240-249 (Feb. 2015).8,
    9, 10

Nat'l Council on Disability,
    *Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their*
    *Children,* available at
    http://www.ncd.gov/publications/2012/Sep272012/Ch1 ....................................10

SAMHSA, *Criminal and Juvenile Justice Overview,*
    available at http://www.samhsa.gov/criminal-juvenile-justice..............................7

Stuart, H.,
    *Violence and Mental Illness: An Overview,* 2(2) Journal of World Psychiatry 121
    (June 2003)...................................................................................9, 10

Swanson, J.W., *et al.,*
    *Mental Illness and Reduction of Gun Violence and Suicide: Bringing*
    *Epidemiologic Research to Policy,* Annals of Epidemiology 25, 366-376 (2015)
    ................................................................................................ 8, 9, 10

U.S. Dep't of Health & Human Serv., *Mental Health Myths and Facts,*
    available at www.mentalhealth.gov/basics/myths-facts/ .......................................7

U.S. Dep't of Justice,
    *Dep't of Justice Reaches Agreement with the Louisiana Supreme Court to*
    *Protect Bar Candidates with Disabilities* (2014), available at
    www.justice.gov/opa/pr/department-justice-reaches-agreement-louisiana-
    supreme-court-protect-bar-candidates .......................................................11

Van Dorn, R., *et al.,*
    *Mental Disorder and Violence: Is There a Relationship Beyond Substance Use?,*
    47 Social Psychiatry and Psychiatric Epidemiology 487 (2012)...........................8

Vinkers, D.J., *et al.*,
   *Proportion of Crimes Attributable to Mental Disorders in the Netherlands Population*, 11 World Psychiatry 2 (June 2012)....................................................8

**Rules**

Fed. R. App. P. 29 ..................................................................................................1

**BRIEF OF *AMICI CURIAE***

## I.    STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* Ohio Disability Rights Law and Policy Center, Inc. (d.b.a. Disability Rights Ohio), Disability Rights Tennessee and Kentucky Protection and Advocacy are designated as their respective states' protection and advocacy system under Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801-10807, 10821-10827. As such, they have considerable experience and expertise in disability rights and civil rights law, particularly with respect to persons with psychiatric and behavioral disabilities.

The Ohio Empowerment Coalition, Inc., (OEC) is a consumer-operated organization that consists of members statewide who are united to provide a platform for the voice of the people with mental illness, to support persons and groups working to transform systems, and to promote wellness, mental health recovery, and resiliency.  OEC envisions that all people whose lives have been affected by mental illness and addiction will live a meaningful life of wellness by implementing their choices in an accepting and supportive community.

---

[1] Pursuant to Fed. R. App. P. 29(a), (b), and (e), *amici* have filed this brief with a Motion for Leave to File. *Amici* obtained consent to file this brief from Appellant and the Government, but counsel for Appellee Hillsdale County Sheriff did not respond as of the time of filing. Pursuant to Fed. R. App. P. 29(c)(5), *amici* state that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than *amici*, their members, and their counsel contributed money that was intended to fund preparing or submitting the brief.

NAMI is the nation's largest grassroots mental health organization. NAMI Ohio is dedicated to improving the quality of life, dignity and respect for persons with serious mental illness and to offering support to their families and close friends.

*Amici* recognize that this case raises significant issues concerning the Second Amendment and federal gun control laws. At the same time, *amici* are particularly concerned about the arguments advanced by the federal government and other *amicus* that include misinformed, sweeping, and stereotypical generalizations about persons with mental illness, as well as erroneous assertions about the meaning of the U.S. Supreme Court's *dicta* in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010). If accepted, the arguments and language utilized by the government only will serve to further discrimination against an already heavily stigmatized and marginalized segment of our population. The *en banc* court need look no further than the original panel opinion, which also used some overly broad language regarding persons with mental illness as a whole, based on the *Heller* and *McDonald dicta*.

People with mental illness are not significantly more likely to commit violent crimes. In fact, as demonstrated in this brief, they are more likely to be victims of crimes. *Amici* welcome this opportunity to provide information about

the harmful effects of stigma and stereotyping of persons with mental illness, about the nature of mental illness and recovery, and to provide research and statistics about the actual likelihood of individuals who have been institutionalized or who have a mental illness to commit violent crimes.

## II. BACKGROUND

At issue in this case is whether the Gun Control Act of 1968 impermissibly violates the Second Amendment, as applied to Appellant Clifford Tyler, because it prohibits firearm possession by "any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution." 18 U.S.C. § 922(g)(4). Nearly 30 years ago, Mr. Tyler was committed to a mental institution during a bout of deep depression after a devastating and unexpected divorce.

Like many individuals with mental illness, Mr. Tyler recovered. Despite this fact, and the fact that he has had no subsequent institutionalizations, no other history of mental illness, and no criminal record or history of violence, he is permanently barred from possessing a firearm under the statute. Mr. Tyler filed this lawsuit because he has no other means to obtain relief from the prohibition against firearm possession.[2]

---

[2] Although the statute does provide for a relief mechanism under 18 U.S.C. § 925(c) whereby an individual can seek relief from the prohibition, Congress defunded the program in the early 1990's, rendering the relief mechanism inoperable. Panel Op., p.3. Congress later enacted a voluntary program to allow participating states to receive federal funds in exchange for implementing a relief-

The district court upheld the statute as applied to Mr. Tyler. It found that a person having a prior institutionalization does not fall within the scope of the Second Amendment right, but that even if the Second Amendment did extend to him, the statute survived intermediate scrutiny. Panel Op., Doc. 43-2 (Dec. 18, 2014), p.7. On appeal, a panel of this court reversed and remanded, finding that, under the strict scrutiny standard, application of § 922(g)(4)'s prior institutionalization provision to Mr. Tyler violated the Second Amendment because his ability to exercise his Second Amendment rights should not hinge upon whether his state of residence has chosen to participate in the relief program. Panel Op. p.33. This Court granted the federal government's request for *en banc* review and vacated the panel decision.

## III.    ARGUMENT

The Panel determined that a permanent ban on Appellant's ability to exercise his Second Amendment right based on a single, unrepeated event that occurred nearly three decades ago—without any avenue for relief—is not appropriately tailored to the Government's stated interest in protecting public safety and preventing suicide.[3] In arguing that the provision is narrowly tailored to

---

from-disabilities program similar to the defunded federal program.  Michigan, where Mr. Tyler resides, does not participate in the program.

[3] This brief does not dispute whether the Government has the requisite level of interest in protecting the public safety and preventing suicide to justify certain restrictions on gun ownership. Nor does this brief address whether someone who is

withstand the applicable level of scrutiny, the Government quickly shifts away from the sole provision at issue—prior commitment to a mental institution—to a focus on the entire "mentally ill" population in order to use the U.S. Supreme Court's *dicta* about the "mentally ill" in *Heller* and *McDonald* as a shield against *any* challenge to laws restricting the Second Amendment right of persons with mental illness. Gov't Supp. Brief, Doc. 62, p. 15. The Government goes on to state that a prior involuntary commitment is relevant "to the risk of current or future mental illness" and that, as it is impossible to predict future dangerousness, the ban for prior involuntary commitment was reasonable because it is a "highly probative objective indicator." Gov't Supp. Brief, pp. 18, 22, and 23. These are sweeping generalizations based on discriminatory stereotypes, and there is little to no factual support for these assertions.

The Panel, relying on the same Supreme Court *dicta*, also made some overbroad and erroneous statements concerning persons with mental illness. The Panel referenced the category of "the mentally ill" to distinguish the prior commitment provision of Section 922(g)(4) with the "adjudicated as a mental defective" provision. Panel Op., pp. 10, 16, 30. Even though the "adjudicated as a mental defective" provision was not at issue, the discussion of it by the Panel

---

currently involuntarily committed should be prohibited from possessing a firearm, since the standard for involuntary commitment typically requires a showing that someone is an imminent risk of danger to himself or others.

unnecessarily suggested that it was presumably constitutional. These arguments and statements are deeply troubling in their reliance on stereotypes about persons who have been institutionalized and persons with mental illness.

## A. Current research dispels the myths about mental illness relied upon by the Government.

Throughout the Government's argument and, in smaller part, the Panel's decision, references were made about "the mentally ill," as if persons with mental illness are a homogeneous group that can be lumped together and disposed of through generalization. Use of this overbroad terminology demonstrates a lack of understanding about persons with mental illness. Further, the broad assertion that firearm restrictions against "the mentally ill" are presumptively constitutional—without any analysis—is reflective of the popular, but inaccurate, assumption that all persons with mental illness are dangerous.

### 1. Persons with mental illness are a diverse group, many of whom recover or successfully function in society.

Mental health conditions are very common, with nearly one in five Americans experiencing a mental health concern at some point in their lives. Persons with mental illness are a heterogeneous group, and not all mental health conditions look the same. Some people have chronic, persistent mental health conditions. A very small percentage (5% or less) are living with a serious mental

illness like schizophrenia, bipolar disorder, or major depression.[4] Others experience episodic, temporary mental health concerns following a traumatic event like divorce, death of a loved one, natural disaster, or exposure to violence.

With treatment, many people recover and never experience another mental health concern throughout their lifetimes. Many more persons with chronic mental health issues successfully manage their mental health and maintain jobs, relationships, homes, and community involvement.[5] Over half to two-thirds of patients who have been institutionalized significantly improve or recover. Harding, C. and Zahniser, J., *Empirical Correction of Seven Myths About Schizophrenia with Implications for Treatment*, Area Psychiatric (1994), 140-146. Therefore, it is incorrect to presume that individuals who have been treated for a mental illness are negatively affected by that condition forever.

### 2. Mental illness is not an accurate predictor for violence.

Predicting the risk of violence–in anyone, regardless of mental illness–has proved elusive. Swanson, J.W., *et al.*, *Mental Illness and Reduction of Gun Violence and Suicide: Bringing Epidemiologic Research to Policy*, Annals of

---

[4] *See, generally*, U.S. Dep't of Health & Human Serv., *Mental Health Myths and Facts*, available at www.mentalhealth.gov/basics/myths-facts/; SAMHSA, *Criminal and Juvenile Justice Overview*, available at http://www.samhsa.gov/criminal-juvenile-justice.
[5] *Id.*

Epidemiology 25, 366-376 (2015), pp. 370-71.[6] Numerous reputable research studies conclude that mental illness, even serious mental illness, is not an accurate or effective predictor of violence, including gun violence. *Id.*; Elbogen, E.B. and Johnson, S.C., *The Intricate Link Between Violence and Mental Disorder: Results from the National Epidemiologic Survey on Alcohol and Related Conditions*, 66 Arch. Gen. Psychiatry 152, 157 (Feb. 2009); Vinkers, D.J., *et al.*, *Proportion of Crimes Attributable to Mental Disorders in the Netherlands Population*, 11 World Psychiatry 2, 134 (June 2012); Van Dorn, R., *et al.*, *Mental Disorder and Violence: Is There a Relationship Beyond Substance Use?*, 47 Social Psychiatry and Psychiatric Epidemiology 487, 499 (2012). In fact, the presence of mental illness alone poses no greater risk of violence than that of the general population and less than 3-5% of all crime in the U.S. is committed by a person with a mental illness. Swanson, p. 370; Elbogen and Johnson, p. 157; Metzl, J. and MacLeish, K., *Framing Health Matters: Mental Illness, Mass Shootings, and the Politics of American Firearms*, Am. J. of Public Health, Vol. 105:2, 240-249 (Feb. 2015), p. 241. The Government erroneously argues, without relevant citation, that prior institutionalization leads to an increase in the risk of current and future mental illness (whatever that means) and that it is a highly probative objective indicator

---

[6] For a cogent explanation of these findings, *see* Dr. Jeff Swanson on *Violence and Mental Illness: Finding the Haystack in a Needle*, available at https://www.youtube.com/watch?v=HNsiHaGmdno.

for dangerousness; in reality, a history of involuntary commitment does not correspond with an increased or continuing risk of violence after release in comparison with the general population. Swanson, p. 372.

These statistics hold true for gun violence, as well. Only about 4% of all violent crimes against others can be attributed to persons with a mental illness, and even these crimes are more likely attributable to the presence of other co-occurring risk factors, such as substance abuse. *Id.*, pp. 368, 372; Metzl and Macleish, p. 241. Thus, even if it were possible to predict and prevent all gun crimes committed against others by persons with mental illness, 96% of the more than 32,000 gun killings and 74,000 gun injuries would still occur each year. Swanson, pp. 368, 372.

Studies also have long shown that evidence-based risk factors, rather than mental health-status based factors, are linked to substantially higher risks of violence and are more predictive of violence. Evidence-based factors include demographic subgroups such as males, younger persons, persons of lower socioeconomic status, persons exposed to trauma or childhood victimization, and substance abusers, as well as certain behaviors, such as a history of violent or assaultive behavior, domestic violence, alcohol abuse, and drug abuse, irrespective of the presence of mental illness. *Id.*, pp. 368, 370; Stuart, H., *Violence and Mental Illness: An Overview*, 2(2) Journal of World Psychiatry 121, 122 (June 2003); *Gun*

*Violence: Prediction, Prevention, and Policy*, APA Panel of Experts Report

(2013), p. 18; Consortium for Risk-Based Firearm Policy, *Guns, Public Health and*

*Mental Illness: An Evidence-based Approach for Federal Policy*, (2013), pp. 2, 4-

5. Indeed, it is well-established that persons with mental illness are exponentially

more likely to be the victims of crime, rather than the perpetrators. Metzl and

Macleish, p. 242 (citation omitted); Stuart, pp. 122-23; Consortium Policy, pp.4-5

(citations omitted).

Nevertheless, negative perceptions about the dangerousness of persons with

mental illness persist. Swanson, pp. 367, 371 (citations omitted); Barry, C., *et al.,*

*After Newtown–Public Opinion on Gun Policy and Mental Illness*, 368 New Eng.

J. Med. 1077, 1080 (2013) (nearly 46% of respondents believe persons with mental

illness are "by far" more dangerous than others). Such negative perceptions and

stigma have serious effects on persons with mental illness. Persons with mental

illness frequently are discriminated against in housing,[7] employment,[8] parental

rights,[9] and professional licensing.[10] This deep and persistent social stigma

---

[7] *See, e.g.,* Allen, M., *Separate and Unequal: The Struggle of Tenants with Mental Illness to Maintain Housing*, Nat'l Clearing House for Legal Services (1996); Bazelon Center for Mental Health Law & Policy, policy documents, available at http://www.bazelon.org/Where-We-Stand/Community-Integration/Housing.aspx.
[8] *See, e.g.,* Stuart, H., *Mental Illness and Employment Discrimination*, Current Opinion in Psychiatry 19(5), (2006), 522-26.
[9] *See, e.g.,* Nat'l Council on Disability, *Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children*, available at http://www.ncd.gov/publications/2012/Sep272012/Ch1.

surrounding mental illness deters people from seeking diagnosis and treatment. APA Experts Report, p. 21.

## B.    Reliance upon U.S. Supreme Court *dicta* is misplaced.

In *Heller*, the Supreme Court determined that the Second Amendment right to bear arms was a fundamental right available to law-abiding, responsible citizens for defense of hearth and home. 554 U.S. at 595, 635. However, the Supreme Court also made clear that the right was not unlimited and that its decision should not be interpreted "to cast doubt upon longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626; *McDonald*, 561 U.S. at 786.

These statements were *dicta*, as neither the *Heller* nor *McDonald* cases concerned firearm restrictions for persons with mental illness. There certainly was no unpacking of the term "mental illness" to explain whether the Court meant every American who has a mental health diagnosis, or who is prescribed psychiatric medication, or who experiences depression following the death of a loved one and takes a common antidepressant, even those who successfully manage a chronic condition, or whether the Court only meant persons adjudicated as dangerous for a limited period of time. Thus, it is unknown what the Court meant by "the mentally ill" because the Court made only a passing reference in

---

[10] *See, e.g.*, U.S. Dep't of Justice, *Dep't of Justice Reaches Agreement with the Louisiana Supreme Court to Protect Bar Candidates with Disabilities* (2014), available at http://www.justice.gov/opa/pr/department-justice-reaches-agreement-louisiana-supreme-court-protect-bar-candidates.

*dicta* to support the main point it was making–that the right to bear arms was not absolute and could be limited in certain instances. The Government's attempt to rely on this *dicta* by lumping all persons with a mental illness into a single category and characterizing them as dangerous and more likely to commit gun violence is both irresponsible and inaccurate.

## IV.  CONCLUSION

The Government's arguments in this case are based on longstanding but incorrect stereotypical thinking about people with mental illness diagnoses. Even the Panel opinion relied to some degree on this type of thinking about people who have been so diagnosed. But a careful review of the available research shows that these conclusions are unwarranted. *Amici* urge the Court to avoid relying on discriminatory assumptions as it resolves the important issues in this case.

Respectfully submitted,

s/ Ronda Cress
Ronda Cress (OH-0080570)
Michael Kirkman (OH-0009854)
Kristen Henry (OH-0082382)
Ohio Disability Rights Law & Policy Center, Inc.
Disability Rights Ohio
50 West Broad Street, Suite 1400
Columbus, Ohio 43215-5923
T: 614-466-7264
F: 614-644-1888
RCress@DisabilityRightsOhio.org

*Counsel for Amici Curiae*

*Ohio Disability Rights Law & Policy Center, Inc.*
*Kentucky Protection & Advocacy*
*Disability Rights Tennessee*
*Ohio Empowerment Coalition*
*NAMI Ohio*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with this Court's length limitation because it contains **2812** words, excluding exempted parts of the brief. This brief also complies with this Court's typeface requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 21, 2015

Respectfully submitted,

s/ Ronda Cress
Ronda Cress (OH-0080570)
Ohio Disability Rights Law & Policy Center, Inc.
Disability Rights Ohio
50 West Broad Street, Suite 1400
Columbus, Ohio 43215-5923
T: 614-466-7264
F: 614-644-1888
RCress@DisabilityRightsOhio.org

*Counsel for Amici Curiae*
*Ohio Disability Rights Law & Policy Center, Inc.*
*Kentucky Protection & Advocacy*
*Disability Rights Tennessee*
*Ohio Empowerment Coalition*
*NAMI Ohio*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 21, 2015 a copy of the foregoing *Brief of Amici Curiae* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/ Ronda Cress
Ronda Cress
Ohio Disability Rights Law & Policy Center, Inc.