No. 13-1876

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### CLIFFORD CHARLES TYLER
**Plaintiff-Appellant**

v.

### HILLSDALE COUNTY SHERIF'S DEPARTMENT, ET AL.
**Defendants-Appellees**

On appeal from the United States District Court
for the Western District of Michigan
Honorable Gordon J. Quist
Civil Case No. 1:12-cv-00523

### BRIEF OF *AMICUS CURIAE*
### LAW PROJECT FOR PSYCHIATRIC RIGHTS
### IN SUPPORT OF PLAINTIFF-APPELLANT
### AND REVERSAL OF DISTRICT COURT

Wayne Ramsay
(Texas Bar No. 16512500)
P.O. Box 9100-277
1132 Main Street
Bandera, Texas 78003
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURES

Pursuant to 6th Circuit Rule 26.1, the Law Project for Psychiatric Rights makes the following disclosures:

1. Said party is not a subsidiary or affiliate of a publicly owned corporation.

2. There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

## INTEREST OF AMICUS CURIAE

The Law Project for Psychiatric Rights (psychrights.org) is a 501(c)(3) public interest law firm dedicated to opposing forced psychiatric drugging and involuntary electroshock and other oppressive psychiatric practices in the United States.

# TABLE OF CONTENTS

                                                            **Page**

Disclosure of Corporate Affiliations and Financial Interest    i

Interest of Amicus Curiae                                      i

Table of Contents                                             ii

Table of Authorities                                         iii - v

Argument

   1. Mental Illness is an Invalid Concept        1

   2. Psychiatric Diagnosis is Scientifically Invalid    5

Conclusion                                                   14

Certificate of Compliance                                    16

Certificate of Service                                       17

<h1 style="text-align:center">TABLE OF AUTHORITIES</h1>

**Statutes**                                                    **Page**
18 USC §922(g)(4)                                           pp. 1, 4, 5, 14


**Cases**

*Barefoot v. Estelle*, 463 U.S. 880 (1983)                      pp. 8-9

*Blocker v. United States*, 288 F.2d 853 (1961)                 p. 3

*Ezell v. City of Chicago*, 651 F.3d  684 (7th Cir 2011).

*U.S. v. B.H.*, 466 F.Supp.2d 1139 (N.D.Iowa 2006)              p. 1

*U.S. v. Hansel*, 474 F.2d 1120 (8th Cir. 1973)                 p. 1

*U.S. v. Greeno*, 679 F.3d 510 at 518 (6th Cir 2012)            p. 4

*U.S. v. Vertz*, 102 F.Supp. 787 (W.D.Mich 2000)               p. 1


**Other**

Appelbaum, Paul S.  & Jeffrey W. Swanson, Ph.D., "Gun Laws
and Mental Illness: How Sensible Are the Current Restrictions?"
*Psychiatric Services*, July 2010                              pp. 14, 15

Associated Press, "Deluged with information, jurors must decide
if theater shooter was legally sane during attack", July 13, 2015    p. 3

Breggin, Peter R., Coast-to-Coast AM, February 9, 2015          p. 3

Breggin, Peter R., *Psychiatric Drugs: Hazards to the Brain*
(Springer Publishing, New York 1983)                            p. 9

Breggin, Peter R., *Toxic Psychiatry* (St. Martin's Press, New York)    p. 3

*British Medical Journal*, "Concerns over accuracy of tools to
predict risk of repeat offending", published 24 July 2012, http://www.bmj.com/   p. 10

Coleman, Lee, *The Reign of Error—Psychiatry, Authority, and
Law* (Beacon Press, Boston, 1984)                               pp. 11 & 12

Copeland, William, et al., "Cumulative Prevalence of Psychiatric
Disorders by Young Adulthood: A Prospective Cohort Analysis
from the Great Smoky Mountain Study," *J Am Acad Child
Adolesc Psychiatry* 2011 March                                    pp. 4 & 5

Dawes, Robyn M., *House of Cards—Psychology and
Psychotherapy Built on Myth* (Free Press 1994)                    p. 9

Department of Defense – Defense Science Board Task Force,
 "Predicting Violent Behavior", August 2012                       p. 11

Dershowitz, Alan M., "The Psychiatrist's Power in Civil
Commitment: A Knife that Cuts Both Ways", *Psychology
Today*, February 1969                                             p. 9

Douglas, Kevin S., Kirk Heilbrun,, and Kento Yashuhara,
"Violence Risk Assessment: Core Controversies" in *Psychological
Science in the Courtroom—Consensus and Controversy*, edited by
Skeem, et al. (Guilford Press, New York 2009)                     p. 14

Eagleman, David *Incognito—The Secret Lives of the Brain*
(Pantheon Books 2011)                                             p. 12

Ennis, Bruce and Thomas R. Litwack, "Psychiatry and the
Presumption of Expertise: Flipping Coins in the Courtroom",
*California Law Review*, Vol. 62, Issue 3 (May 1974)              p. 12

Fisher, David J., Medical Director, Columbia Center for
Occupational & Forensic Psychiatry, "Violence and
Suicidal Tendencies," columbiaforensic.com                        p. 11

Frances, Allen, "Mass Murder Psychobabble Misses Gun
Policy Point", August 2, 2012, http://www.huffingtonpost.com/     p. 9

Frances, Allen, *Saving Normal—An Insider's Revolt Againt Out-of-
Control Psychiatric Diagnosis, DSM-5, Big Pharma, and the
Medicalization of Ordinary Life* (William Morrow/Harper
Collins 2013)                                                     pp. 5 & 7

Henry, Ray, "Judge says she did not involuntarily commit
theater gunman", July 27, 2015                                    p. 1

Insel, Tom, "Director's Blog: Transforming Diagnosis", April 29, 2013     p. 6

Stuart A. Kirk, et al., *Mad Science—Psychiatric Coercion, Diagnosis, and Drugs* (Transaction Publishers 2013)     p. 3

Linde, Paul R., *On the Front Line With an ER Psychiatrist* (University of California Press 2010)     p. 11

Neuman, Fredric, "Is It Possible to Predict Violent Behavior? Can a psychiatric examination predict, and prevent, a mass murder?" December 16, 2012     p. 12

Perline, Irvin H., and Jona Goldschmidt, J.D., Ph.D., *The Psychology and Law of Workplace Violence: A Handbook for Mental Health Professionals and Employers* (Charles C. Thomas, Publisher, Ltd., Springfield, IL)     p. 4

Pinel,Philippe, *A Treatise on Insanity* (Sheffield, London 1806)     p. 4

Roche, Philip Q., *The Criminal Mind* (Farrar, Straus and Cudahy 1958)     p. 2

Rosenhan, Daniel, *Science* magazine, "On Being Sane in Insane Places", Vol. 179, January 19, 1973     pp. 7 & 8

Silverberg, Herbert, "The Civil Commitment Process: Basic Considerations", in *Legal Rights of the Mentally Handicapped*, Practicing Law Institute 1973     p. 10

Steadman, Henry J., and Joseph J. Cocozza, "We Can't Predict Who Is Dangerous", *Psychology Today,* January 1975     p. 10

# ARGUMENT

## 1. MENTAL ILLNESS IS AN INVALID CONCEPT

The statutory firearms disability imposed by 18 USC §922(g)(4), which continues in force even after decades of successful living, makes the Government's position in this case unreasonable and untenable, on both Second Amendment and Equal Protection grounds, even assuming *arguendo* that mental illness is a valid concept. In the words of Carroll County Probate Judge Betty Cason, who is responsible for civil commitments in her county in Georgia, in 2015—

> Somebody may be depressed, they may have gone through, lost their jobs or whatever, and they can overcome that. You wouldn't want to earmark that person as somebody who is mentally ill for the rest of their life.[1]

However, 18 USC §922(g)(4) creates a lifetime firearms ban that does essentially that.

The 18 USC §922(g)(4) firearms ban applies to anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution". Two federal district courts have ruled that a finding of mental illness and involuntary commitment because of that mental illness is <u>not</u> an adjudication as a mental defective: *U.S. v. Vertz*, 102 F.Supp. 787 (W.D.Mich 2000) and *U.S. v. B.H.*, 466 F.Supp.2d 1139 (N.D.Iowa 2006), the latter relying on *U.S. v. Hansel*, 474 F.2d 1120 (8th Cir. 1973). This view was most clearly and succinctly stated in *Vertz:*

> The government contends that Vertz has been adjudicated mentally defective. The only adjudication the government has presented, however, is the 1988 adjudication by Probate Judge Luke Quinn that Vertz was a person requiring treatment because he is mentally ill. This adjudication is not sufficient to bring Vertz within the statute. The probate court made no finding that Vertz was a danger to himself or others or that he lacked the mental capacity to contract or manage his own affairs. Accordingly, the government has presented no evidence that Vertz ha been adjudicated mentally defective. [102 F.Supp.2d at 788]

---

1   Ray Henry, "Judge says she did not involuntarily commit theater gunman", July 27, 2015, http://bigstory.ap.org/article/5191180c4acd4fd7abbd507c05f3f485/judge-says-she-did-not-involuntarily-commit-theater-gunman

If *Vertz, B.H.* and *Hansel* are accepted as correct, the question in the present case becomes whether Plaintiff-Appellant Clifford Charles Tyler may be subjected to a lifetime ban on possessing a firearm (that moved in or affects interstate or foreign commerce) because he was "committed to a mental institution".

The prerequisites for commitment to a "mental institution" always include "mental illness." It is therefore relevant to point out that despite being an almost universally accepted concept, scientifically there is no "mental illness." Mental illness is a *social construct,* which is to say, something everyone believes in because everyone else believes in it. Mental illness is not a biological or even psychological fact but rather a term that expresses the speaker's *attitude* about a person. Said another way, a "diagnosis" of mental illness is a *value judgment* about a persons thinking or behavior. Philip Q. Roche, M.D., the prison psychiatrist at Eastern State Penitentiary in Philadelphia and winner of the American Psychiatric Association's Isaac Ray Award for outstanding contributions to forensic psychiatry and the psychiatric aspects of jurisprudence, in his book *The Criminal Mind* says this:

> As I have stated in an earlier chapter, in the natural world there is no such thing as mental disease or defect, but rather certain patterns of behavior to which, in a given social context, we apply certain names which enable us to talk about and to effect certain changes in the social relationships of those who exhibit them and to effect changes in the individuals themselves. At best, we are left to the imposition of purely arbitrary criteria in selecting such persons.[2]

Dr. Roche is quoted by Warren Burger, then a judge on the U.S. Court of Appeals for the District of Columbia, and later Chief Justice of the U.S. Supreme Court, in a concurring opinion in *Blocker v. United States*, 288 F.2d 853 (1961):

> We know also that psychiatrists are in disagreement on what is a "mental disease," and even whether there exists such a definable and classifiable condition. So distinguished an authority as Dr. Philip Q. Roche, author of *The Criminal Mind*, which received the Isaac Ray Award from the American Psychiatric Association, said as recently as 1958: "I will say there is neither such a thing as 'insanity' nor such a thing as 'mental disease.' These terms do

---

2  Philip Q. Roche, M.D., *The Criminal Mind* (Farrar, Straus and Cudahy 1958), p. 253

not identify entities having separate existence in themselves. ... The idea that mental illness *causes* one to commit a crime or that it produces a crime has an unmistakable lineage from demonology."[3]

Judge Berger goes on to say, "the term *disease* as applied to mental conditions should be dropped because it is misleading" and criticizes "The fallacy of judicial reliance on terms such as 'disease' or 'disorder'" as applied to mental or psychological states.[4]

In their book *Mad Science—Psychiatric Coercion, Diagnosis, and Drugs,* published in 2013, Stuart A. Kirk, D.S.W., Tomi Gomory, Ph.D., and David Cohen, Ph.D., say this:

> [W]e have argued, the existence of a *disease* of mental illness has never been established ... [T]ogether we've amassed over seventy-five years of teaching mental health courses in graduate schools of social work to thousands of students and practitioners ... [A]fter more than ten decades of determined research and the expenditure of untold sums, no one can verify that madness is a medical disease. ... [T]he emperor has no clothes ... [W]hile many people could use help for their distress or have their disturbance contained to preserve our peace of mind, there is no mental illness. [italics in original][5]

In 1991 in his book *Toxic Psychiatry*, psychiatrist Peter Breggin, M.D., says "there is no evidence that any of the common psychological or psychiatric disorders have a genetic or biological component."[6] On the Coast-to-Coast AM radio show on February 9, 2015, Dr. Breggin said—

> There is no known physical connection to any psychiatric disorder. There is no genetically determined cause. It's all drug company propaganda, because the pharmaceutical industry with its billions of [advertising] dollars, and the medical industry, thinks you're more likely to take drugs if you think you have a genetic or biological disease.

Additionally, there is reason to believe the concepts of "mental illness" and "mental disorder" today are far broader than what people thought of as "insanity" in

---

3   *Blocker v. U.S.*, 288 F.2d 853 (1961), http://openjurist.org/288/f2d/853

4   *Id.*, approvingly quoting Cavanagh, A Psychiatrist Looks At The Durham Decision, 5 Catholic U.L.Rev. 25, 28, 30 (1955), emphasis in original

5   Stuart A. Kirk, D.S.W., et al, *Mad Science—Psychiatric Coercion, Diagnosis, and Drugs* (Transaction Publishers 2013), pp. 195, 301, 302, 328.

6   Peter R. Breggin, M.D., *Toxic Psychiatry* (St. Martin's Press, New York), p. 291

1791 when the Second Amendment was ratified.[7]  This is relevant if the Second Amendment protects a "right as publicly understood when the Bill of Rights was ratified." *U.S. v. Greeno*, 679 F.3d 510 at 518 (6th Cir 2012, quoting *Ezell v. City of Chicago*, 651 F.3d  684, 702 (7th Cir 2011).  The modern view is  "[O]ne can be mentally ill without meeting the legal definition of insanity."[8]  For example, in one publicized case—

> A defense psychiatrist fielded more than 50 questions from jurors last week, about delusions, schizophrenia, mental illness and her methods for determining someone's sanity.  Merely having a mental illness, or suffering from delusional thinking, does not mean someone is insane, she said.[9]

Therefore, in the modern view, it is apparently possible to be mentally ill and sane at the same time.  Since "mental illness," not insanity, is the criteria for involuntary commitment in modern involuntary commitment statutes, people like Plaintiff-Appellant Clifford Charles Tyler have been (and others today continue to be) involuntarily committed and suffer loss of liberty and experience a lifetime of psychiatric stigma (exemplified by 18 USC §922(g)(4)) even though they were never "insane" at any time during their lives.  The Second Amendment does not by its terms make an exception for insane persons, but even if it is interpreted as doing so, it is reasonable to wonder if today's conception of "mental illness" that sometimes is thought to justify involuntary treatment in a "mental institution" does <u>not</u> equate with the concept of "insanity" when the Second Amendment was ratified in 1791.

The breadth of the *modern* conception of "mental illness" or "mental disorder" is illustrated by a study, the "Cumulative Prevalence of Psychiatric Disorders by Young

---

7  See, for example, Philippe Pinel, *A Treatise on Insanity* (Sheffield, London 1806), published 15 years after ratification of the Second Amendment, wherein the author uses the term "insanity" 112 times on or before page 50, but an electronic search of all 288 pages for the word "mental" failed to reveal even one use of the term "mental illness" or "mental disease."  "Mental disorders" appears five times, on pages xlvii, xxxv, 86, 239, and 259.  "Mental derangement" appears 24 times.

8  Irvin H. Perline, Ph.D., and Jona Goldschmidt, J.D., Ph.D., T*he Psychology and Law of Workplace Violence: A Handbook for Mental Health Professionals and Employers* (Charles C. Thomas, Publisher, Ltd., Springfield, IL), p. 209

9  Associated Press, "Deluged with information, jurors must decide if theater shooter was legally sane during attack", July 13, 2015, http://bigstory.ap.org/article/875c5ad2213b45cd8ba16ae129f26eb9/after-all-said-theater-shooting- trial-was-he-sane

Adulthood: A Prospective Cohort Analysis from the Great Smoky Mountain Study," published in 2011. Researchers "assessed 1420 participants … between ages 9 and 21 from 11 counties in southeastern US." They found that "By age 21, 61.1% of participants had met criteria for a well-specified psychiatric disorder. An additional 21.4% had met criteria for an NOS [Not Otherwise Specified] disorder only, increasing the total cumulative prevalence for any [psychiatric] disorder to 82.5%." This same study found the incidence of mental disorder prior to reaching the age of 21 in the general population studied was higher among males than females: 89.1%. These numbers speak for themselves. As the authors of the study state, "psychiatric illness is a nearly universal experience."[10] This study illustrates the fact that the modern conception of "mental illness" or "mental disorder" is so broad that today the vast majority of human beings qualify as mentally ill or disordered. It is unlikely those who ratified the Second Amendment had such an expansive view of insanity. Could those who ratified the Second Amendment have believed it applied to only about 11% (100% minus 89.1% = 10.9%) of male inhabitants? It is because of this "diagnostic inflation" that has occurred over time that one prominent psychiatrist published a book in 2013 titled *Saving Normal* (analogous to "Save the Whales"), complaining of "out-of-control psychiatric diagnosis" and "the medicalization of ordinary life" such as Plaintiff-Appellant Clifford Charles Tyler's perfectly normal and understandable grief when his wife divorced him.[11]

## 2. PSYCHIATRIC DIAGNOSIS IS SCIENTIFICALLY INVALID

The firearms ban imposed by 18 U.S.Code §922(g)(4), like involuntary psychiatric commitment, exists because of the belief psychiatric diagnosis is valid. Without

---

10 William Copeland, Ph.D., et al., "Cumulative Prevalence of Psychiatric Disorders by Young Adulthood: A Prospective Cohort Analysis from the Great Smoky Mountain Study," *J Am Acad Child Adolesc Psychiatry*. 2011 Mar; 50(3): 252–261, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3049293/
11 Allen Frances, M.D., *Saving Normal—An Insider's Revolt Againt Out-of-Control Psychiatric Diagnosis, DSM-5, Big Pharma, and the Medicalization of Ordinary Life* (William Morrow/Harper Collins 2013)

psychiatric diagnosis there would be no involuntary commitment, because all state commitment statutes make a psychiatrist's, or at least some physician's, or in some states a psychologist's, diagnosis of mental illness a prerequisite to commitment. However, psychiatric diagnosis has no validity, whether rendered by a psychologist, psychiatrist, or another type of physician. The Director of U S. National Institute of Mental Health (NIMH), Tom Insel, M.D., refutes the validity of modern psychiatric diagnosis in an article published on the NIMH web site on April 29, 2013. In this article, Dr. Insel criticizes the American Psychiatric Association's official psychiatric diagnosis manual, the _Diagnostic and Statistical Manual of Mental Disorders_, called the DSM:

> The strength of each of the editions of DSM has been 'reliability' — each edition has ensured that clinicians use the same terms in the same ways. The weakness is its lack of validity.[12]

In contrast with "reliability," which as Dr. Insel says is _agreement among observers_, validity means _truth_. "Reliability" (agreement among observers) doesn't matter if what is being done lacks validity (truth). In this article, Dr. Insel says that because diagnosis pursuant to the American Psychiatric Association's DSM is invalid, the "NIMH will be re-orienting its research away from DSM categories."[13] No less an authority than America's preeminent mental health government agency has rejected the American Psychiatric Association's system of diagnosis. This invalid system of diagnosis is the supposed justification for involuntary psychiatric treatment, including hospitalization, that under 18 USC §922(g)(4) triggers a lifetime firearm ban. Despite the scientific invalidity of the DSM, it remains the official and standard guidebook for all mental health professionals, not just psychiatrists but also other physicians, psychologists, marriage and family counselors, and licensed mental health counselors.

 Dr. Allen Frances, another heavyweight authority in psychiatry, also questions the

---

12 Tom Insel, M.D., "Director's Blog: Transforming Diagnosis", April 29, 2013, http://www.nimh.nih.gov/about/ director/ 2013/ transforming-diagnosis.shtml
13 _Id._

validity of psychiatric diagnosis. Dr. Frances is the psychiatrist who was Chairperson of the Task Force that created two editions of the American Psychiatric Association's DSM (DSM-IV in 1994 and DSM-IV-TR in 2000), making him probably the most influential psychiatrist in the World prior to the publication of DSM-5 in 2013. In his book *Saving Normal—An Insider's Revolt Against Out-of-Control Psychiatric Diagnosis, DSM-5, Big Pharma, and the Medicalization of Ordinary Life,* published in 2013, Dr. Frances decries "the tide of overdiagnosis" in psychiatry, "the widespread unconstitutional abuse of involuntary psychiatric hospitalization" in the USA, and "runaway diagnostic inflation that threatens normal and results in massive overtreatment with psychiatric medication."[14]

This overdiagnosis and overtreatment in psychiatry includes institutionalization. In the 1970s Stanford University psychology professor David Rosenhan and his colleagues published the results of their study in which Dr. Rosenhan and seven of his colleagues who had no history of or evidence of mental illness, called "pseudopatients" in the study, went to 12 different psychiatric hospitals on the East and West coasts of the U.S.A. as inpatients where they remained as long as 52 days. They found that no matter how normally they behaved they were not recognized as normal by the psychiatrists and other mental health professionals they came in contact with. Despite being normal, all were prescribed psychiatric drugs: "All told, the [eight] pseudopatients were administered nearly 2100 pills, including Elavil, Stelazine, Compazine, and Thorazine". This undermines the commonly held assumption that psychiatric drugs are given only to people who need them. When the results of this experiment were revealed to the psychiatrists and other staff members of another psychiatric hospital, they "doubted that such an error could occur at their hospital." Dr. Rosenhan said "The staff was informed that at some time during the following 3 months, one or more pseudopatients would attempt to be admitted into the psychiatric hospital." During that time the hospital staff

14 Allen Frances, M.D., *Saving Normal—An Insider's Revolt Againt Out-of-Control Psychiatric Diagnosis, DSM-5, Big Pharma, and the Medicalization of Ordinary Life* (William Morrow/Harper Collins 2013), pp. 74-76

identified "Forty-one patients...with high confidence, to be pseudopatients ... Twenty-three were considered suspect by at least one psychiatrist. ... Actually," said Dr. Rosenhan, "no genuine pseudopatient (at least not from my group) presented himself during this period." Dr. Rosenhan concluded the inability of psychiatrists and other mental health professionals to distinguish normal persons such as himself and his colleagues from true mental patients is "frightening." He said:

> How many people, one wonders, are sane but not recognized as such in our psychiatric institutions? How many have been needlessly stripped of their privileges of citizenship, from the right to vote and drive to that of handling their own accounts? How many have feigned insanity in order to avoid the criminal consequences of their behavior, and conversely, how many would rather stand trial than live interminably in a psychiatric hospital but are wrongly thought to be mentally ill? How many have been stigmatized by well-intentioned, but nevertheless erroneous, diagnoses?[15]

### Predicting Future Behavior

The facts in the instant case are that Plaintiff-Appellant Clifford Charles Tyler was involuntarily committed because he was thought to be at risk of suicide. He was, in other words, committed because of a prediction about his future behavior.

Prediction of future behavior, including by psychiatrists and psychologists, is so unreliable nothing should ever be done in a court of law because of these predictions. In *Barefoot v. Estelle*, 463 U.S. 880 at 921 (1983) three dissenting U.S. Supreme Court justices said this:

> The APA's [American Psychiatric Association's] best estimate is that two out of three predictions of long-term future violence made by psychiatrists are wrong. ... The APA also concludes, see APA Brief 9-16, as do researchers that have studied the issue, [Footnote 3/3] that psychiatrists simply have no expertise in predicting long-term future dangerousness.

Robyn M. Dawes, Ph.D., former professor of psychology and former head of the

---

15 Daniel Rosenhan, "On Being Sane in Insane Places", *Science* magazine, Vol. 179, January 19, 1973, pp. 250-258

psychology department at the University of Oregon, and former president of the Oregon Psychological Association, and professor in the Department of Social and Decision Sciences at Carnegie-Mellon University, says this in his book *House of Cards— Psychology and Psychotherapy Built on Myth*:

> I am angered when I see my former colleagues make bald assertions based on their "years of clinical experience" in settings of crucial importance to others' lives—such as commitment hearings, or in court hearings about custody arrangements, or about suspected child sexual abuse. ... An expert in a courtroom setting is supposed to be competent to present an opinion with reasonable certainty. But a mental health expert who expresses a confident opinion about the probable future behavior of a single individual (for example, to engage in violent acts) is by definition incompetent, because the research has demonstrated that neither a mental health expert nor anyone else can make such a prediction with accuracy sufficient to warrant much confidence.[16]

In an article published August 3, 2012, psychiatrist Allen Frances, M.D., says this:

> Psychiatry has no way to predict mass murder and no way to prevent it. Many mass murderers never see a mental health worker before going ballistic. Even those who do are as impossible to identify as needles in a large haystack. Violent thoughts are not uncommon among psychiatric patients, but vanishingly few will ever act on them. Future mass murderers are far too rare to be selected out of the crowd before the deed is done. Psychiatry ... strikes out in predicting or preventing violence.[17]

In his book *Psychiatric Drugs: Hazards to the Brain,* psychiatrist Peter Breggin says "there is a growing awareness in legal circles that psychiatrists are not able to predict dangerousness."[18]

In a *Psychology Today* magazine article, Harvard Law School professor Alan M. Dershowitz says—

> ...our research suggests that for every correct psychiatric prediction of violence, there are numerous erroneous predictions.[19]

16 Robyn M. Dawes, Ph.D., *House of Cards—Psychology and Psychotherapy Built on Myth* (Free Press 1994), p. viii
17 Allen Frances, M.D., "Mass Murder Psychobabble Misses Gun Policy Point", August 2, 2012,
   http://www.huffingtonpost.com/allen-frances/mass-murderer-psychobabbl_b_1733243.html
18 Peter R. Breggin, M.D., *Psychiatric Drugs: Hazards to the Brain* (Springer Publishing, New York 1983), p. 267
19 Alan M. Dershowitz, "The Psychiatrist's Power in Civil Commitment: A Knife that Cuts Both Ways", Psychology

The conclusion of Henry J. Steadman, Ph.D., acting director, and Joseph J. Cocozza, senior research scientist, at the Mental Health Research Unit of the New York State Department of Mental Hygiene, in 1975 was that because of involuntary civil commitment based on predictions of "dangerousness" by psychiatrists and psychologists, "as many as 20 harmless persons are incarcerated for every one who will commit a violent act."[20]

Herbert Silverberg, Director of the Patients Advocacy Project of the Public Defender Service at St. Elizabeth's Hospital, a psychiatric hospital in Washington, D.C., has said—

> Prediction of dangerousness is virtually impossible for psychiatrists ... what few studies there are seem to demonstrate the virtual inevitability of false-positive predictions.[21]

A study of "risk assessment instruments to predict violence and antisocial behavior in 73 samples involving 24,827 people" published in the *British Journal of Psychiatry* in 2012 found that—

> ...risk assessment tools produce high rates of false positives (individuals wrongly identified as being at high risk of repeat offending) ... Our review would suggest that risk assessment tools, in their current form, can only be used to roughly classify individuals at the group level, not to safely determine criminal prognosis in an individual case.[22]

A study by the Columbia Center for Occupational & Forensic Psychiatry found that—

> Psychiatrists cannot predict when or if a patient will actually commit suicide or homicide. Psychiatrists cannot PREDICT future harmful acts. [emphasis in original][23]

---

Today, February 1969, p. 43 at 47

20 Henry J. Steadman, Ph.D.,and Joseph J. Cocozzza, "We Can't Predict Who Is Dangerous", *Psychology Today*, January 1975, pp. 32 at 35

21 Herbert Silverberg, "The Civil Commitment Process: Basic Considerations", in *Legal Rights of the Mentally Handicapped*, Practicing Law Institute 1973, p. 103 at pp. 105-106)

22 *British Medical Journal*, "Concerns over accuracy of tools to predict risk of repeat offending", published 24 July 2012, http://www.bmj.com/press-releases/2012/07/24/concerns-over-accuracy-tools-predict-risk-repeat-offending

23 David J. Fisher, M.D., Medical Director, Columbia Center for Occupational & Forensic Psychiatry, "Violence and Suicidal Tendencies," http://www.columbiaforensic.com/violence.html, emphasis (caps) in original

After a U.S. Army psychiatrist, Major Nidal Malik Hasan, on November 5, 2009 shot and killed 13 people and injured at least 30, targeting fellow soldiers in uniform, at Fort Hood, a U.S. Army base near Kileen, Texas, the U.S. Department of Defense chartered a Defense Science Board Task Force to investigate ways to predict and prevent similar future occurrences. The Task Force's 104 page final report published in August 2012, titled "Predicting Violent Behavior", under the heading "Overall Conclusions" says "There is no effective formula for predicting violent behavior with any degree of accuracy."[24]

Emergency Room psychiatrist Paul R. Linde, M.D., makes the same point in his book *On the Front Line With an ER Psychiatrist*, published in 2010:

> Psychiatrists were now charged with a duty to maintain public safety, a responsibility more consistent with police powers than with medical ones. The task of a psychiatrist, which previously involved evaluating a person's need for treatment, had shifted suddenly to that of establishing "dangerousness criteria" and attempting to predict who might constitute a danger to self or a danger to others. ... At the same time, evolving judicial precedents more or less announced that psychiatrists should be able to foresee "preventable" acts of suicide or violence. It became our job to somehow keep those dangerous people locked up, preventing self-harm and mayhem. I refer to this as the crystal ball standard. ... It's still nearly impossible to predict suicides, assaults, or homicides—legal opinions to the contrary notwithstanding.[25]

In his book *The Reign of Error—Psychiatry, Authority, and Law*, psychiatrist Lee Coleman, M.D., says—

> For decades it was assumed that a psychiatrist could predict dangerous behavior at least as well as other doctors could prognosticate about medical illness. Finally, in the 1960s and 1970s, research studies demonstrated conclusively that psychiatric predictions of dangerousness were no better than **flipping a coin**. In fact, they were worse... [emphasis added][26]

Similarly, in his book *Incognito—The Secret Lives of the Brain*, Baylor College of

---

24 Department of Defense – Defense Science Board Task Force, "Predicting Violent Behavior", August 2012, http://www.acq.osd.mil/dsb/reports/PredictingViolentBehavior.pdf, p. 2
25 Paul R. Linde, M.D., *On the Front Line With an ER Psychiatrist* (University of California Press 2010), pp. 100-102
26 Lee Coleman, M.D, *The Reign of Error - Psychiatry, Authority, and Law* (Beacon Press, Boston, 1984), p. 6

Medicine neuroscientist David Eagleman recalls—

> Several years ago, researchers began to ask psychiatrists and parole board members how likely it was that individual sex offenders would relapse when let out of prison. Both the psychiatrists and the parole board members had experience with the criminals in question, as well as with hundreds before them—so predicting who was going to go straight and who would be coming back [to prison] was not difficult.
>
> Or wasn't it? The surprise outcome was that their guesses showed almost no correlation with the actual outcomes. The psychiatrists and parole board members had the predictive accuracy of **coin-flipping** [emphasis added].[27]

Courts making decisions based on psychiatrists' and psychologists' predictions of future human behavior was also compared with coin-flipping in a law journal article by attorney Bruce Ennis and psychology professor Thomas R. Litwack, "Psychiatry and the Presumption of Expertise: **Flipping Coins** in the Courtroom", *California Law Review*, Vol. 62, Issue 3 (May 1974; emphasis added).

In 2012, psychiatrist Fredric Neuman, M.D., Director of the Anxiety and Phobia Treatment Center in at White Plaines Hospital, White Plaines, New York, in an article titled "Is It Possible to Predict Violent Behavior? Can a psychiatric examination predict, and prevent, a mass murder?" concluded, "It is always possible to make a psychiatric diagnosis on everyone. … There are no measures that can be taken to prevent future violent behavior."[28]

In the final analysis, psychiatric diagnosis is so unreliable and invalid that any loss of rights because of psychiatric diagnosis or psychiatric prediction of a previously law-abiding person's future behavior violates the fundamental fairness that constitutes due process. For the same reason, psychiatric diagnosis can never provide a rational basis for differential treatment when a claim is brought alleging a violation of the Fourteenth Amendment's Equal Protection Clause—whether the right in question is the right to liberty, parental rights, Second Amendment rights, or any other rights.

---

27 David Eagleman, *Incognito - The Secret Lives of the Brain* (Pantheon Books 2011), p. 178
28 Fredric Neuman M.D., "Is It Possible to Predict Violent Behavior? Can a psychiatric examination predict, and prevent, a mass murder?" December 16, 2012, https://www.psychologytoday.com/blog/fighting-fear/201212/is-it-possible-predict-violent-behavior

Nevertheless, political leaders from President Barack Obama to many members of Congress and most candidates for President of the United States in the 2016 election, particularly now in the wake of the Umpqua Community College shooting in Roseburg, Oregon, on October 1, 2015, are heard demanding "reasonable gun control laws." Most of these proposals focus on taking guns away from "the mentally ill," assuming against all evidence (such as appears above) that mental illness is a valid concept, that psychiatrists can accurately identify who is "mentally ill" and who isn't, that psychiatrists can accurately determine who will commit acts of violence in the future, and that relying on mental health professionals to pick out and preventively incarcerate or disarm the bad guys will effectively protect the public from gun violence, mass murder, and mayhem. If these proposals find their way into law, they will violate the rights of those subjected to unscientific and invalid psychiatric diagnosis and prediction, and without protecting the public from violence, as will become apparent after a number of years—but before enough years have passed for that realization to be widespread, the rights of people psychiatrically "diagnosed" and accused of "dangerousness" despite a law-abiding past will be violated. It is the duty of courts to avoid becoming part of this hysteria and to uphold the Constitution, and the Constitutional rights of individuals, even when it is unpopular and difficult to do so.

Violence by people who were previously law-abiding but despite this were thought by a mental health professional to be "mentally ill" has never constituted even a significant minority of instances of violence. TV crime shows suggesting "mentally ill" people are dangerous may be entertaining, but they prove nothing and may create misleading stereotypes. Paul S. Appelbaum, M.D., professor of psychiatry at Columbia University, and Jeffrey W. Swanson, Ph.D., professor of psychiatry and behavioral sciences at Duke University, made these observations in 2010:

> But the net increment to public safety from restricting gun access by persons with mental illnesses is likely to be small. The best available national data suggest that only 3%-5% of violent acts are attributable to serious mental illness, and most of these acts do not involve guns. Most studies concur that the added risk of

violence, if any, conferred by the presence of a serious mental disorder is small. ... Thus, one might question whether the disproportionate emphasis on restricting firearms access by persons with mental disorders reflects sound public policy or is a manifestation of exaggerated public perceptions of the danger associated with mental illnesses. ... restrictions on persons with mental illnesses represent a drop in the bucket of crime prevention policy.[29]

Kevin S. Douglas, Ph.D., Associate Professor and Coordinator of the Law and Forensic Psychology Program in the Department of Psychology at Simon Fraser University in Vancouver, and Kirk Heilbrun, Ph.D., and Kento Yashuhara of the Department of Psychology at Drexel University in Philadelphia, summarize the relevant research:

> *Is Mental Illness a Risk Factor for Violence?*
> In many risk assessment contexts (particularly civil commitment), there is a question of whether a person's risk for violence is linked to his or her mental illness. Despite the presence of literally hundreds of studies that address this question, it remains unclear whether mental illness is indeed a risk factor for violence.[30]

Studies showing an association between mental illness and violence may confuse cause and effect: Perhaps people are not violent because they are mentally ill; perhaps they are called mentally ill because they are violent. Studies that fail to account for this are invalid and may be misleading.

## CONCLUSION

The *lifetime* firearm ban of 18 USC §922 (g)(4) because of his involuntary commitment in 1986—29 years ago, after almost three decades of living well—violates Plaintiff-Appellant Clifford Charles Tyler's Second Amendment right to purchase and possess a firearm. This remains true whatever level of scrutiny is applied. Because it does not take into account a person's *present* mental competence and responsibility, the *lifetime*

---

29 Paul S. Appelbaum, M.D. & Jeffrey W. Swanson, Ph.D., "Gun Laws and Mental Illness: How Sensible Are the Current Restrictions?", Psychiatric Services-ps.psychiatryonline.org, July 2010, pp. 652-654, http://michellawyers.com/wp-content/uploads/2011/05/Gun-Laws-and-Mental-Illness_How-Sensible-Are-the-Current-Restrictions.pdf
30 Kevin S. Douglas, Ph.D., Kirk Heilbrun, Ph.D., and Kento Yashuhara, "Violence Risk Assessment: Core Controversies" in *Psychological Science in the Courtroom - Consensus and Controversy*, edited by Skeem, et al. (Guilford Press, New York 2009) p. 333 at 347-348

firearm ban of 18 USC §922 (g)(4) cannot pass even a rational basis test. The lifetime firearm ban created by 18 USC §922 (g)(4) should be declared unconstitutional and unenforceable. *If* the case is remanded to the District Court, the only consideration should be whether Mr. Tyler's *past* behavior indicates he is likely to be a responsible gun owner. Requiring anybody to prove what his future behavior will be, other than by pointing to his past, is unreasonable for the same reasons loss of liberty or other rights based on psychiatrists' predictions of future behavior is unreasonable. There may be disagreement about the level of scrutiny that should be applied, but whatever level of scrutiny is decided upon, the unanimous opinion of the 3-judge panel that Mr. Tyler's Second Amendment right to possess a firearm is violated by 18 USC §922 (g)(4) should be adopted by the en banc Court.

DATED: October 9, 2015

                Respectfully submitted,


                s/Wayne Ramsay

                Wayne Ramsay
                (Texas Bar No. 16512500)
                P.O. Box 9100-277
                Bandera, Texas 78003
                (210) 362-0254
                wayneramsay@mail.com

                on behalf of
                The Law Project for Psychiatric Rights, PsychRights.org
                James B. Gottstein, President/CEO
                (Alaska Bar No. 7811100)
                406 G Street. Suite 206
                Anchorage, Alaska 99501
                (907) 274-7686
                jim.gottstein@psychrights.org

## CERTIFICATE OF COMPLIANCE

As counsel for *amicus curiae*, I certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c) that the foregoing brief is in 14-point, proportionally spaced Times New Roman font. According to the word processing program used to prepare this brief (Microsoft Word), the word count of the brief is 4,520 words, excluding the cover, disclosure statement, table of contents, table of authorities, certificate of service, and this certificate of compliance.

DATED: October 9, 2015

<div style="text-align:center">

s/Wayne Ramsay
WAYNE RAMSAY
Counsel for *Amicus Curiae*

</div>

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2015, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit via electronic mail. The Clerk of the Court will provide service to all registered attorneys in this case.

DATED: October 9, 2015

<div style="margin-left: 40%;">

s/Wayne Ramsay
Wayne Ramsay
counsel for *amicus curiae*

</div>